**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES GOLBERT, Acting Cook County Public Guardian, on behalf of Class Representatives Stephen W., Carrion C., Careale C., Jamya B., Charlie W., Joshua F., Erica C., Alana M., and Johnnise W., and Named Plaintiffs Skylar L., Issac D., Archie C., Burl F., Sterling B., and Tyrese B., on behalf of themselves and a class of others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | Case No: |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| BEVERLY J. WALKER, THE ESTATE OF GEORGE SHELDON, CYNTHIA TATE, BOBBIE GREGG, ARTHUR BISHOP, THE ESTATE OF RICHARD H. CALICA, ERWIN McEWEN, MICHAEL C. JONES, LAUREN WILLIAMS, SARI ROWITZ, JANE GANTNER, JILL TICHENOR, JULIANA HARMS, TONYA MAYS-HARRINGTON, LINDA STROUD, FELICIA GUEST, MARSHAE TERRY, THERESA MATTHEWS, ANGELA HASSELL, DONNA STEELE, LARRY SMALL, D. JEAN ORTEGA-PIRON, DEBRA DYER-WEBSTER, JANET AHERN, and the Illinois Department of Children and Family Services, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## **COMPLAINT**

PLAINTIFF CHARLES GOLBERT, Acting Cook County Public Guardian, by and

through his attorneys, LOEVY & LOEVY, and on behalf of class representatives Stephen W.,

1

Carrion C., Careale C., Jamya B., Charlie W., Joshua F., Erica C., Alana M., and Johnnise W., and a class of other children similarly situated, and named Plaintiffs Skylar L., Issac D., Archie C., Burl F., Sterling B., and Tyrese B., complain of Defendants BEVERLY J WALKER, THE ESTATE OF GEORGE SHELDON, CYNTHIA TATE, BOBBIE GREGG, ARTHUR BISHOP, THE ESTATE OF RICHARD H. CALICA, ERWIN McEWEN, MICHAEL C. JONES, LAUREN WILLIAMS, SARI ROWITZ, JANE GANTNER, JILL TICHENOR, JULIANA HARMS, TONYA MAYS-HARRINGTON, LINDA STROUD, FELICIA GUEST, MARSHAE TERRY, THERESA MATTHEWS, ANGELA HASSELL, DONNA STEELE, LARRY SMALL, D. JEAN ORTEGA-PIRON, DEBRA DYER-WEBSTER, JANET AHERN and the Illinois Department of Children and Family Services, and state as follows:

## Introduction

1.      This is an action pursuant to 42 U.S.C. § 1983 challenging the unconstitutionality of policies and practices promulgated by the Defendants acting within the Illinois Department of Children and Family Services ("DCFS") that directly and negatively impact children who are held in psychiatric hospitals long past the time that their treatment required them to be confined.

2.      The problem is straightforward. Each of the child class members was in DCFS's care and required psychiatric hospitalization. Upon being medically cleared for discharge, instead of going to an appropriate facility, the Defendants forced the children to remain in locked psychiatric wards, causing immense harm. This unconstitutional practice is referred to as holding children beyond medical necessity, or "BMN."

3.      The Constitution requires that the Defendants, as responsible state officials entrusted with the care of vulnerable children, ensure that those same children are not locked in

mental hospitals unnecessarily. This is particularly important because nearly every child who is in the care and custody of DCFS has experienced significant trauma in his or her life.

4.     The effects of holding children BMN are heartbreaking at an individual level and staggering when multiplied among all the children who have been subjected to the practice. Simply put, holding a child BMN is inhumane. Being unnecessarily locked in a psychiatric hospital undermines – even eliminates – the precious stability that children formed during their admission. Children in psychiatric hospitals receive no formal schooling. They are locked indoors every day. Their ability to visit with siblings and family members is drastically curtailed. And psychiatric facilities can be dangerous, particularly for vulnerable children, when other patients express psychiatric and behavior disorders.

5.     By way of one example, class representative Alana M. entered DCFS care after her adoptive mother passed away and her adoptive grandmother, who passed away shortly after, was too ill to care for her. Alana was hospitalized for depression when she was 13 years old. The post-hospitalization plan was for Alana to live with her sister in Indiana, but by the time the placement was approved, Alana had been held BMN for four and a half months. Alana's doctors found that because of her prolonged BMN stay, she now required placement in a residential facility, rather than being able to live with her sister.

6.     Defendants have known about this practice since at least 1988 when the issue of holding children BMN was raised in *BH v. Johnson* (Case No. 88 C 5599, N.D. Ill.). The problem has remained so widespread and unnecessary that in 2015 the Illinois State Legislature directed DCFS to track the children who were being held BMN.

7.     Despite tracking the children held BMN, and thereby having direct knowledge of the prevalence of the problem and the severity of its effects, Defendants have done absolutely nothing to end the practice.

8.     Adding to the problem is that DCFS pretends it is saving taxpayer dollars by cutting funding for residential and group home care – placements that are desperately needed by children being held BMN. But the reality is that detaining children BMN is extraordinarily expensive, leaving Illinois taxpayers to spend millions of dollars on an unconstitutional practice.

9.     Thus, DCFS reaps a false public relations benefit on the backs of the children it is charged to protect, while wasting millions of dollars on a practice that undeniably hurts kids.

