# Exhibit A

**<u>TRANSCRIBED FROM DIGITAL RECORDING</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES GOLBERT, Acting Cook County Public Guardian, on behalf of Class Representatives and Named Plaintiffs, et al. ) ) ) ) ) | Case No. 18-cv-8176 |
| Plaintiffs, ) | Chicago, Illinois |
| -vs- ) | May 17, 2023 |
| BEVERLY J. WALKER, et al., ) | 10:38 a.m. |
| Defendants. ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. DAVID WEISMAN, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:    MR. RUSSELL R. AINSWORTH
MR. D. SAMUEL HEPPELL
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL  60607
(312) 243-5900
Russell@loevy.com
Sam@loevy.com

For the Defendants:    MS. BARBARA LYNN GREENSPAN
MR. THOMAS VERTICCHIO
MS. VJOLCA SALIU
MS. PAULINE GAFFNEY
Attorney General's Office
100 West Randolph Street, Suite 11-200
Chicago, IL  60601
(312) 814-7087
Barbara.greenspan@illinois.gov

\*\*PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION\*\*
NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
PORTIONS UNINTELLIGIBLE AND INAUDIBLE

Transcriber:
KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
Official Court Reporter
United States District Court
219 South Dearborn Street, Suite 1426
Chicago, Illinois  60604
Telephone:  (312) 435-5569
Kathleen_Fennell@ilnd.uscourts.gov

(Proceedings heard in open court:)

THE CLERK: 18-cv-8176, Golbert et al., v. Walker, et al.

THE COURT: Good morning.

Good morning. For plaintiff?

MR. AINSWORTH: Good morning, your Honor. Russell Ainsworth appearing on behalf of the plaintiffs.

THE COURT: Good morning.

MR. HEPPELL: Sam Heppell also on behalf of the plaintiffs.

THE COURT: Good morning both of you.

And for defendants?

MS. GREENSPAN: Good morning, your Honor. Barbara Greenspan, Assistant Attorney General, on behalf of the defendants.

MR. VERTICCHIO: And good morning, your Honor. Thomas Verticchio on behalf of the defendants.

And, your Honor, with your permission, I will file an additional appearance later, later this week. I have not appeared yet.

THE COURT: All right. I will accept that late filing.

Ms. Greenspan, do you have other colleagues with you who are going to speak?

MS. GREENSPAN: They will not speak this morning, but

they are present if I can put those on the record.

THE COURT: Okay.

MS. SALIU: Vjolca Saliu, Assistant Attorney General, also on behalf of defendants.

MS. GAFFNEY: Pauline Gaffney on behalf of defendants.

THE COURT: Great. Thank you all very much for being here.

Just to make sure we're orientated in the right direction, I had asked both sides to file parallel memorandums of law addressing the need to delay expert discovery while we were still plowing through written discovery, and it has become apparent to the Court over the last several months that the written discovery process is slow moving.

And, you know, this is a 2018 case, and I'm trying to figure out where we are on expert discovery and why we need to finish the written discovery that has been ongoing for at least three years.

And so I asked both sides to file their briefs. I appreciate the work that was put into them. The majority of my questions are for you, Mr. Ainsworth, and you, Mr. Heppell.

So as I understand your theory is that this -- the case is built around a systemic neglect by defendants in getting sufficient funding for wards of the state who were committed or admitted to a psychiatric hospital, and then

4

after the course of treatment was completed and they no long were medically deemed necessary to be hospitalized, were held over in the hospital setting because there were insufficient places to place these wards of the state.

Am I understanding your general approach, Mr. Ainsworth?

MR. AINSWORTH: Your Honor, last time we were here, it was apparent to me that I wasn't making a whole lot of sense, and so what I did was I went back to the office, and I found somebody smarter than me.

And Mr. Heppell is going to take the lead today because I learned back in high school that it is better to be thought a fool than to open your mouth and prove it. So I'm going to let him address it.

THE COURT: Those are wise words that I follow myself sometimes.

So Mr. Heppell, have I articulated the plaintiffs' theory as to liability in this case?

MR. HEPPELL: I would say by and large, yes, your Honor. The only, I guess, tweak to the way you framed it, I think it's less in the allegations specifically about insufficient funding, and the focus is about insufficient placements, and the funding is one piece that goes into that discussion, but the -- I think the best articulation of our theory is there were not sufficient placements.

THE COURT: All right. So that's fair, so whether it's an issue of funding, I will note the discovery I looked at has no questions about funding in it, so that does answer one of the questions.

But what I'd like to you do, Mr. Heppell, and I don't mean to put you on the hot seat, but I've looked through the Requests for Production. I've looked through the interrogatories, the first set of interrogatories, and I've looked through the first set of Requests to Admit, and those are Exhibits A, B and C to your filing.

Can you point to me in your interrogatories, let's start there, any interrogatories that you think deal with systemic problems by DCFS such that your expert would need those answers to prepare her or his opinion?

MR. HEPPELL: So I guess one -- one point I would make at the outset on that is obviously we have, as has been discussed, a situation where at least on two of the claims, we have individual defendants. And so our discovery is necessarily -- as to two of the claims, only individual defendants. The other two claims, it's individual defendants and DCFS as an entity.

And the -- a subset of the individual defendants are the directors of DCFS, current and former directors. So to --

THE COURT: When you say a subset, I thought those were all the defendants. Who are the other defendants,

individual defendants?

MR. HEPPELL: Individual defendants occupying a number of other senior-level positions --

THE COURT: Okay.

MR. HEPPELL: -- within DCFS. So these are all senior DCFS administrators.

So when we're looking at interrogatories that, as they're phrased, aren't directed at getting at, you know -- they're phrased toward particular individuals and what was your role, what were your obligations, but I think that's the -- that's the missing piece perhaps, at least in our view, because these are all senior-level DCFS administrators.

It may be that come our class certification motion, it's even a narrower set of the individual defendants, but these are people who, in our view, had individual responsibility for these systemic issues.

THE COURT: All right. Do you remember what the question was I asked?

MR. HEPPELL: I do. You were asking us to identify specific interrogatories --

THE COURT: That address the systemic claims that you are making.

MR. HEPPELL: And so looking -- you're looking at the first -- the first set --

THE COURT: Let me repeat the question: Any

interrogatory that you have filed or propounded that addresses the systemic issue that you are building your case around that your expert needs to see an answer for before she can prepare an expert report.

MR. HEPPELL: So 1, looking to the supplementary interrogatories --

THE COURT: Where is that?

MR. HEPPELL: That is Exhibit D.

THE COURT: All right. I asked Exhibit B.

MR. HEPPELL: I'll start with Exhibit B.

So the Interrogatory No. 3 in our Exhibit B, it's directed at notice and notice of a systemic problem, which I think is going to be an important part --

THE COURT: Why does your expert need to know about notice to show that there was a systemic problem?

I understand why notice is important. Last time we were here, we had a wide-ranging conversation. I am trying to be laser focused on the issue, which is why this 2018 case cannot have an expert report prepared now, and I was told that the reason is that the answers to the interrogatories and other discovery that's been propounded is necessary. I wish I had looked at this six months ago.

Can you -- No. 3 does not do it. I can tell you this kind of highlights the problem. You should have an answer to this ready. That's what this hearing is about.

MR. HEPPELL: Well --

THE COURT: And I can tell you none of the interrogatories, in my mind -- but I could be wrong, that's why I'm asking you -- address systemic issues that an expert would need to have answers to to prepare a report.

MR. HEPPELL: So --

THE COURT: But answer my question. Take as much time as you want.

MR. HEPPELL: So if I understood your concern with my last answer was that you -- I have not successfully articulated to you why an expert would need it, or are we still on the systemic point?

THE COURT: We are trying to get to class certification, correct?

MR. HEPPELL: Correct.

THE COURT: Notice is an issue for liability eventually.

MR. HEPPELL: Correct.

THE COURT: Okay.

MR. HEPPELL: But I think the issue of notice is something that informs what subset of the defendants against whom class cert. might be appropriately brought, and I do think in -- I'm not trying to -- I'm not trying to avoid your question, but I'm giving you --

THE COURT: Let's look -- we're not doing this. This

has been going on too long.

Here's No. 3: Identify all ways, if any, that you were informed about the number and/or identities of children who were hospitalized beyond medical necessity on a daily, weekly and/or monthly basis, and how you were informed, if at all, about the progress of obtaining placements for children who were hospitalized beyond medical necessity.

That does not address systemic placement issues.

That may address defendants' awareness of the issue and failure to react to it, but that does not address systemic issues as it's been articulated twice now.

What's your next one?

MR. HEPPELL: Interrogatory No. 2, which asks, you know, whether they were responsible for obtaining placements and asks for them to describe steps they took to fulfill that responsibility, including delegating the responsibility.

I -- again, given that they're directed to senior-level DCFS officials, I think that does go to a systemic issue.

THE COURT: I think we all know the answer is yes, that was part of their responsibility, and then they would have a narrative about what they tried to do.

MR. HEPPELL: Right. And we don't know what that narrative is going to be. We want our expert to be able to offer opinions --

THE COURT: We're talking about class certification issues.