10.     Accordingly, Plaintiff, on behalf of class representatives Stephen W., Carrion C., Careale C., Jamya B., Charlie W., Joshua F., Erica C., Alana M., and Johnnise W., and a class of other children similarly situated, and Skylar L., Issac D., Archie C., Burl F., Sterling B., and Tyrese B., seek damages from Defendants in hopes that this lawsuit will once and for all prevent more children from suffering under the inhumane practice of BMN.

## Jurisdiction and Venue

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claim arises out of the same facts as the federal claims. Venue is proper under 28 U.S.C. § 1391(b) as on information and belief Defendants BEVERLY J. WALKER, THE ESTATE OF GEORGE SHELDON, CYNTHIA TATE, BOBBIE GREGG, ARTHUR BISHOP, THE ESTATE OF RICHARD H. CALICA, ERWIN McEWEN, MICHAEL C. JONES, LAUREN WILLIAMS, SARI ROWITZ, JANE GANTNER, JILL TICHENOR, JULIANA HARMS, TONYA MAYS-HARRINGTON, LINDA STROUD, FELICIA GUEST, MARSHAE TERRY, THERESA MATTHEWS,

4

ANGELA HASSELL, DONNA STEELE, LARRY SMALL, D. JEAN ORTEGA-PIRON, DEBRA DYER-WEBSTER, JANET AHERN and the ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES, are physically situated in this judicial district, and a substantial part of the events giving rise to the claims occurred here.

**Parties**

12.     Named Plaintiff CHARLES GOLBERT is the Acting Cook County Public Guardian. By orders of the Chief Judge of the Cook County Circuit Court and the Presiding Judge of the Juvenile Justice and Child Protection Division of the Circuit Court (Juvenile Court), Mr. Golbert is appointed attorney and guardian *ad litem* for the children who are the subjects of abuse, neglect, and dependency petitions filed in Juvenile Court. Mr. Golbert has extensive experience in child welfare and civil rights litigation. The Acting Public Guardian brings this suit as next friend on behalf of his child clients.

13.     Class representative Stephen W. is a minor in the custody of DCFS. Stephen first entered DCFS custody after suffering physical abuse as a toddler and was eventually adopted. He later returned to DCFS care on two separate occasions as a result of his mental health needs. In 2014, Stephen, then 12 years old, was detained BMN on two separate occasions and spent a total of five months unnecessarily detained. In 2017, Stephen was again detained BMN for five months, spending his 16th birthday unnecessarily locked inside a psychiatric ward.

14.     Class representative Carrion C. is a minor in the custody of Illinois DCFS. In 2018, at only seven years old, Carrion was detained BMN for over a month in a psychiatric hospital. Carrion has significant cognitive limitations and was unable to access school, recreational activities, or play and trauma-based therapy during the length of his BMN hospitalization.

15.     Class representative Careale C. is a minor in the custody of Illinois DCFS. Careale was detained BMN for over a month in 2018 when he was just eight years old. Like his brother Carrion C., Careale suffers from significant cognitive limitations and was denied the services and therapy that he required during the length of his BMN detention.

16.     Class representative Jamya B. is a minor in the custody of Illinois DCFS. Jamya came into DCFS care as a result of physical abuse. At just 11 years old, Jamya was held BMN for about four months, including the entire summer of 2018. Jamya has been diagnosed as having Reactive Attachment Disorder and, as a result, has a heightened need for predictable long-term relationships, which extended hospital stays necessarily disrupt.

17.     Class representative Charlie W. is a minor in the custody of Illinois DCFS. Charlie is a nine-year-old boy who entered DCFS care as a result of physical abuse. At that time, Charlie was noted to be educationally at-risk with possible speech difficulties. He was held BMN for two months in 2015, when he was just five years old, only leaving the hospital after a judicial order was entered requiring his discharge. During his hospitalization, Charlie was unable to access necessary developmental intervention, special education services, or meaningful therapy.

18.     Class representative Joshua F. is a minor in the custody of Illinois DCFS. Joshua is now 12 years old and entered DCFS care after spending the first several years of his life being physically and emotionally abused by his mentally ill mother. Upon being brought into DCFS care at age eight, he was immediately hospitalized and then held BMN for nearly two months, including Christmas and New Year's Day.

19.     Class representative Erica C. is a minor in the custody of Illinois DCFS. Now 16 years old, Erica came into DCFS care just before her tenth birthday as a result of her own long history of mental illness that her family could no longer manage. In 2014, at the age of 12, Erica

was psychiatrically hospitalized and held BMN for over one month including Thanksgiving and Christmas.

20.     Class representative Alana M. is a minor in the custody of Illinois DCFS. She entered DCFS custody when was 13 years old and her adoptive mother died, causing her to become depressed and need hospitalization, and her adoptive grandmother was too ill to care for her upon her expected release. At the time DCFS assumed temporary custody of her, Alana was still hospitalized for depression and suicidal ideation. While in DCFS custody, she was held BMN for over four months in 2015, including her 14th birthday. As a result of being held BMN, Alana decompensated to the point that she could no longer be placed with her sister as planned, but instead was housed in a residential placement, and finally a specialized foster home.