MR. HEPPELL: Correct. And -- but when we file our class certification motion, we're not going to be able to prevail on that motion articulating our theories in the abstract.

THE COURT: Okay. These are -- you have just told me these are all high-level executives with Department of Children and Family Services, correct? So they -- whatever they did affected every ward who was with Department of Children and Family Services.

Does it go to commonality? What does this interrogatory go to for class certification that your expert needs an answer to that she doesn't know already to prepare an opinion? That's all we're looking at.

MR. HEPPELL: I do --

THE COURT: I think your expert would say I understand how Department of Children and Family Services is structured. I understand what these positions are, and this is what these individual defendants' job duties were.

MR. HEPPELL: And from the --

THE COURT: So why do you need an answer to that interrogatory?

MR. HEPPELL: Because to the extent there's going to be a disagreement about what those facts are, in our view, our

class certification motion needs to be rooted in something in the record and not just rooted in our sort of broad, 5,000-foot-level theory.

THE COURT: Okay, fine. So Interrogatory No. 2, I'm going to direct defendants to answer within two weeks as to this portion of Interrogatory 2.

I'm assuming the answer is going to be other than qualified no. So I'm assuming they're going to say yes, but maybe I'm wrong.

The steps that each defendant took to fulfill that responsibility during their tenure and efforts they -- each individual defendant generally made to address the placement of wards while they were in those positions.

What else do you need?

MR. HEPPELL: So interrogatory -- the next substantial number of interrogatories, which are each directed at a subset of the individuals based on the particular timeframes involved, are directed towards receiving a response as to the particular -- as to each of the particular plaintiffs.

THE COURT: Yeah, and that you don't need for your class certification. That is exactly right. So that covers 4 through 31.

MR. HEPPELL: Judge, if I might briefly on that point, I understand your view on that as you articulated, but

in the defendants' position statement, they articulated their view in -- in, you know, at a high level of why class certification is not appropriate, and that is their view that each of these -- each child who's in a psychiatric hospital --

THE COURT: Your theory is systemic.

MR. HEPPELL: Correct.

THE COURT: That there's a systemic problem. That's the theory you're operating under. None of those interrogatories deal with systemic issues. It deals with each of these individual plaintiffs.

MR. HEPPELL: Right, and it goes to our need to, in addition to making out our systemic case, rebutting their response to class certification, their theory of why class certification is not appropriate, which I understand from looking at their briefing is that these are all individualized, highly complex decisions that -- that rest on this particular child might only want to go to this particular location or --

THE COURT: That may very well be the case. How does that forward your systemic theory?

MR. HEPPELL: Because we want our expert to be able to look at not just at that level of generality but them having put their money where their mouth is and articulated with our clients why this happened and our expert to go on and say, look, this does not illustrate an individualized

assessment issue, an individualized problem. Everything they're saying --

THE COURT: Okay, stop. Let's, for the record, read this interrogatory.

So you're talking about an executive who runs a system that is completely overtaxed, that has all sorts of issues, but this is the interrogatory you think you need for all these plaintiffs, and they all look the same: Two defendants, McEwen and Jones, Guest and Ortega-Piron only. This is Interrogatory 26, but this pattern is consistent.

Were you aware that plaintiff Burl F, while a minor in custody of DCFS, was hospitalized beyond medical necessity in 2008? If your answer is anything other than an unqualified no, identify when you first learned that Burl F was hospitalized beyond medical necessity, the manner in which you first learned that Burl F was hospitalized beyond medical necessity, all persons you alerted that Burl F was hospitalized beyond medical necessity, all steps you took, if any, to ensure that an appropriate placement was made for Burl F, and all reasons why you did not obtain an adequate placement sooner for Burl F in 2008.

Of those five things you're asking, only one addresses the issue that you're talking about, and that is (e) all reasons why you did not obtain an adequate placement sooner for Burl F in 2008. All right?

The idea that an executive of an agency like DCFS would know all of these or any of these plaintiffs is a bit far-fetched, but to the extent that any of these defendants did know, how would that change your class certification argument?

MR. HEPPELL: It would allow us to respond to what we -- with -- with opinions from our expert to what we now understand defendants' argument to be, which is every single one of these is a unique, complicated situation, and the reasons for which are myriad and different, and it is our anticipation that they -- when we receive a response to this interrogatory, we will be able to go through with our expert, in combination with her prior knowledge, in combination with other records in the case, to be able to articulate our position, which is, no, whatever those individual issues are, certainly we're not disputing that there are individual issues that come up with particular people.

No matter what those individual issues are, the reason this child was not able to be placed sooner was a result of the systemic lack of appropriate placements and not due to some esoteric issue particular to this person. But to be able to engage in that level of analysis and fully have our expert --

THE COURT: So look at the question that interrogatory's asking: All reasons why you did not obtain an

adequate placement sooner for Burl F in 2008.

MR. HEPPELL: And it's our understanding, based on the positions that these particular defendants occupied that --

THE COURT: They themselves could go find individual placements, that was their job.

MR. HEPPELL: That certainly they have responsibility for overseeing --

THE COURT: That's a systemic question. That's not what you're asking.

MR. HEPPELL: And the companion interrogatory --

THE COURT: Is it -- tell me -- okay, what's your companion interrogatory?

MR. HEPPELL: So looking at -- we're looking at 26, and I think 27 is broader because it's not limited to reasons why you did not obtain an adequate placement, but it goes to all actions taken to your knowledge to ensure that a particular plaintiff did not -- you know, to ensure they received an adequate placement and the reasons, again, to their knowledge, not limited to their personal actions, why that individual did not receive an adequate placement.

THE COURT: And, again, that is -- that is not inviting an answer to the systemic theory that you are looking for. It does -- I do agree with you there's a semblance of relevance to what defendants may be saying, but this

interrogatory is way too broad, and under the efficiency standards, which have been completely abandoned at this point, I'm not going to make these interrogatories answered. They don't fit into the theory you're articulating.

The only other one I find -- because all the others run that same course. 1, 2 and 3 are different. All the others run the same course we just went through up through 32.

That should have been your answer as to what you need for the interrogatory for your expert.

MR. HEPPELL: I'm sorry, I didn't catch that.

THE COURT: That should have been your answer.

MR. HEPPELL: What should have been my answer?

THE COURT: No. 32.

MR. HEPPELL: No. 32.

THE COURT: I'm going to order each defendant to answer No. 32.

MR. HEPPELL: Including DCFS as an entity?

THE COURT: Yes.

Next exercise, Requests for Production. Please tell me all the ones in here that you think go to your systemic theory that your expert needs to have so she can begin her opinion formation process.

MR. HEPPELL: So, are you referring to Exhibit A?

THE COURT: Yeah.

MR. HEPPELL: And I didn't -- I apologize if my brief

left confusion on that topic. I included that to illustrate the point that I made about the discovery that was served. That first set of Requests for Production, there's been a rolling production of documents, so there's not a specific individual numbered Request for Production out of that first set.

THE COURT: You know, again, we're laser focused: What does your expert need to form her opinion?

MR. HEPPELL: Out of Exhibit A?

THE COURT: Yes.

MR. HEPPELL: There's nothing that I'm aware of that they haven't turned over.

THE COURT: Okay. Then we can proceed. Fine. Exhibit C.

MR. HEPPELL: Same question?

THE COURT: Yes.

MR. HEPPELL: So looking at this in the same sort of categorizations, I think these track conceptually the interrogatories. The first --

THE COURT: Yes, they do, and do you understand my frustration?

MR. HEPPELL: I --

THE COURT: I understand why these interrogatories would make perfect sense and be extremely efficient if we were past class certification. I wish people used requests to

admit more often.

But we are -- we are not even attempted to get to the substantive issues around class certification because I've been told that you need answers to all of this discovery, and I -- I don't -- I don't see it in the requests to produce. You've told me that you got what you need, so that's taken care of.

There were a few in there, but other than that, the interrogatories, No. 2 and No. 32, seem to be the only ones you need and at the end of the day, the expert report is going to probably be the most crucial consideration for the district court, and now I'm on to requests to admit, and they do track your interrogatories.

So tell me which of your requests to admit your expert needs so she can form her opinion.

MR. HEPPELL:  I think -- may I have a moment?

THE COURT:  Yeah, for sure.

(Pause.)

MR. HEPPELL:  So I think on -- the question you asked, which was related to expert discovery, I think many of the requests for admit in Exhibit C are not things we need for our expert.  I do think they are items that would be helpful to narrow the scope of the issues relevant for class certification

THE COURT:  Tell me how.  I don't see that, but tell

me how.

MR. HEPPELL: Because --

THE COURT: Give me an example of one so we can talk through it.

MR. HEPPELL: The -- so, I think the individual -- the ones that are targeted towards individual plaintiffs and particular individuals in combination with the limited answers that I think they're going to give on the interrogatories will help inform whether these are individuals against whom class certification is even appropriately sought. You know, what were these particular roles? I mean, when we named the individual defendants --

THE COURT: Okay. Do you remember my question?

MR. HEPPELL: Which -- which particular --

THE COURT: Yeah, any one that we can talk through.

MR. HEPPELL: Well, let's --

THE COURT: That's what -- we've been talking in the hypothetical and the theoretical long enough.