21.     Class representative Johnnise W. is a minor in the custody of Illinois DCFS. Johnnise entered DCFS custody due to her biological mother's drug addiction and mental illnesses. At the tender age of eight years old, Johnnise was hospitalized and detained BMN for a total of 89 days in 2010. She experienced anxiety relating to the lack of services and instability that accompanied the prolonged detention.

22.     At all times relevant to the events in this Complaint, named Plaintiff Skylar L. was a minor in the custody of Illinois DCFS. Skylar was held BMN for a total of 79 days in 2015. Despite stabilizing psychiatrically, she was unable to go outside for the entire length of her BMN detainment, which included her 16th birthday. She lost valuable time at school. She was discharged to an inappropriate group placement, from which she ran away, until finally being placed in an appropriate residential treatment center where she was able to stabilize and re-start her education. Skylar L. currently resides in Des Plaines, Illinois.

23.     At all times relevant to the events in this Complaint, named Plaintiff Issac D. was a minor in the custody of Illinois DCFS. Issac entered DCFS custody after experiencing emotional and physical abuse by his biological parents. In 2012, at the age of 12, Issac was psychiatrically hospitalized and then confined BMN for over three months, including his 13th birthday. During that period he was unable to go outside, had only one visit from a family member and, as a result, had significant difficulties coping during his prolonged hospitalization. Issac D. resides in Chicago, Illinois.

24.     At all times relevant to the events in this Complaint, named Plaintiff Archie C. was a minor in the custody of Illinois DCFS. Archie entered DCFS care in 2007 after experiencing violence and neglect in his biological parent's home. At age 11 he was hospitalized and held BMN for over two months. Archie C. currently resides in Chicago, Illinois.

25.     At all times relevant to the events in this Complaint, named Plaintiff Burl F. was a minor in the custody of Illinois DCFS. Burl entered the custody of DCFS after experiencing extreme abuse by his biological father. In 2008, when he was only nine years old, he was held BMN for nearly two months, including his tenth birthday. Burl F. currently resides in Calumet City, Illinois.

26.     At all times relevant to the events in this Complaint, named Plaintiff Sterling B. was a minor in the custody of Illinois DCFS. Sterling entered DCFS care after suffering abuse and neglect, resulting in the need for residential treatment. Sterling was held BMN for a total of 26 days in 2014 when he was just 13 years old. During his hospitalization, Sterling was physically attacked by another patient on at least one occasion. Sterling B. currently resides in Chicago, Illinois.

27.     At all times relevant to the events in this Complaint, named Plaintiff Tyrese B. was a minor in the custody of Illinois DCFS. Tyrese entered DCFS care after witnessing and experiencing extreme physical violence in his home. Tyrese was only nine years old at the time of his hospitalization in 2009 and was held BMN for over one month, including his tenth birthday. He experienced trauma related to his isolation during his time held BMN. Tyrese B. currently resides in Chicago, Illinois.

28.     Defendants BEVERLY J. WALKER, GEORGE SHELDON (for whose actions DEFENDANT ESTATE OF GEORGE SHELDON IS LIABLE), CYNTHIA TATE, BOBBIE GREGG, ARTHUR BISHOP, RICHARD H. CALICA (for whose actions DEFENDANT ESTATE OF RICHARD H. CALICA is liable), and ERWIN McEWEN, each served as either the Acting Director or Directors of DCFS at various points during the class period. The DCFS Director is responsible for ensuring that all programs comply with state and federal law and the Constitution. The DCFS Director must ensure that all children in DCFS custody or under its guardianship are safe, appropriately placed, and receive appropriate and timely care and treatment. These Defendants acted under color of law and within the scope of their employment at all times relevant to the allegations in the Complaint.

29.     Defendants MICHAEL C. JONES and LAUREN WILLIAMS each supervised DCFS's Central Matching Unit at various points during the class period. As supervisor of the Central Matching Unit, each was responsible for ensuring that every child had a therapeutically appropriate placement upon discharge from a psychiatric hospital. These Defendants acted under color of law and within the scope of their employment at all times relevant to the allegations in the Complaint.

30.     Defendants LINDA STROUD and FELICIA GUEST each headed DCFS's Psychiatric Hospitalization Project at various points during the class period. In that capacity, each was responsible for monitoring every child held BMN and ensuring that these children were discharged from the hospital as soon as hospitalization was no longer therapeutically necessary. These Defendants acted under color of law and within the scope of their employment at all times relevant to the allegations in the Complaint.

31.     Defendants JANE GANTNER, CYNTHIA TATE, and LARRY SMALL each served as Deputy Director of Clinical Practice for DCFS at various points during the class period. As Deputy Director of Clinical Practice, each was responsible for ensuring that every child being held BMN had an appropriate placement to be discharged to upon conclusion of his or her treatment in a psychiatric hospital. These Defendants acted under color of law and within the scope of their employment at all times relevant to the allegations in the Complaint.

32.     Defendant MICHAEL C. JONES also serves as the current Senior Deputy Director for Clinical and Child Services. In that role he supervises both the Central Matching Unit and the Clinical Practice. This Defendant acted under color of law and within the scope of his employment at all times relevant to the allegations in the Complaint.