MR. HEPPELL: Sure. So 15 and 16 and the other ones, you know, track that in form -- sorry, not 15. I think 17 and 18 are a better example. They're narrowing down did they try to find placements, and --

THE COURT: And so for the record, 17 to defendants Gregg, Williams, Stroud and Dyer-Webster only: Admit that you tried to find a placement for plaintiff Stephen W while they

20

were hospitalized beyond medical necessity.

All right. So that request to admit, the answer could be yes, because I was always trying to find for everyone who needed it. The answer could be no, because I didn't know about Stephen W's particular circumstance, so I couldn't honestly say I was trying to place Stephen W over, for example, plaintiff Karen C, who's referenced in request to admit 20. So, no, the answer is no, I wasn't trying to get just plaintiff Stephen W.

How does that help your expert? It's not a really well-phrased request to admit to begin with, but the answer itself is yes or no and it doesn't tell you -- it's really up to Ms. Greenspan and her team as to how they even understand it.

So that's 17, right? You told me to look at 17 and 18?

MR. HEPPELL: 18 is just the inverse of it. Well --

THE COURT: So how -- tell me that. How does that help your expert?

MR. HEPPELL: So I -- just to be clear, I'm not talking about expert anymore, I'm talking about just for clarification --

THE COURT: Well, that's what I'm talking about. Okay. That's fair. Go ahead.

You're right. Go ahead.

MR. HEPPELL: So I think my response to that would be in combination with the interrogatory answers, that's going to pin down what defendants' position is on what these individuals' level of responsibility was for these issues and their contention about what they did or didn't do for these particular plaintiffs.

THE COURT: How does 17 inform any of the individual defendants' level of responsibility? If they were as high up in the Department as you indicate they were, and the problem which was known that there were wards being held in psychiatric hospitals beyond the time they needed to be there, it would seem to me that every one of them as part of their daily work was either trying to do that generally, systemically, or perhaps they were doing it for an individual person, but how does that go to class certification?

MR. HEPPELL: I'd like to move on from 17 and 18.

THE COURT: No, I'd like an answer. Does -- I don't think it does, and so I'm not going to order those be answered.

Is that fair, or am I missing something?

MR. HEPPELL: I think I've made the point that -- the best that I'm able, so I think --

THE COURT: Well, what am I missing?

MR. HEPPELL: I --

THE COURT: I appreciate you saying that, by the way,

but I want to make sure I'm not missing something.

MR. HEPPELL: Sure, sure. I mean, I don't -- I think I would say these particular requests for admit are less important. I do think they go to the point of trying to narrow down what each person's role was and what their responsibilities were, which I do think is useful as we're approaching class cert. and carefully considering who you want to include in that.

But I -- I don't want to spend time focusing on something which I think is --

THE COURT: All right, but to your last comment, let me draw your attention to 1 through 12 --

MR. HEPPELL: Yes.

THE COURT: -- because those seem to be of the ilk you're suggesting.

MR. HEPPELL: Yes.

THE COURT: So I'd like to understand which of those you think you need.

MR. HEPPELL: Thank you for refocusing me on more fruitful ground.

THE COURT: You're welcome.

MR. HEPPELL: So the first pair is a broad level, you know, were they responsible.

THE COURT: I think 1 and 2 need to be answered.

Ms. Greenspan, do you have any objection to those

being answered?

MS. GREENSPAN: I do, Judge.

THE COURT: Tell me.

THE CLERK: Speak into the microphone.

THE COURT: Sorry. Ms. Owens is reminding you to speak into the microphone.

MS. GREENSPAN: I'm -- thank you, Judge. Sorry.

THE COURT: Thanks.

MS. GREENSPAN: It has to do with the way these requests are phrased.

THE COURT: So if that's your objection, that's fine. You can just answer accordingly, but as far as -- I'm looking at relevance for expert discovery and class certification to Mr. Heppell's point, class certification generally, they seem to -- they seem to be relevant to me as far as what someone's role, individual defendant's role would be and how that may impact his or her appropriateness in the class certification process.

If you don't like the way it's phrased, that's different. You can take care of that. I'm just saying the answer itself under Rule 26 for relevancy, any objection to that?

MS. GREENSPAN: No with respect to 1 through 8.

THE COURT: 1 through 8, okay.

MS. GREENSPAN: 1 through 8. With respect to 9, 10,

24

11 and 12 --

THE COURT: Okay. So that's good. We're done, we're 1 through 8.

Let's go to 9, 10, 11 and 12, and we can talk through those.

MR. HEPPELL: Might I have one moment, your Honor?

THE COURT: Sure.

(Pause.)

MR. HEPPELL: 9 through 12 we don't need for class certification purposes.

THE COURT: All right. 9 through 12 don't need to be answered within the timeframe I'm going to give.

Then 13 through 83 -- 13 through 74 are all of the kind that we just illustrated that deal with individual plaintiffs and defendants' awareness of individual plaintiffs. I don't think any of those need to be answered for class purposes.

I understand you have a different view, Mr. Heppell. You can take it up with Judge Chang if you think I have this wrong, but that's where we are on those.

Then on to 75. Well, before I leave that, do you want me to make a further record of my reasoning as to those requests to admit?

MR. HEPPELL: I don't think that's necessary, your Honor. Thank you.

THE COURT: All right. We're on to 75.

MR. HEPPELL: 75 and 76 I think are relevant. I think they fall --

THE COURT: I agree.

Ms. Greenspan?

MS. GREENSPAN: Of course, reserving objections to the way they're phrased.

THE COURT: Okay, 75 and 76 will be answered.

You're on a roll, Mr. Heppell.

MR. HEPPELL: 77 and 78, I do think are relevant, although I also think that we asked a better version of that, a more precisely worded version of that in our supplementary set in Exhibit --

THE COURT: D.

MR. HEPPELL: -- D.

THE COURT: Okay. Let's --

MR. HEPPELL: I can jump to that now or set that aside.

THE COURT: Oh, give me a second.

Ms. Greenspan did you want to say something?

MS. GREENSPAN: Yes, Judge.

THE COURT: Go ahead.

MS. GREENSPAN: I disagree with respect to 75 and 76. 75 and 76 -- I take it back. I was looking at 77 and 78. I do not disagree on 75 and 76.

THE COURT: Okay. We're at 77 and 78 though, so do you disagree on those?

MS. GREENSPAN: Yes, I do, Judge.

THE COURT: Tell me why.

MS. GREENSPAN: I think that question goes to the merits as to whether each of those children had suffered from a disability at the time they were hospitalized beyond medical necessity. That goes to the merits, not to the systemic issue that's going to be before the expert.

THE COURT: Let's -- why don't we jump over to D, see what Mr. Heppell is saying he thinks there's a better one he'd prefer an answer to.

MR. HEPPELL: Well, I will certainly take what I can get. I think that the ones in Exhibit D are more fleshed out than the more numerous.

So the issue is whether each of the individuals was an individual with a disability as required to trigger the antidiscrimination provisions in the Americans with Disabilities Act and the Rehabilitation Act. Those are the claims 3 and 4 in the complaint and I -- in terms of class certification --

THE COURT: Yeah, so tell me -- I understand why that's relevant, and I also understand Ms. Greenspan being hesitant to answer that because that is a very substantive issue.

So tell me for class certification purposes -- because I have not -- I have not in the defendants' briefing and any oral discussions we've had here, I have not heard the defendants say we don't think they're covered by the Act. That may be something that they raise later, but for class certification, I haven't heard that come up.

So --

MR. HEPPELL: So if they're not disputing that for class certification purposes, then we may not need that. I mean --

THE COURT: Well, let me ask you this: If the defendants are saying for class certification, we may say it's an individualized assessment you have to make, and that goes to, you know, why it shouldn't be class certification. How would the answers to these particular plaintiffs change that response?

In other words, you're looking for class certification, the class being wards of the state who are held beyond medical necessity during this time period. Each of them for your disability claim and the Rehabilitation Act claim would need to be disabled under the statute.

It may be a -- I don't see questions along this line, maybe I missed these, but the questions are not framed in the sense that anyone who was receiving psychiatric services is disabled. You don't have those systemic questions, and so I

think that just goes to a legal point that doesn't need discovery on, which is it's an individualized assessment. They're going to make that argument.

And even if, Ms. Greenspan, even if I ordered her to answer that to each of these plaintiffs, that still wouldn't change the legal argument. It would just force Ms. Greenspan earlier to make that legal assessment and, for the individual defendants, force her to decide whether the individual defendants knew all that to make that -- to make that determination.

So, again, laser focused on class certification and discovery necessary for it, why is that necessary?

MR. HEPPELL: So first and narrowest point but maybe the easiest, we're going to have to establish that each of our proposed class representatives is an appropriate class representative as part of our class certification briefing, which would include showing that at least they themselves have a viable claim. They're not an appropriate class rep for ADA claim if they're not themselves covered by the ADA, so --

THE COURT: They're in -- I think that's a fair point. But whether or not Ms. Greenspan or her clients agreed, that wouldn't change anything, right?

I suppose if they agreed, it would be easier, but if they didn't agree, that wouldn't mean that because Ms. Greenspan and her clients don't agree that someone was

disabled that they couldn't be an appropriate class representative because you could convince Judge Chang they were disabled, and this is how we know because they were getting treatment for mental health issues, and under the statute, that makes them subject to -- you know, that makes them a viable candidate.