33.     Defendants SARI ROWITZ, JILL TICHENOR, JULIANA HARMS, TONYA MAYS-HARRINGTON, MARSHAE TERRY, THERESA MATTHEWS, ANGELA HASSELL, and DONNA STEELE attended weekly meetings to monitor every child held BMN at various during the class period. As a result, each of these Defendants had the ability and the responsibility to ensure that children being held BMN were immediately provided appropriate placements outside a psychiatric hospital, but failed to do so. These Defendants acted under color

10

of law and within the scope of their employment at all times relevant to the allegations in the Complaint.

34.     Defendants D. JEAN ORTEGA-PIRON, DEBRA DYER-WEBSTER, and JANET AHERN each served as DCFS Guardianship Administrator for class members at various points during the class period. As DCFS Guardianship Administrator, each was responsible for ensuring that each child received a placement in the least restrictive environment available, including placements outside of a psychiatric hospital once a child began being held BMN. These Defendants acted under color of law and within the scope of their employment at all times relevant to the allegations in the Complaint.

35.     DCFS is an Illinois State Agency that receives both state and federal funding. The Children and Family Services Act (20 ILCS 505/7) mandates that DCFS place each of the children in its care in safe and adequate placements consistent with each child's health, safety and best interests.

36.     The named Plaintiffs, other than Mr. Golbert, bring this class action on their own behalf and on behalf of all other similarly situated individuals.

37.     The Plaintiff class consists of all children who are subject to abuse, neglect or dependency petitions filed in the Circuit Court of Cook County, who have been placed in the custody or guardianship of DCFS, and who were placed in a psychiatric hospital BMN for a week or longer during the class period, as further described below.

**Background on DCFS and the Practice of BMN**

38.     Illinois's Department of Children and Family Services is the state agency designated to administer and supervise the administration of child welfare services.

Approximately one-third of its annual budget is obtained from federal funds, primarily through Title IV-E of the Social Security Act, which matches money for state spending on foster care.

39.     DCFS assumes responsibility for the placement and care of a child after a court has determined there is sufficient evidence that the child is abused, neglected, or otherwise dependent on the State for care. Based on Illinois law, DCFS then has the responsibility to house each child in the least restrictive (most family like) setting that is in the child's best interest.

40.     On occasion, some of the children in DCFS's care manifest acute psychiatric symptoms that require inpatient care at a psychiatric hospital.

41.     When necessary, a child in the care of DCFS may be admitted to a psychiatric hospital. Once admitted, hospital staff endeavor to stabilize the child while developing a discharge plan that involves managing medication and initiating or continuing treatment on an outpatient basis. Children who are psychiatrically hospitalized are only meant to stay in the hospital so long as it takes them to be stabilized. In other words, psychiatric hospitals are meant to be short-term crisis centers, not long-term treatment facilities. Children should be released once they are stabilized and appropriate follow-up treatment plans are in place.

42.     Instead, since as far back as at least 1988, a disturbing practice came to the Director's attention, and to every Director Defendant to serve thereafter (and to the attention of every Defendant): children were being locked in psychiatric wards long after they should have been discharged.

43.     For decades, the Public Guardian has been rallying against the inhumane practice of holding children BMN in psychiatric hospitals.

44.      The issue has been raised in court filings, correspondence, treatment plans, and even by the Legislature. Nevertheless, the problem continues unabated.

45.     In 1988, a class of children in DCFS custody filed suit in a case captioned *BH v. Johnson* (Case No. 88 C 5599, N.D. Ill.) seeking injunctive relief. Among other allegations, the children complained that they were being housed in psychiatric hospitals BMN.

46.     Over the ensuing decades, numerous court filings have sought to bring attention to and address the fact that numerous children in DCFS custody are regularly held BMN.

47.     Eventually, this Court entered a consent decree requiring DCFS to ensure that children are not hospitalized "longer than is clinically necessary."

48.     Sadly, that decree has been routinely ignored for many children over the ensuing decades, including for every single class member, rendering it not worth the paper upon which it was written.

49.     Over the years the BMN problem has grown, and each of the Defendants knew it. Nevertheless, each Defendant failed to act to stop the practice, despite having the opportunity to do so.

50.      The Public Guardian's Office has continued to raise the BMN issue with DCFS over the ensuing years. By way of example, in 2006 the Public Guardian authored a Placement Study Report, which described how children were being held BMN and requested, with urgency, that DCFS increase placement capacity, particularly in the areas of residential and specialized foster care.

51.     Six months later, the Office of the Public Guardian wrote again, detailing the case of a child who was held BMN for over four months and calling for a specific placement plan to be implemented.

52.    On November 10, 2008, the Office of the Public Guardian wrote Judge Grady of

this Court (copying Defendant McEwen and several DCFS personnel on the letter) and detailed

the exact same problem Plaintiffs complain of here:

> Eleven-year-old Wayne is one example of the problem. Wayne
> was psychiatrically hospitalized for two and a half months beyond
> medical necessity because DCFS did not have a bed for him in a
> residential treatment facility (RTC). While Wayne was
> hospitalized, he was not allowed to attend school or go outside; he
> never left the hospital property. **Wayne's psychiatrist told DCFS
> that leaving Wayne at the hospital longer than necessary was
> just like leaving him in prison**

(emphasis added).