Isn't that the argument you're going to make?

MR. HEPPELL: If -- to respond to that point, I would say if they agree, it will eliminate a whole section, significant detail than the personal section of the class cert. briefing where we're going to have to convince Judge Chang that each of them does have a disability within the meaning of the statute by citation to their medical records, their mental health records, legal argument about what that means, and that will -- if they admit that they were, then we can skip over that portion of the class cert. briefing.

THE COURT: All right. Ms. Greenspan, your response to --

MS. GREENSPAN: We will not agree to that, Judge.

THE COURT: Okay. But if you were forced to answer a request to admit for each of the individual defendants, I don't know what DCFS would do with that, but why would you -- if I said you have to answer it, what would you do? You'd have to answer it.

MS. GREENSPAN: I would have to answer it for each

defendant. For example, we're talking about Stephen W. For the time period that Stephen W was beyond medical necessity in a psychiatric hospital, were of these -- how many of these 18 defendants were even in their positions at that time such that they would have known? They wouldn't.

Do we have records of that? Doubtful.

Would they -- would they be disabled under the definition of disability under the ADA? Different question.

So the answer to that would be complex, individualized --

THE COURT: And it sounds like you're saying --

MS. GREENSPAN: -- not susceptible of direct response that the plaintiffs are looking for to make their argument simpler, which I get is what they're after.

THE COURT: Yeah, and you're saying to answer that as a request to admit, you wouldn't be able to do, so you'd deny it.

MS. GREENSPAN: Yes. Although a denial, you know, given the way that these are phrased, denial becomes a little bit challenging.

THE COURT: Yeah.

MS. GREENSPAN: We would respond appropriately, deny because they lack knowledge or all of the reasons there would be a denial.

THE COURT: Okay.

MR. HEPPELL: Just briefly on that point.

THE COURT: Yeah.

MR. HEPPELL: Our view of these particular requests for admit is that these are --

THE COURT: So where are we? Are we on D, or are we back on C?

MR. HEPPELL: On D, and specifically following on the discussion we've been having about whether the named plaintiffs are within the meaning of the ADA and the Rehabilitation Act covered individuals at this -- at the point in time that they were held beyond medical necessity. So it is a focused, detailed request for admission --

THE COURT: Okay. So just for the record, and these read all the same, admit that plaintiff Stephen W was an individual with a disability within the meaning of the Rehabilitation Act and Title II of the Americans with Disabilities Act at the time they were held beyond medical necessity in psychiatric hospitals, and it proceeds in the same fashion for all the plaintiffs.

MR. HEPPELL: In our view, this has nothing to do with each particular individual defendant's knowledge at the time or now about the disability status. This is about defendants collectively through their counsel taking a position on a -- I guess a mixed question of fact and law which may or may not be disputed, and if it's not disputed,

then we -- then we can skip over that for class certification.

If it is disputed, then we won't be able to. And in our view, that's an appropriate use of requests for admission to narrow the issues, and I don't think these go -- these don't hinge on whether a particular defendant had personal knowledge of their disability. It's, you know, were they covered.

MS. GREENSPAN: Well --

THE COURT: I agree, and I think I said something a little bit contrary to that earlier, but I agree whether or not someone's aware of it is a separate question than what you're trying to get to in your requests to admit.

Ms. Greenspan.

MS. GREENSPAN: Yes, your Honor. What plaintiffs just said I think, you know, encapsulates what our objection is for this, where they talk about asking defendants collectively to admit to something.

This is an action against 18 individuals in their individual capacity because it is an action seeking damages, not seeking damages against the State of Illinois or against DCFS other than the ADA claim, and, of course, you have to show intent to prove up claims under the ADA and the Rehab Act.

So let's first talk about those 18 individuals who will be called upon to respond to this, and in point of fact,

they can't.

THE COURT: Yeah --

MS. GREENSPAN: It is simply inappropriate to say, well, just, you know, never mind the jurisdictional component of this. Let's just say collectively because it would make it simpler for plaintiffs to -- to file their motion.

Your Honor, it just does not make any sense. We're talking about class certification here and class certification with respect to this many defendants with these claims.

If plaintiffs' claim is that this is a systemic issue and their expert's going to speak to that, I think we've discussed -- already talked about discovery that could lead to helpful information for their expert.

I do not believe that an admission or denial with respect to an individual plaintiff who was beyond medical necessity for a particular period of time for each of these 18 people is a fair question. It's not.

THE COURT: Well --

MS. GREENSPAN: And certainly not to answer collectively. We would not do that.

THE COURT: Yeah, I -- all right. So I don't -- I don't think you need this for your expert for certain because I'm not hearing anything about your expert at this point.

So I think the issue is one of that it is really best left to the briefing process for class certification because

you certainly can know that you tried to get this figured out through discovery early on and you couldn't.

I think, you know, defendants have a valid point is they can't answer collectively, although you certainly can answer based on your attorneys' knowledge, each defendant could do that, but the -- I think the real issue is the analysis that's necessary here is not necessary to be done fully for class certification.

And you are asking all these defendants, including DCFS, to do a deep dive on each of these people, which still doesn't answer, beyond your class -- potential class representatives, the class as a whole.

I think the struggle we're demonstrating here is evidence of what defendants are going to argue, which is it is each a unique case that needs to be considered.

What am I missing, Mr. Heppell?

MR. HEPPELL: I mean, that's obviously their position and our position is different about them --

THE COURT: But it must be your position as well. Otherwise, you wouldn't have these requests to admit here.

MR. HEPPELL: Well, if they -- if they disagree -- our position is that we wanted to find out what their position was.

THE COURT: Okay.

MR. HEPPELL: And I -- if I can briefly address the

collectivity point or the issue about that it's sent to all individual defendants.

THE COURT: I'm not moved by that, I don't think. I have a different view than Ms. Greenspan does on that issue.

MR. HEPPELL: Then I won't risk saying something that would --

THE COURT: Yeah, I think defendants could answer it based on their collective knowledge and the knowledge of their counsel, so I don't think that that -- I have a different view of that.

I'm not deciding that issue now, but what I am looking at is saying that that -- the issue for class certification, again, is is this one that -- an issue that fits for all, or is this one that would require each claimant to be assessed for whether or not they were disabled. That's the claim you brought, and that is a, you know, fact-intensive inquiry I think in general.

Part of me, I don't know this, but part of me thinks that the need to be hospitalized for psychiatric issues may answer that question in and of itself. I don't know that, but if that's your position, getting an answer to this discovery is not going to change that.

MR. HEPPELL: That -- that is our position.

THE COURT: Okay.

MR. HEPPELL: I would make two brief points. I don't

want to repeat myself, but it's our burden at class certification to establish, you know, each of the required elements and for each of the, you know, required named plaintiffs, and it's going to be an extensive process.

And so absent an admission on each of these requests for admit, you know, if they have a good-faith basis to deny it or legal objection, you know, that's fine.

But if they're not even going to be required to answer it, absent an admission, we are going to have to take up time and space in our briefing to make out the case that the named plaintiffs were individuals with disabilities such that they're appropriate class representatives.

So that's point 1. And point 2 is while I agree that all of the named plaintiffs being individuals with disabilities does not -- is not dispositive of the broader question of whether across the class that issue can be resolved on a classwide basis, I think that's one piece of persuasive evidence that we can point to along with other evidence to establish to our burden to a preponderance of the evidence that that's something that would sweep broadly across the class and not be an individual determination, given that we're talking about a universe of people who are hospitalized in psychiatric hospitals for some period of time with medical necessity.

THE COURT: Okay. Let's -- I hear what you're

saying.

Ms. Greenspan, you may have a different view on the collective knowledge idea, but there is some efficiency if you said no to all of these, just to answer it to say deny, but it doesn't sound like you're comfortable doing that either.

MS. GREENSPAN: I'm not, Judge, because I do not believe that it is -- would be an appropriate answer under the federal rules to collectivize the defendants' responses.

THE COURT: Okay.

MS. GREENSPAN: With respect to imputing counsel's knowledge --

THE COURT: Yeah, there's different schools of thought on that and different cases that deal with it differently, so --

MS. GREENSPAN: Right. So if I were required to answer, I would, of course, do so.

THE COURT: Yeah, I mean, I looked at the rule just to make sure because the rule does allow for the application of law in a request to admit, so that is -- that part seems to invite counsel's injection into the answer because obviously the client isn't doing that. It's the attorney.

MS. GREENSPAN: Yes, Judge. Counsel's legal judgment, of course, applies when responding but not with respect to the fact of the matter.

THE COURT: Yeah, okay. I think that -- I think the

discussion here is evidence why answering -- requiring an answer is not going to be fruitful.

I agree with you, Mr. Heppell, will you need to take up some space in your brief to explain it, but I don't think it's putting you at a disadvantage because the legal argument I think you're going to make, which you told me you thought you would be making as well, which is based on their admission for psychiatric services, that makes them disabled under the statute. Nothing more needs to be discovered.

And Ms. Greenspan, you know, she may have a different view on that. I don't know. But that seems to me to be your primary argument.