53.    The letter went on to discuss other children being held BMN, including 15-year-

old Tammy (72 days):

> No friends or family members visited Tammy at the hospital. When
> Tammy formed strong emotional bonds with the staff members assigned
> to care for her, she was moved to another unit because the hospital
> determined that this bonding was detrimental to the entire unit.

54.    That same letter discussed Mia, who she celebrated her 18th birthday while being

held BMN:

> She was unable to go outside or to attend the church where [she] is a youth
> pastor. Hospital rules denied Mia, an avid musician, access to her electric
> piano. … When she turned 18, the hospital moved her from the juvenile
> ward to the adult ward. While in the adult ward, Mia lived primarily with
> severely mentally ill male patients.

55.    According to the letter, the facility where Mia was held BMN was extremely

dangerous – in the three years preceding July 2008, at least ten mentally disabled children had

been assaulted.

56.    That same letter described 15-year-old Nancy being held BMN for over a month.

57. The letter provided the results of a two-year study conducted by the Office of the Public Guardian, revealing that children who needed a higher level of care had to wait an average of nearly three months for an appropriate placement.

58. The Office of the Public Guardian wrote Defendant Director McEwen on December 17, 2008 demanding the immediate release of 14-year-old Nicole, who had been held BMN for over three months. With the holiday season fast arriving, the letter described what it was like for Nicole to be held BMN:

> She has been unable to play with other children outside of the psychiatric unit, visit regularly with her brother and her mother, breathe the fresh air of freedom, attend school, or play in the snow. **This prolonged confinement of Nicole in a locked psychiatric facility is outrageous and unlawful**

(emphasis added).

59. Although Nicole's treatment was outrageous and unlawful, it was by no means unique to her.

60. The Office of the Public Guardian continued to doggedly pursue help for children being held BMN. Defendant Director Bobbie Gregg received direct correspondence from the Public Guardian's Office in July of 2014 that detailed specific examples of children who were held BMN, one for as long as 98 days, in psychiatric hospitals.

61. In that July 2014 letter, the Office of the Public Guardian sought help for Stephen W., one of the class representatives in this suit. The letter noted that "[c]hildren who remain psychiatrically hospitalized longer than clinically necessary frequently deteriorate emotionally," and complained that Stephen had been held BMN for over a month at that point. Nevertheless, Defendant Gregg and other Defendants allowed Stephen to languish in a locked psychiatric ward for another month and a half.

62.     Having direct knowledge of the practice, Defendant Directors then delegated responsibilities to their staff, including the remaining Defendants.

63.     Defendants Jones, Williams, Stroud, Guest, Gantner, Tate, Small, Rowitz, Tichenor, Harms, Mays-Harrington, Terry, Matthews, Hassell, and Steele worked directly and collaboratively throughout their tenure at DCFS during the relevant class period with attorneys, guardians, case workers, and medical personnel; all were thus fully aware of both the systemic problem of children being held BMN within DCFS and the personal stories of those directly impacted. The BMN problem became so entrenched that the Legislature had to step in. Senate Resolution 140, adopted on April 25, 2015, directed the Illinois Auditor General to conduct a Performance Audit of DCFS regarding the number of youth who were being left in psychiatric hospitals BMN.

64.     The audit showed a more than two-fold increase in the number of youth in DCFS care remaining BMN in psychiatric hospitals from 2014 (75 youth) to 2015 (168 youth), in addition to a significant increase in the number of days, on average, that they waited for clinically appropriate placements.

65.     Defendants do not dispute that this practice continues to the day and, based on their own data, including data obtained from the Performance Audit of DCFS, they cannot.

66.     From 2015 through 2017, more than 800 children were held BMN.

67.     Nearly 30% of all children in DCFS care who were hospitalized were held beyond medical necessity, for a collective total of more than 27,000 days.

68.     Eighty percent of the more than 800 children whose stays became medically unnecessary between 2015 and 2017 were held for ten days or more beyond when they should

have been released. More than 40% were confined for a month or longer; 15% had to wait two months or longer.

69.     Despite clear knowledge and recognition of the problem, the number of children in DCFS care who are held BMN keeps rising. In the year 2014, 88 psychiatric hospital admissions went beyond medical necessity, and that figure jumped to 246 the following year. In 2016 the number of children held BMN rose to 292, and then rose again to 301 in the year 2017.

### Defendants' Failure

70.     Having known of the problem for decades, Defendants had a number of measures available to them to ensure that no child was ever abandoned in a psychiatric hospital upon discharge. Discharge planning is supposed to commence immediately upon admission to a psychiatric hospital.

71.     The Psychiatric Hospitalization Project is supposed to monitor every hospitalized child so that the children receive appropriate post-discharge care and placements.

72.     The Central Matching Unit is required to find appropriate post-discharge placements for every hospitalized child who needs one.

73.     Once a child begins to be held BMN, daily reports are generated and distributed to the DCFS Director, the Psychiatric Hospitalization Project Administrator, the DCFS Guardianship Administrator, the head of the Clinical Unit, and the head of the Central Matching Unit.

74.     Through these internal DCFS notification procedures, every Defendant became aware during the class period that children were being held BMN but failed to provide appropriate placements for the children despite having the opportunity to do so.