I agree with you if you got an answer that was clean and the answer you were looking for, it would make for -- it would short circuit a lot of argument, but it's apparent you won't get that answer from Ms. Greenspan, so I'm not going to order answers that aren't going to help you.

MR. HEPPELL: Understood. While we're on this particular topic, and I don't want to jump around, but Interrogatory No. 2 in the same -- in the Exhibit D, the same set of supplemental -- supplemental written discovery requests is a --

THE COURT: Hold on. Let Ms. Greenspan and her team get there.

Okay. I'm there. Are you there, Ms. Greenspan?

MS. GREENSPAN: I am, Judge.

THE COURT: Okay. Go ahead, Mr. Heppell.

MR. HEPPELL: So this is Interrogatory No. 2, the top of page 2 of Exhibit D, so this is on the same subject a contention interrogatory related to this -- this issue, and the Court may have a different view.

In our view, this would be getting an answer to this or an answer to a portion of this would be helpful in fleshing out in advance of class certification what position they are taking on this issue to allow us to, in our motion, make the case we need to make and not spend time making a case that we don't need to make.

THE COURT: Okay. You persuaded me.

The first part of Interrogatory 2 I'm going to order an answer, and this is Exhibit D supplemental discovery. So the first part reads: Do you contend that any of the plaintiffs and putative class members as defined in the complaint were not individuals with a disability within the meaning of the Rehabilitation Act of Title II of the Americans with Disabilities Act at the time -- I may have misread that -- within the meaning of the Rehabilitation Act and Title II of the Americans with Disabilities Act at the time they were held beyond medical necessity in psychiatric hospitals?

I'm going to require an answer to that. I'm not going to require an answer to the following phrase or

question: If your answer is anything other than an unequivocal no, identify every fact, every witness, and every document to which you will rely in order to support your position.

So I think, Mr. Heppell, maybe in retrospect and reflection, you could understand why that second part is an absurd interrogatory because that would require them to answer everyone in the class.

So you'll get your answer, but it's not going to have to explain why they say no.

MR. HEPPELL: Would the Court consider a narrowed --

THE COURT: No.

MR. HEPPELL: -- version of that only to the named plaintiffs?

THE COURT: Uh-uh. That's getting at the same way differently, and I'm still -- I haven't changed my mind on that.

Ms. Greenspan, do you have any objection to answering the first part of 2? I'll hear you out.

MS. GREENSPAN: We will answer it. We've been directed to do so.

I have the same problem with that question as I did with the more specific ones, but we will respond just -- and I'd like to point out, Judge, that this will be responded -- each of the 18 individual defendants and DCFS would be

responding to the first sentence in Supplemental Interrogatory 2.

THE COURT: Correct.

All right. Mr. Heppell, we were -- we've gotten off our little order here. We were going through Exhibit C, requests to admit. We've gotten to 75 and 76. Those will be answered.

77 to 78 we said no to. You directed me over to Exhibit D. I would like to get back through 79 through 83 on requests to admit.

MR. HEPPELL: 79 --

THE COURT: Ms. Greenspan, you're with us?

MS. GREENSPAN: Yes, your Honor.

THE COURT: You're tracking? Okay.

MR. HEPPELL: 79, 80 and 81 in our view are similarly helpful in terms of narrow, potentially narrowing the scope of issues at dispute for claims 3 and 4. It does not suffer from the problems some of the others perhaps that it's specifically down the line with individual plaintiffs. I don't know if we'll get a helpful answer, but that's not, you know, that's not the standard, but I don't want to waste time --

THE COURT: Well, 79 seems to me to be an answerable question.

Ms. Greenspan?

MS. GREENSPAN: So 79, for the record, is admit that

it was only because of the plaintiffs' disabilities that a placement option could not be found once they were deemed ready for discharge from the psychiatric hospital.

THE COURT: Yeah, and my guess is you're going to say the answer is no.

MS. GREENSPAN: Yes, Judge. That's correct.

THE COURT: So you can get that one answered.

MS. GREENSPAN: I can.

THE COURT: What about 80?

MR. HEPPELL: I mean, 80 is the inverse of 79.

THE COURT: Yeah, if my algebra is right on this, it's going to be yes.

We're looking at 80, Ms. Greenspan.

MS. GREENSPAN: I mean, there are problems with the way these are -- with the way these are drafted, but we will include those in our response --

THE COURT: Okay.

MS. GREENSPAN: -- Judge. I don't think the answer is quite that simple.

THE COURT: Okay. I'm going to have each defendant answer 79 and 80.

MR. HEPPELL: And 81 is -- I mean, it's on the same topic, but it's slightly broader. It's a "but for" causation point.

THE COURT: Hold on.

Oh. How does that help with class certification?

MR. HEPPELL: I think it -- it goes to an element of the disability discrimination claims that, if it's admitted, would establish the plaintiffs as appropriate class representatives.

THE COURT: Ms. Greenspan?

MS. GREENSPAN: No, your Honor, I believe it goes to the merits. It does not go to -- it might go to an element of the claim depending on how plaintiffs structure their arguments in their motion for class certification, but not having seen -- not having seen that, we obviously cannot respond.

But it seems to me that this is -- this is a merits question if it's causation. I just don't see how it helps -- would help plaintiff in their briefing if that's the objective here.

THE COURT: Yeah, and the other problem with this is that it assumes a fact that is still disputed, and that is whether the plaintiffs had disabilities, so it is embedding all the issues that we've just spent about 15 minutes talking about.

I'm not going to have it answered at this time.

82 and 83 are left.

MR. HEPPELL: I think those go to the temporal scope of the class that we'll seek to certify.

THE COURT: Well, your client -- maybe it's not your client, but I know there's still an active case here in this courthouse dealing with this issue, so I think that information is known.

What -- how does that go to your -- are you proposing the class would be to current?

MR. HEPPELL: For damages purposes, yes, that's what our -- I think our class, at least as it's currently alleged in the complaint, obviously we are going to assess in pursuing class certification what the appropriate scope is, but I think if we determine that that's appropriate, getting their position as to whether it's an ongoing issue or not would be relevant to class certification.

THE COURT: Ms. Greenspan?

MS. GREENSPAN: Your Honor, you're correct. That case is *B.H. vs. Smith*, 88 C 5599. And the requests 82 and 83 will not -- will not inform the class question. This is a merits question at best. It's I would suggest extremely pejorative.

THE COURT: Yeah, I'm -- how -- I'm trying to understand how that helps you for class purposes.

MR. HEPPELL: Because in making out our argument for class certification that it's appropriate to certify a class of these individuals over this particular time period, an admission that it's still occurring would assist us in I think

nailing -- in deciding how much space we need to put in that brief to nail down that it is still an ongoing problem.

THE COURT:  So your theory of systemic underfunding would never end, and it wouldn't matter if there are children being held beyond medical necessity because placement is challenging.

Let's say there are -- it's still happening.  My guess is it probably still is happening, and it is not because there aren't beds but because there are a dozen wards of the state who are very challenged for placement.

How would that help you?  I wish it were only a dozen.  My guess is that it's probably more than that.  How does that -- again, we're not talking about what we would like our society to look like.  How does this help you for class certification?

MR. HEPPELL:  Might I have one moment?

THE COURT:  Yeah.

(Pause.)

MR. HEPPELL:  We are willing to not seek these answers for class certification purposes.  I'm not going to respond to -- more broadly to what you said because I don't think it's necessary for our purposes today

THE COURT:  Yeah, and that's fine.  I'm not saying that these discovery responses don't have to be answered.  I'm saying they don't have to be answered on the date I'm going to

give on the ones that we just went through.

All right. And then D, I'll tell you my problem generally with D, and this came up last time, Mr. Ainsworth may have told you, is that it actually was the impetus for all of this, and that is these come out and when does this end? And we had been working towards getting written discovery answered and then doing experts.

So these come out, and I don't -- I don't know when this all ends. I don't know if any of these are actually ones you need for class certification, and, you know, obviously these came out last couple weeks, couple months, and we've been working through this discovery for class certification purposes for I don't know when I got on the case, but it's been a while.

So are there ones in here that are beyond curiosity? There has been, I'm sure Mr. Heppell you know this, there's a discovery issue here regarding certain information that was available that wasn't produced on -- in a way -- there was a transparency issue, however you want to frame it, there's an issue there. I don't know what it fully looks like, so I'm not opining.

But that inspired some of these questions which I know can't go to class certification issues. Those are discovery on discovery. And then there are others. So I'm trying to understand if there are any in Exhibit D that you

think you need for class certification purposes.

MR. HEPPELL: So to your point about discovery on discovery, that's interrogatory -- Supplemental Interrogatory No. 4, which we agree we don't need for class certification purposes.

THE COURT: Okay.

MR. HEPPELL: We've already addressed No. 2.

THE COURT: Interrogatory No. 2 will be partially answered.

MR. HEPPELL: Right.

THE COURT: I was looking at 1.

MR. HEPPELL: Yeah, you know, our view is that we do need an answer or at least an answer would be fruitful for us. And, again, I don't think this is something for our expert, but for class certification more broadly on the, you know, again the contention interrogatory related to the disability claims.