75.     Weekly meetings are held to discuss every child being held BMN and ensure that his or her unnecessary detention ends. Attendees of these weekly meetings are apprised of the contents of the daily reports generated for every child being held BMN.

76.     Nevertheless, the number of children being held BMN has risen every year for the past four years.

77.     Despite knowing of the severe risks posed to children being held BMN and having both the responsibility and the resources to provide appropriate placements, the Defendants nevertheless permitted the class members to be held BMN.

78.     Each and every Defendant has known that children were being held BMN and allowed those children to languish BMN in dangerous conditions for over a week.

79.     Each and every Defendant had the ability to ensure that children being held BMN received an appropriate placement before being BMN for more than a week. If there was a question as whether there were sufficient appropriate placements for children, Defendants could have created enough to fill the need by diverting the funds wasted on BMN hospitalizations to fund appropriate and therapeutic placements.

**BMN Costs Illinois Taxpayers Money**

80.     Even if providing appropriate placements cost more money, that is exactly what Defendants were required to do under Illinois law and the United State Constitution.

81.     But the fact of the matter is that ending the BMN practice will actually save Illinois money.

82.     In various news reports, DCFS representatives have pushed a false narrative that the BMN practice is unavoidable because the affected children have no other available placements when they are ready to be discharged from the hospital.

83.     Underlying this false narrative is that there is not enough money to provide adequate placements for BMN children.

84.     Defendants' false narrative is equally disappointing and misleading. There are appropriate placements for BMN children, and care providers are more than happy to create more placements to meet any demand.

85.     The fact is that Defendants' BMN practice is not only inhumane, it is fiscally irresponsible. They are literally wasting millions of Illinois taxpayer dollars to harm children, as described below.

86.     Warehousing children BMN in psychiatric wards is the most expensive therapeutic housing situation possible. Every Constitutionally permissible and appropriate placement for these children is cheaper for the State of Illinois by at least 50%.

87.     Every day a child needlessly spends locked in a psychiatric hospital costs the State a minimum of $126, which is the difference in the cost between hospitalizing a child BMN (average cost to Illinois taxpayers is $350 per day) and the next most expensive care option available (average cost to Illinois taxpayers is $224 per day).

88.     Simple math exemplifies the problem. From 2015 to 2017, children in DCFS custody spent an astounding 27,000 days BMN. By multiplying the daily savings of $126 by the 27,000 days that children unnecessarily spent BMN, the added cost to the State of Illinois from the practice becomes at least $3.4M for just those three years.

89.     The $3.4M cost to the State is a minimum figure for 2015 to 2017. The figure rises dramatically if the children could have been placed in specialized foster care or other lesser restrictive settings.

90. Thus, Defendants are causing the State to pay millions of dollars to lock children in psychiatric wards where they do not want to be, where their doctors do not want them to be, and where they are destined to suffer lasting harm. Instead of allowing children to languish, Defendants could use the cost savings from eradicating the BMN practice to provide better care for all DCFS youth in care and comply with the Constitution.

91. The BMN practice continues to the present; thus far in 2018, children in DCFS custody have collectively spent at least 1,000 days BMN every single month, costing the State of Illinois at least $126,000 per month.

92. The Defendants are hurting children, and spending millions of Illinois taxpayer dollars to do so.

**The Harm**

93. When youth remain hospitalized long after they are deemed ready for discharge, the potential gains of hospitalization diminish and the potential for adverse effects increases.

94. Children in DCFS custody at psychiatric hospitals are typically stabilized by treatment teams, which begin to develop treatment plans upon admission that involve managing medications and initiating treatment that will continue with outpatient mental health services.

95. Psychiatric hospitalization for children is not intended to "cure" children; rather, such hospitalizations are intended to stabilize the children, develop treatment plans, manage medications, and address acute issues. Typical medically necessary hospitalizations last for less than two weeks.

96. Psychiatric hospitalization poses a number of severe constraints on children's ability to maintain a healthy lifestyle. For example, schooling is limited to no more than one hour a day, and it may or may not correspond to the child's coursework prior to hospitalization.

97.     Children must remain in the hospital 24 hours a day. Recreational opportunities and time outdoors are either non-existent or profoundly curtailed. Visits with family are limited in duration and usually cannot involve visits from siblings younger than eighteen.

98.     Hospitalized children may use the phone only five to ten minutes per day, and they are not permitted access to electronic devices to maintain contact with friends and relatives who may be sources of support.

99.     At the same time, hospitalized children are subjected to a dangerous environment, where other patients may engage in physically or sexually violent behavior or be physically restrained by hospital staff. Just as damaging is the exposure to maladaptive behaviors that hospitalized children invariably witness and often begin to replicate, such as new means of acting out.

100.     As youth held BMN continue to be hospitalized, they observe new patients being admitted to their units and then being discharged. Watching other children get to leave often exacerbates feelings of abandonment, loss, anxiety, anger, powerlessness, and the sense that the child is somehow less valued than other patients. There are few clearer ways to tell a child that he or she does not matter than by locking him or her in a psychiatric ward when there is no justification for doing so.

101.     Lengthy hospitalizations tend to erase any gains made by children during the medically necessary portion of their stay, and over time many children exhibit more psychiatric distress than they presented with at admission.