THE COURT: Yeah, No. 1 is interesting. It's, you know, innovative. It is asking for the defendants to file their brief in an answer to an interrogatory.

MR. HEPPELL: Well --

THE COURT: Tell me, so just for the record, do you contend that the question of whether DCFS discriminated against children who have been held beyond medical necessity in psychiatric hospitals from 2008 to the present is not

subject to adjudication on a classwide basis?

I think we all know the answer to that, and the answer is, yes, we don't think it's subject to classwide adjudication. If that's the answer you want, I'm happy to have Ms. Greenspan and her team answer it, but the follow-up is the problem. If your answer is anything other than an unequivocal no, identify every fact, every witness, and every document on which you will rely in order to support your position.

MR. HEPPELL: Any -- our view --

THE COURT: Let me ask you this. If in a regular case that had not gotten off the rails as badly as this one has and there's a discovery interrogatory, do you believe this case is subject to resolution at summary judgment? If your answer is other than an unequivocal no, state every reason, document, blah, blah, blah, that you could use to support it.

Do you think any judge in her right mind would allow that to go forward?

MR. HEPPELL: As you phrased it, no, but I do think contention interrogatories are --

THE COURT: Do you contend that this case should be resolved at summary judgment based on the fact that there's undisputed evidence supporting one side?

I can do it better if I had time to -- I'm not a wordsmith. But, again, the question is do you think any judge

in this courtroom -- courthouse, not courtroom -- courthouse would say you need to answer that?

MR. HEPPELL: No, not as you phrased it.

THE COURT: Okay. We're not going to get an answer to 1. That's what this is doing.

2 we've been through.

3. You said 4 was discovery on discovery? I feel like 3 is as well, but maybe -- Mr. Ainsworth is shaking his head, so maybe I'm missing that one.

MR. AINSWORTH: Your Honor, in regard to No. 3, this is not discovery on discovery because we're simply trying to get an answer from the Department that officially what has been produced can be relied upon for class certification purposes to show who is part of the class, and, you know, the information that's contained in the database is complete and over what timeframe it covers.

And so that's all this interrogatory is requesting. The defendants had agreed to produce this information. We're just trying to formalize that process.

And we need it for class certification because it indicates to us over what time period, you know, so we can go through -- we can use that data to support our motion and say this is what it represents to be. Otherwise, it kind of lacks foundation. We have a database and we can't say, like, this is the --

THE COURT: Okay. I get it. It's a little clunkily phrased, but I get what you're getting at.

Ms. Greenspan?

MS. GREENSPAN: Judge, we have the psychiatric hospitalization database has been produced, not in its entirety as I explained, but I believe when we were last in court, perhaps the time before that.

We produced the psychiatric hospitalization database for all youth who are beyond medical necessity, not the entire psychiatric hospitalization database. That would be much larger. There are many more children who were psychiatrically hospitalized, but not beyond medical necessity.

So our -- the Department's answer would say that.

In addition, the psychiatric hospitalization database, as I explained on the record, is a transactional database. It is a point in time. So we can answer that question, but we explained that --

THE COURT: Okay.

MS. GREENSPAN: -- when we turned it over, and we also turned over a data dictionary.

THE COURT: Okay. Let me ask it a different way, Mr. Ainsworth.

Ms. Solomon's declaration, are you saying that that's not sufficient to satisfy your evidentiary concerns?

MR. AINSWORTH: Correct.

THE COURT:  Why is it not?

MR. AINSWORTH:  Because it doesn't answer what timeframe the database covers, and we don't know if the -- we just want to ensure that -- and we can clarify that we are only concerned with BMN -- you know, the BMN portion of the psychiatric hospitalization database, but so long as the Department confirms that this is the entirety of the BMN psychiatric hospitalization database that's been produced and the timeframe that's covered at the point in time that it was produced to us.

THE COURT:  Okay.  I'm -- I'm going to do it this way.  I'm going to give a date for the defendants to answer all the discovery we've gone through.

I'm going to order the defendants to provide an affidavit from Ms. Solomon or someone else who's appropriately designated that addresses your concerns, Mr. Ainsworth.  I understand what you're trying to get done.  It does make sense.

I'll further direct counsel, defense counsel, to get with you to find out what you're looking for to satisfy your evidentiary concerns.

Do you have any objection to that, Ms. Greenspan?

MS. GREENSPAN:  With the clarification that this is with respect to Interrogatory No. 3.

THE COURT:  Correct, that's what I'm looking at.

52

MS. GREENSPAN: That would be fine, Judge. We'd agree.

THE COURT: All right. Does that satisfy your needs, Mr. Ainsworth?

MR. AINSWORTH: Yes. Thank you.

THE COURT: Okay. So 4 we're past. We're at 5.

MR. HEPPELL: So No. 5 I'm feeling optimistic that it will read to you as it reads to me like it is focused on systemic issues. We want our expert to be able to -- and there's a companion Request for Production asking for the production of these documents. So it's asking them to identify them and then asking them to produce them.

We want our expert to be able to review DCFS's databases or, you know, the information they used to track the number of available placements over the class time period, which will inform the opinions we want her to offer on that topic relevant for class certification.

THE COURT: Okay. So I do think you're right, you should feel hopeful. It is a systemic question, so that's good.

I -- it's phrased as an interrogatory. Understandable. I don't want to get us bogged down. I want to move forward.

So I'm wondering, Ms. Greenspan, what's your thought on responding to Interrogatory No. 5 if you can do that, and

then we're going to get to this request to produce, which I thought we were -- I thought we had done that. That's what I'm worried about.

But tell me what your thought is on the Interrogatory No. 5.

MS. GREENSPAN: We can -- since this is directed to DCFS, we can respond to it, Judge. The answer will be extremely broad.

THE COURT: So that's what I was wondering about. Wouldn't it be better if you just had identified the electronic databases that Department possesses that provides you with that information so then they can ask for those databases and provide them? Because I do think they're entitled to know the number of beds or we're calling them beds, I'm not sure what DCFS says, but the number of beds and the number of wards who are in psychiatric hospitals so they can look at that systemic issue.

MS. GREENSPAN: And the Department can provide a response to that, but it is -- I know, Judge, having started to review these interrogatories already with my client, that when we go back to 2008, so a solid 15 years ago, systems change over time. What's available by way of computer, by way of -- which, you know, some of this information will be contained in contracts with private agencies. Some of it is contained in some electronic databases.

It is just not as simple an answer as -- as, you know, people might hope.  This is a very large organization.  These are -- when we look for, you know, how many beds or placements are available, it is extraordinarily broad.

THE COURT:  Let me ask you this, going back to 2008, was the Department using electronic databases or some form of electronically stored information, or were there still documents that they used to keep count?

MS. GREENSPAN:  There was electronically stored information, Judge, and there were hard copy documents as well.

THE COURT:  Okay.

MS. GREENSPAN:  The electronically stored information may not be in the form of databases, where someone could push a button and be able to generate the number of available, you know, specialized foster care beds or, you know, placements in residential facilities, or placements -- or placements or "beds" out of state --

THE COURT:  Okay.

MS. GREENSPAN:  -- at any given day of the week when a youth might be looking for a placement.  It is simply more complex than that, but we can answer that question.

THE COURT:  Okay.  So No. 5 will get an answer.  Thank you.

All right.  Then we're on to -- we're on Exhibit D,

Request for Production, page 3.

MR. HEPPELL: So number -- I think these are categorically similar in terms of the types of documents they're getting at, but to address them one by one, No. 1 is specifically requesting documents that reflect a gap analysis, right?

So does DCFS have documents where they've undertaken an analysis of comparing the available placements to their projected needs for placements, and that's obviously centrally -- I shouldn't say obviously -- in our view --

THE COURT: No, I --

MR. HEPPELL: -- centrally relevant to the claims and appropriate for our expert to opine on including in support of class certification.

THE COURT: Ms. Greenspan, your thoughts on that?

MS. GREENSPAN: And, again, Judge, this is to all defendants, so to all 18 individual defendants and the Department, whether they, for example, I mean, setting aside the two deceased defendants for whom there may be ESI on this. Perhaps there are people still with the Department from who we could glean some knowledge, perhaps not going back as far as 2008, as to what assessment was done by them at that time.

It becomes very, very complex, and I'm not sure whether a gap analysis, whatever that means, would be helpful to moving towards their question of a systemic problem.

THE COURT: Well, yeah, that one I actually think would because it would show what the Department and its executive leaders understood to be the difference between the need versus the supply, so to speak, of, you know, beds outside of a psychiatric facility for these type of wards, so I do -- I do think that fits into the systemic theory that they are articulating.

Mr. Heppell, what do you think about limiting it to DCFS as opposed to all the individual defendants?

MR. HEPPELL: We have no issue with that.

THE COURT: Ms. Greenspan, so I'll have No. 1 answered to DCFS only. Thank you both.

No. 2.

MR. HEPPELL: If I may have one moment?

THE COURT: Sure.

(Pause.)

MR. HEPPELL: Just to forestall a similar conversation, I think all of these can be directed only to DCFS. It's not our understanding that each of these individuals is likely to have large quantities of things that we need that are personal to them, whether they're --

THE COURT: And you can always get that later.