102.     By way of example, named Plaintiff Stephen W., who was detained BMN twice in 2014 and again in 2017, incurred documented psychiatric distress. Hospital records from 2017 establish that Stephen consistently struggled with the idea that his placement would never come through. As a result of his hopelessness from being held BMN, Stephen required medication to help him sleep and generally cope with his detainment; he described himself as worthless and inflicted harm on himself; he was anxious and agitated on a daily basis, and thus had difficulty connecting with his peers.

103.     Named Plaintiff Burl F., who was hospitalized and held BMN from December 9, 2008 through January 30, 2009, had limited contact with the outside world, including limited contact with family members. As a result, his behavior deteriorated and he became significantly more depressed, often opting to isolate himself inside his room instead of attending programs at the hospital.

104.     The harm of BMN is exemplified throughout the class. Class member James M. has autism and has significant cognitive deficits; although a larger person, he functions at a toddler-level. James M. entered DCFS care in 2016 after his caregiver was no longer able to care for him. At age 17, he was detained BMN in a psychiatric ward for more than seven months. Having been set for discharge in November 2016, James instead spent Christmas, New Year's Day, and Memorial Day locked inside a psychiatric ward for no therapeutic reason. Only upon being discharged to an appropriate placement was James able to make meaningful strides forward.

105.     In short, psychiatric hospitalizations are meant to be short-term crisis centers, not long-term treatment facilities. A child should be released after they are stabilized, a treatment plan is in place, and a doctor has determined that there is no medical necessity for him or her to be locked in a psychiatric ward. Otherwise, children will suffer great isolation and harm.

### Class Action Allegations

106.     Mr. Golbert and named Plaintiffs Skylar L., Issac D., Archie C., Burl F., Sterling B., and Tyrese B., bring this action on behalf of the named class representatives and on behalf of a class of those similarly situated, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

107.     Plaintiffs seeks to represent a class consisting of the following people:

All those who are or were subjects of abuse, neglect, or dependency petitions filed in the Circuit Court of Cook County, who have been placed in the custody or under the guardianship of DCFS at any time on or after March 4, 2008 and who were held in a hospital for purposes of

psychiatric treatment for at least a week beyond medical necessity and who are 20 years old or younger as of the date of filing of this Complaint.

Because not all Defendants served in DCFS at the same time, it is appropriate to divide the class into subgroups as follows:

a) All those who were in DCFS custody who were held in a hospital for purposes of psychiatric treatment for at least a week beyond medical necessity between March 4, 2008 and the end of Erwin McEwen's tenure as director of DCFS.

b) All those who were in DCFS custody who were held in a hospital for purposes of psychiatric treatment for at least a week beyond medical necessity between the end of Erwin McEwen's tenure as director and the end of Richard Calica's tenure as director of DCFS.

c) All those who were in DCFS custody who were held in a hospital for purposes of psychiatric treatment for at least a week beyond medical necessity between the end of Richard Calica's tenure as director and the end of Arthur Bishop's tenure as director of DCFS.

d) All those who were in DCFS custody who were held in a hospital for purposes of psychiatric treatment for at least a week beyond medical necessity between the end of Arthur Bishop's tenure as director and the end of Bobbie Gregg's tenure as director of DCFS.

e) All those who were in DCFS custody who were held in a hospital for purposes of psychiatric treatment for at least a week beyond medical necessity between the end of Bobbie Gregg's tenure as director and the end of Cynthia Tate's tenure as director of DCFS.

23

f) All those who were in DCFS custody who were held in a hospital for purposes of psychiatric treatment for at least a week beyond medical necessity between the end of Cynthia Tate's tenure as director and the end of George Sheldon's tenure as director of DCFS.

g) All those who were in DCFS custody who were held in a hospital for purposes of psychiatric treatment for at least a week beyond medical necessity between the end of George Sheldon's tenure as director and the end of Beverly J. Walker's tenure as director of DCFS.

108. As each individual Defendant assumed his or her position in DCFS described in paragraphs 28-34, he or she had an opportunity to end the BMN practice but did not do so. Rather than end it, each individual Defendant knowingly perpetuated it, thereby cementing the practice of holding children BMN and making Defendants liable for the constitutional violations that befell all class members from the time he or she assumed the position referenced above to the present.

109. Plaintiffs estimate that the class numbers in the hundreds of children, making joinder of all members impractical.

110. Common questions of law and fact exist to all class members. Among these common questions are:

a) whether any legitimate governmental purpose exists to detain the class members in medical facilities BMN;

b) whether Defendants maintained a practice of violating class members' rights under the due process clause of the Fourteenth Amendment through this practice of holding them BMN; and

    c)   whether Defendant DCFS deprived class members of less restrictive housing on the basis of their disabilities and thus violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

111.    The claims of the Named Plaintiffs are typical of the claims of the class. The named Plaintiffs were confined BMN and subject to unconstitutional conditions by the same practices as the class. They seek to prove that the conditions of being held BMN violated their rights and that Defendants are liable as a result.

112.    The named Plaintiffs will fairly and adequately represent the interests of the class. They have retained counsel experienced in class action, civil rights, and conditions of confinement litigation.

113.    The further requirements of Federal Rule of Civil Procedure 23(b)(3) are met in this cause in that questions of law and fact common to members of the class, which are described above, predominate over any individual issues that may exist. In addition, a class action would be the most and efficient method of adjudicating the class members' claims and is therefore the superior method of adjudication.