MR. HEPPELL: Right. And we're not approaching these as all or nothing, and if there are -- you know, in the ordinary course of responding to discovery, if there's a

particular concern about scope or -- we're open to having those conversations.

Right now I understand the exercise to be the threshold question of do we even -- you know, are we even entitled to some -- to get something on these.

THE COURT: Yeah, and just so we're clear, when I'm saying you're not getting that, I mean you're not getting it in the near future. So some of these -- you know, again, some of these written discovery issues would be great if we were into the merits, you know.

MR. HEPPELL: Understood.

THE COURT: Great may be too strong a word, but they'd be -- I'd have a different view, so I'm just trying to get us into class cert. land.

Okay. So, Ms. Greenspan, what about if these Requests to Produce 1 through 8 limited to DCFS as opposed to the individual defendants?

MS. GREENSPAN: Your Honor, these are very overbroad questions.

THE COURT: I know they're -- so --

MS. GREENSPAN: This is not directed to youth who have been just (inaudible) to start, for example, Request No. 2, documents sufficient to show the weekly census of children placed at each agency contracted with the Department to provide out-of-home care by type of placement from 2008 to

the present, including, and not limited to, residential treatment facilities, residential -- by that, I assume they mean independent living or temporary transactional living, specialized foster care or the equivalent of those types of placements writ large for every child, and it's the weekly census of every kid. That is not --

THE COURT: Okay. But you --

MS. GREENSPAN: -- it is extraordinarily overbroad.

THE COURT: You included a phrase that's not in there. You said "including, but not limited to," but it doesn't say that. It says this interrogatory --

MS. GREENSPAN: Or the equivalent.

THE COURT: -- is limited to, so that's fair.

MS. GREENSPAN: Or the equivalent, Judge, which expands it. I mean limited to the following types of placements or the equivalent. What they would be excluding from that is presumably relative foster care or --

THE COURT: Okay. So --

MS. GREENSPAN: -- that's the only thing they've excluded.

THE COURT: I'm going to order the Department to respond to this one. I'm going to strike "or the equivalent of any of these three types of placements."

I'm going to assume, Mr. Ainsworth, when you structured these requests, you understood these terms of art,

and it's limited to DCFS.

MR. AINSWORTH: That's correct.

MS. GREENSPAN: And, your Honor, I -- to foreshadow the response, you were asking for the weekly census of children, presumably youth in the care, custody of DCFS.

THE COURT: That's fine. We don't need weekly, how about monthly?

MS. GREENSPAN: Again, Judge, my objection would be the same, which is that it's for agencies contracted to -- with the Department. I don't know that as I sit here today, whether the Department has those documents. It would need to go to those agencies perhaps and ask for them.

This is something we could find out, but it is certainly not something that we'd be able to uncover, I believe, in a time period that your Honor's going to be asking us to respond to it for these purposes.

I also do not see where that gets us with respect to the question of a systemic problem. We don't know, for example, whether, you know, let's say for a specialized foster care, you can't -- we can't say, as we sit here today, that a particular specialized foster care home would have the capacity to take on a youth with a particular constellation of needs. So asking for a number writ large I think gets you nowhere.

THE COURT: That's your view.

MS. GREENSPAN: Yeah.

THE COURT: Plaintiffs have a different view, and so I think that may be something that is, you know, raised during the briefing on class certification, but what I'm trying to do is give plaintiffs the evidence or information that they -- that is tied to their theory of their case. This seems to do that.

I do appreciate it may be harder than I think. I totally get that, but my hope is that DCFS had a list of agencies where they could make these type of placements, and I agree with you weekly is too much, we don't need that, but --

MS. GREENSPAN: But, Judge, it does have that list -- I apologize for interrupting the Court.

THE COURT: No, no.

MS. GREENSPAN: But it does have that list that it's through that central matching process that we described briefly in our papers. You know, so there is a list of agencies that's generated when placement is sought for an individual youth who's beyond medical necessity. It's through the central matching process.

THE COURT: All right. But do plaintiffs have those raw numbers so they could say these were the beds available, and this was the trend that was going on for a while?

MS. GREENSPAN: I'm not sure that there are raw numbers available, Judge, because it is at a point in time

through that central matching process does X agency have a placement potentially available for this particular youth? Yes or no? Would there be an interview process, and you go through that individualized assessment and placement process.

But as far as a list of agencies with a number -- what number of openings they had at any point in time? If the Court orders it, we will certainly look into it, but I'm foreshadowing, your Honor, the challenges that -- in responding to this particular request.

THE COURT: So 2 is just asking for the number of children who were placed at each agency. So I would imagine that the Department would know on a daily basis where each of its wards are placed.

MS. GREENSPAN: That the casework for children is, in large part, privatized, Judge, so I am not sure, again, as we sit here today, how the Department is informed about that.

THE COURT: Okay. So I don't think weekly is necessary. Monthly census, so I'm going to have this answered, weekly census -- I'm sorry -- monthly census, not weekly, and strike "or the equivalent of any of these types of placements."

And see -- I'm going to tell you now I'm going to give you an earlier date for some, but these Requests for Production, I'll give you a little bit more time on.

No. 3.

MR. HEPPELL: No. 3, it's getting to the same broad issue through I think a slightly different category of documents.

I imagine some of these might be overlapping. We don't know what the types of documents are, but this is getting to, you know, the Department's, the capacity that the Department has contracted with its external agencies for providing the types of beds that we understand --

MS. GREENSPAN: Judge, we're talking about literally hundreds --

THE COURT: Yeah, how is --

MS. GREENSPAN: (Inaudible).

THE COURT: How is 3 different from 2 what you may be getting in a different format?

MR. HEPPELL: It's -- so 3 relates to capacity and 2 relates to census. And maybe it's the same documents that they produce in response to 2 or 3.

We don't know how they track them. 3 is looking at how many space -- how many places -- placement spaces are available, how many beds are available. 2 is the census, how many children are going there.

THE COURT: And you're saying, Ms. Greenspan, there's no centralized database now with that information?

MS. GREENSPAN: I don't know, Judge.

THE COURT: Okay. I'll have the Department answer

No. 3 to the extent it's contained in a centralized database. So if -- you know, I'm hoping at some point that was centralized. If it didn't happen until 2010, 2011, not 2008, you don't have to go back and get other stuff, but whenever the Department started to centralize that.

MS. GREENSPAN: And we're talking about contracted capacity of the agencies in your judgment?

THE COURT: Yeah.

MS. GREENSPAN: That number changes from time to time over the period of the contract. Additional --

THE COURT: That's fair.

Mr. Heppell, so Ms. Greenspan is saying the number changes, so do you want -- if you wanted all documents, then you'd just be getting documents as to when these -- you know, whenever the numbers changed, I don't know.

I said limited to a database, so they're not going to go find documents, but I'm assuming at some point they started to centralize that and it's some form of electronically stored information. But, again, it's going to be a place in time. I'm inclined to say monthly, whatever the monthly census was, or capacity, you use capacity for 3.

So, Ms. Greenspan, that will be limited to monthly capacity reports. You can choose first of the month, end of the month, the 15th, I don't care, but -- and it's limited to a database of sorts for ESI, not documents.

Okay. We're on 4.

MR. HEPPELL: I think in function, 4 is the same as 1 in terms of what we're getting at. We're looking for documents reflecting that comparison between supply and demand, to use a crude analogy.

THE COURT: I think it is. I don't -- I'm not going to order the Department to answer 4. I think 1 -- Ms. Greenspan, as long as you understand 1 -- give me a second.

As long as you understand 1, the wording of No. 4 to inform what they're looking for in No. 1, I'm not going to order you to answer 4. I think it's duplicative.

MS. GREENSPAN: Thank you, Judge. And with respect to 1, can we have that as reflected in the centralized database as well?

THE COURT: Yeah.

MS. GREENSPAN: I think that makes sense. Thank you, Judge.

THE COURT: So that's centralized database as well. It's just going to get you the information faster, Mr. Heppell.

MR. HEPPELL: Understood.

I guess just two -- not knowing what documents are out there, if they had commissioned some study or report that was, like, here's our gap analysis, here's, you know,

someone's gone off and done that analysis, that would be outside of a centralized database. If that exists, that would obviously be very relevant.

THE COURT: That's fine, that's fine. So No. 1 is limited to database and includes any report, any formal report, prepared from 2008 to the present that documents that analytical comparison, whether that's internally, it's been internally commissioned or externally commissioned through some type of consultant. If there's a report or reports that look at that issue in that way, those need to be produced.

MS. GREENSPAN: Again, this is with respect to systemic issues.

THE COURT: Correct, the gap analysis. That's -- okay.

No. 5?

MR. HEPPELL: We don't need No. 5 for class certification purposes.

THE COURT: I think that's a good answer.

No. 6?

MR. HEPPELL: No. 6 is getting to one aspect of our theory, which is, you know, the funding component of the availability of placements. And part of our theory, which I know was discussed last time around, wasn't just that they were not asking for increases, they'd actually -- you know, decrease our budget, we're going to get rid of these

placements. So I think that is relevant to the systemic issues we're talking about, and it's something we do want our expert to be able to opine on that aspect of the process.

THE COURT: Ms. Greenspan, is that hard to get to? I don't know.

MS. GREENSPAN: It will take some time because it's going back 15 years, Judge.