### Count I – Class claims pursuant to 42 U.S.C. § 1983
### for violations of the Fourteenth Amendment

114.    Each paragraph of this Complaint is incorporated herein.

115.    There is no legitimate governmental purpose for holding a child in a psychiatric hospital BMN.

116.    The individual Defendants, cloaked under color of law, had a duty to protect Plaintiffs and the class members from physical and emotional harm.

117.    The individual Defendants knew or should have known that subjecting Plaintiffs to the practice of holding them BMN created a risk that Plaintiffs would suffer physical and/or severe emotional harm.

118.    The individual Defendants were deliberately indifferent to the risk posed to Plaintiffs and the class members by the BMN practice.

119.    In being deliberately indifferent to the known risk posed to Plaintiffs and the class members, the individual Defendants did not exercise any professional judgment at all. They simply ignored Plaintiffs' and the class members' plight and allowed them to suffer the consequences of being children locked inside a psychiatric hospital for absolutely no reason at all.

120.    As a consequence of the individual Defendants' deliberate indifference, Plaintiffs and the class members suffered harm, including, but not limited to, severe emotional distress.

### Count II – Class claims pursuant to 42 U.S.C. § 1983
### Fourteenth Amendment Failure to Provide Medical Care

121.    Each paragraph of this Complaint is incorporated herein.

122.    There is no legitimate governmental purpose for holding a child in a mental health facility BMN.

123.    The individual Defendants owed each class member a duty to provide him or her with adequate medical care.

124.    Each class member required psychiatric hospitalization.

125.    Rather than providing each class member with medically necessary treatment, the individual Defendants ensured that any hospital-based treatment would be followed by a lengthy period of detainment BMN that would necessarily diminish the therapeutic value of such treatment such that every class member was deprived of necessary care.

126.     The individual Defendants knew or should have known that subjecting Plaintiffs to the practice of holding them BMN created a risk that Plaintiffs would receive constitutionally deficient medical care.

127.     The individual Defendants were deliberately indifferent to the risk posed to Plaintiffs and the class members by the BMN practice.

128.     In being deliberately indifferent to the known risk posed to Plaintiffs and the class members, the individual Defendants did not exercise any professional judgment at all. They simply ignored Plaintiffs' and the class members' plight and deprived them of necessary medical care.

129.     As a consequence of the individual Defendants' deliberate indifference, Plaintiffs and the class members were deprived of necessary medical care and suffered harm.

### Count III – Class claims pursuant to Rehabilitation Act
### 29 U.S.C. § 794(a)

130.     Each paragraph of this Complaint is incorporated herein.

131.     Section 504 of the Rehabilitation Act states that no otherwise qualified individual with a disability shall be "excluded from participation in, be denied the benefits of, or be subjected to discrimination in any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

132.     Plaintiffs and class members are qualified "individuals with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a) because they have a mental health, intellectual, or developmental disability.

133.     DCFS, as a department of the State of Illinois, receives "federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

134.  The operations of DCFS are a "program or activity" that falls within the meaning of 29 U.S.C. §§ 794(b)(1)(A)-(B) and /or (b)(2)(B).

135.  Plaintiffs and class members were excluded from and were denied the benefits of placement in less restrictive housing due to their disability.

136.  Plaintiffs and class members were discriminated against by Defendant DCFS based on their mental health disabilities and were denied less restrictive housing as a direct and proximate result.

137.  As a direct and proximate result, Plaintiffs and class members suffered harm.

**Count IV – Class claims pursuant to Americans with Disabilities Act
42 U.S.C. § 12132**

138.  Each paragraph of this Complaint is incorporated herein.

139.  Plaintiffs and class members are qualified "individuals with a disability" within the meaning of Title II of the ADA because they have a mental health, intellectual, or developmental disability.

140.  Title II of the ADA prohibits exclusion of qualified individuals from participation in services, programs, or activities by public entities like DCFS.

141.  The claims under the ADA are brought against Defendant DCFS as a department of the State of Illinois.

142.  Defendant DCSF is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

143.  In violation of Title II of the ADA, Plaintiffs and class members have been discriminated against on the basis of their disabilities, and were thus excluded from participating in, and were denied the benefits of, placement in less restrictive housing due to their disabilities.

**Requests for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

28

a) Certify this case as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and appoint the undersigned as class counsel pursuant to Rule 23(g); and

b) Enter judgment in Plaintiffs' favor and against Defendants, awarding compensatory damages, costs, and attorneys' fees against all Defendants, and awarding punitive damages against all individual Defendants; and

c) Grant any other relief this Court considers just and proper.

**Jury Demand**

Mr. Golbert, Acting Cook County Public Guardian, and named Plaintiffs Skylar L., Issac D., Archie C., Burl F., Sterling B., and Tyrese B., respectfully demand trial by jury on behalf of themselves and the class members on all issues so triable.

Respectfully Submitted,

/s/ Russell Ainsworth
One of Plaintiffs' Attorneys

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Julie Goodwin
Adair Crosley
LOEVY & LOEVY
311 N. Aberdeen
3rd Floor
Chicago, IL 60607
312-243-5900