THE COURT: Yeah.

MS. GREENSPAN: I -- I would not hazard a guess about how long it would take.

THE COURT: Okay. But I'm assuming, just having worked for government myself, that you put in -- you know, the agency puts in its request. Doesn't mean it gets filled and all sorts of things happen after that, but I would think they'd be able to say this was our request for each of these years.

MS. GREENSPAN: Yeah.

THE COURT: Okay. So --

MS. GREENSPAN: They would be able to generate a document, budget proposal and --

THE COURT: Okay. I'll order 6 be responded to.

MR. HEPPELL: 7, I think, is subsumed by some of the others. I think it's phrased differently to try and -- but make sure we're covering our bases, but I don't think it's a new category beyond what we've discussed.

THE COURT: I'm not going to order 7 be answered. I think it's duplicative. I think the information is subsumed in No. 1, especially as modified.

MR. HEPPELL: No. 8, I don't know if we addressed in terms of a ruling. I know I referred, said it's a request seeking copies of what was identified in the interrogatory.

THE COURT: Let me look.

Okay. Do you see what that one's doing, Ms. Greenspan?

MS. GREENSPAN: I don't. Sorry, Judge.

THE COURT: So we're on page 4 of Exhibit D, No. 8.

MS. GREENSPAN: I see that.

THE COURT: All documents or ESI, electronically stored information, identified by the Department in response to Supplemental Interrogatory No. 5, and No. 5 is the penultimate interrogatory: What electronic databases does the Department possess that would provide information about the number of beds or placements available from 2008 to present?

MS. GREENSPAN: Well, this may put us in the unpalatable position of having to -- to the extent that we need to get new ESI in this case?

THE COURT: Yeah, that's what I'm trying to avoid. So what has been produced that gives -- and, plaintiff, I'll hear from you next, Mr. Heppell. What do you think you've produced that gives plaintiff both the demand or need for beds

and the availability of beds?

MS. GREENSPAN: There were no search terms that went to that, Judge.

THE COURT: I would -- yeah, I don't think there would be. I just don't know what discovery has been produced as you've whittled it down.

MS. GREENSPAN: Of the documents that we've reviewed, plaintiffs have, of course, nearly 6.7 million pages, there are a large number of documents that provide lists of children who were beyond medical necessity at any given point in time. Whether that's going to tell them the number of available placements or beds for out-of-home care from 2008 to the present by type of placement, I don't know that we've got. We will look.

THE COURT: So that's a question, do you have documents that do that? Like, do you have databases that say these are, you know, on Wednesday, May 17th, I need to place a ward and how many beds are available to do that?

MS. GREENSPAN: And, again, Judge, that goes to the central matching process. Today we've got -- let's talk hypothetically. Today there's a young person who is psychiatrically hospitalized who needs to find a placement, they're ready for release or planning to be released from the hospital, and the request goes through the process that we outlined.

There's an assessment of what that child's needs are. Here's the request made to the central matching because that's the device by which the list of agencies that may have a placement for that child come up. Let's say it's LSSI and, you know, three other agencies in a geographic area that may have a placement available.

The request goes out. Packets are sent to those agencies. We've got this child who needs a placement, do you have a placement for them?

Agencies respond and let's say two of them say, yes, we have a potential placement for this child. Let's set up an interview or send me additional information.

That's generally how the process unwinds. That's in very broad strokes.

So the direct answer to your question, Judge, I'm not sure that there is a specific database that would give overall the number of available placements or beds without drilling down to the specific child. The system is arranged in a way that is centered around the child and the needs for that individual child.

THE COURT: Okay.

MS. GREENSPAN: There's contracted capacity, of course, with different agencies. As Mr. Williams, I believe, or Mr. Jones responded in their interrogatory responses that we attached to our briefing, if there's not a placement with a

particular agency, sometimes they would reach out to that agency and say, you know, do you have an opening for this child? Because, of course, the agencies don't just contract with DCFS. They contract with other agencies and entities that would need to place children in those facilities or foster homes, specialized foster homes.

So it's not quite that simple.

THE COURT: Okay. So, Mr. Heppell, what are -- I understand why you're looking for that. I'm just -- I don't know that they have that.

And I'll tell you the thing that worries me -- I'm sorry for interrupting you and I'll hear you out. "All documents" worries me because that is -- that ends up being hours and hours and days and days. Databases that they maintain I'm less worried about because if they maintained them, you know, and you wouldn't -- based on how Ms. Greenspan's describing them, I think the database is a fluid thing.

So you wouldn't get the database from every day, but certainly -- I understand what you're trying to show, and I would give you some form of the data if it's available, but "all documents" is going to be a problem, I can tell you that. So tell me what you're thinking.

MR. HEPPELL: I understand the point about the breadth of all documents, and we are amenable to limiting it

to databases. We had included a specific reference in the interrogatory. I made the mistake of not attaching the transcript as one of the exhibits, but that's, you know, while we're trying to flesh out our understanding of what they have, obviously if what we're asking for doesn't exist or it doesn't exist --

THE COURT: That's easy.

MR. HEPPELL: -- that's easy, if it only exists as it exists today and the way that it's maintained, there aren't those versions over time, then they will, through the combination of the requests and the interrogatory response provide that information to us.

THE COURT: Let's do this. I'm open to you getting this information. I want to see what the answer to the interrogatory is, and then we'll look at you getting the documents.

I'm using documents in the most broad terms, not the, you know, the database, the ESI, whatever.

But let's see the answer to that, and then we'll get back in here shortly after that to figure out what that looks like and what you need to try to prove your theory of the case.

All right. So that, 4, we're going to go back and get dates for all of this, but the Requests for Production I'm going to give you more time on, so just remind me,

Ms. Greenspan, when we start getting dates.

Then requests for admission, where are you on those, Mr. Heppell?

MR. HEPPELL:  I believe we addressed these already, Judge, when I skipped out of order.

THE COURT:  Yeah, okay.

Okay.  So I think none of those will get answered in for now.

The -- other than the Requests for Production that we just were plowing through, Ms. Greenspan, I'm inclined to order you to answer by May 26th or June 2nd.

MS. GREENSPAN:  To which parts of it, Judge?

THE COURT:  Not the Requests for Production, just -- I can go through all of them again.  Let's do that.

For the interrogatories, whatever schedule you're on, just stay on that schedule because -- I'm sorry, Requests for Production, Exhibit A, whatever schedule you're on, you can just stay on that.

MS. GREENSPAN:  Judge, if I may, let's -- if we're looking for a schedule overall, let's say June 2nd.

THE COURT:  June 2nd, okay.

MS. GREENSPAN:  Other than the Requests for Production.

THE COURT:  Correct.

MS. GREENSPAN:  And to be clear, what we're talking

about is information contained in database.

THE COURT: Well, my law clerk is excellent, so he's going to go through and put out all the things I said you need to answer and who needs to answer. Some are just for DCFS. That will be June 2nd.

I'll get you back in here. Give me a second.

June 8th, 2:00. Does that work for everyone? Let's make it 2:30 actually. The case before you takes up a lot of time.

And then a status report June 6th. Tell me where you are and all of that. And then Ms. Greenspan, I'd want a reasonable date for the Requests to Produce that we've gone over that you think you'll need and Interrogatory No. 5 on Exhibit D, which is the database that gives the supply side of the calculus that plaintiff is looking for, what that's telling you and whether there are databases or not that, you know, and what they look like.

MS. GREENSPAN: Judge, so I'm clear. That would be included in the status report?

THE COURT: Yeah, just -- yeah, just put that in there so when we sit down, I have some semblance of where we're going.

MS. GREENSPAN: Thank you, Judge.

THE COURT: Sure. Is there anything else you think needs to be in that status report, Ms. Greenspan?

MS. GREENSPAN: Not as I sit here right now, Judge.

THE COURT: Okay. Mr. Heppell, anything else you want in that status report?

MR. HEPPELL: No. Thank you, your Honor.

THE COURT: All right. Any other issues, Mr. Heppell?

MR. HEPPELL: Not at this time from plaintiffs, Judge.

THE COURT: Okay.

MS. GREENSPAN: Your Honor, Mr. Verticchio had an excellent suggestion.

THE COURT: Sure.

MS. GREENSPAN: This has got a lot of moving parts here. Could we set up a time for a call with chambers, with counsel, you know, all of us, to make sure that everything that comes through fits with our notes and our mutual understandings? Would that make sense?

THE COURT: Yeah, why don't we -- we won't set the time. Why don't you just file a status report after the minute order comes out. If you have any questions on that, just say we would like to meet with the Court. Here are our questions.

MS. GREENSPAN: If there are none, then there would be none.

THE COURT: Yeah, and you can say everything was

75

good.

That's a good idea.  I do think there's a lot of moving parts, but at least we're moving, so that's good, and it seems to be forward.

All right.  Thank you all for your patience and your time and we will see you in a few weeks.  Thanks so much.

MR. AINSWORTH:  Thank you, Judge.

MR. HEPPELL:  Thank you, Judge.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital-recording system.

*/s/Kathleen M. Fennell*                    *May 18, 2023*
_____              _____
Kathleen M. Fennell                         Date
Official Court Reporter