# Exhibit 1

August 7, 2024

McCarrel expert report in Golbert v. Walker


I am Deborah McCarrel and have almost 40 years of experience in the state's human services delivery system with an emphasis on child welfare and children's behavioral health program development and implementation. I hold a bachelor's and master's degree in social work from the University of Illinois and hold licensure as a Licensed Clinical Social Worker (LCSW). During my state tenure, I held various positions in human service departments working on children's issues and programming. The focus of my career was in service to the Department of Children and Family Services (DCFS). My last position with DCFS was the Chief of Operations responsible for all statewide regional field activities for the care and placement of foster children. I have led and supported the implementation of state and federal policies or procedures pertaining to child welfare placement, adoptions, and resources, while serving as a chief policy formulating executive. I am well versed in the state's delivery of children's behavioral health services having provided leadership to program staff while with the Department of Healthcare and Family Services (HFS) for the NB vs Hamos lawsuit that certified a class of Medicaid eligible children with mental health or behavioral disorders in need of services. My team developed a comprehensive children's behavioral health service delivery model that was grounded in Systems of Care (SOC) values and principles in coordination with constituents, all state child-serving agencies, attorney general's office, and governor's office. I am uniquely qualified to provide comment on this issue as I have a deep understanding of the child welfare system as well as the children's behavioral healthcare system.

I have been asked to opine on common issues of fact in litigation challenging ongoing issue of children in the care of DCFS being held in psychiatric hospitals *beyond medical necessity*, and I offer the following opinions based on the evidence described below that is available to date.

## Materials Reviewed

In preparing my report, I reviewed the following documents:

- Cook County Public Guardian Written Testimony from September 2, 2021 House Adoption and Child Welfare Committee Subject Matter Hearing
- January 31, 2024 Letter from the Cook County Public Guardian to Judge Jorge L. Alonso re: *B.H. v. Smith*, No. 88 C 5599
- The Challenge of Youth in Psychiatric Hospitals
- March 1, 2024 Consolidated Order in *In re Interest of TT Tillman*, 19 JA 61, *In re Interest of Sincere Lee*, 22 JA 189, and *In re Interest of Peace Powell*, 17 JA 1179
- January 3, 2022 Consolidated Order in *In re Interest of* MDC, 07 JA 311, *In re Interest of* DG, 21 JA 361, *In re Interest of* MJB, 16 JA 25, *In re Interest of* KK, 21 JA 673, *In re Interest of* LM, 07 JA 770, *In re Interest of* RA, 19 JA 1533, *In re Interest of* AM, 19 JA 791, *In re Interest of* TP, 21 JA 1093, *In re Interest of* CRM, 21 JA 689, *In re Interest of*

1

DJ, 21 JA 452, *In re Interest of* EM, 19 JA 964, *In re Interest of* KB, 19 JA 1203, *In re Interest of* KJ, 21 JA 1105, *In re Interest of* QE, 21 JA 1046
- Transcript of Testimony of Dr. Mark Friedman and Lauren Williams in *In re AM*, 19 JA 382
- FY 2023 BMN End of year Summary
- 2023 DCFS Report to the General Assembly – Annual Youth in Care Waiting for Placement Report
- 2018 DCFS Report to the General Assembly – Youth in Care Waiting for Placement
- 2020 DCFS Report to the General Assembly – Annual Youth in Care Waiting for Placement Report
- 2021 DCFS Report to the General Assembly – Annual Youth in Care Waiting for Placement Report
- DCFS Procedure 301.110 Psychiatric Hospitalization
- DCFS Procedure 315.15(b) Best interest of the Child, The Child's Sense of Time
- DCFS Procedure 301.55, Placement & Visitation Services
- All documents referenced in DCFS's supplemental responses to Plaintiffs' interrogatories

**Description of Common Factual Issues**

"Beyond Medical Necessity," ("BMN") in this instance, means a psychiatric hospitalization that continues after a DCFS Youth in Care has been medically cleared for discharge. Children are given the BMN designation by the psychiatric hospital when the youth in care has completed required treatment but has no placement to return to after acute services are rendered.

DCFS applies standard definitions of a psychiatric hospital as follows: 'A psychiatric hospital is not a placement. A psychiatric hospitalization is intended to assess, evaluate, diagnose, treat and stabilize a child experiencing a serious emotional and/or psychiatric crisis.' (DCFS Procedures 301.110 Psychiatric Hospitalization).

More specifically, a psychiatric hospital is defined by 210 ILCS 85/3 as follows:

> Sec. 3. As used in this Act:
> (A) "Hospital" means any institution, place, building, buildings on a campus, or agency, public or private, whether organized for profit or not, devoted primarily to the maintenance and operation of facilities for the diagnosis and treatment or care of 2 or more unrelated persons admitted for overnight stay or longer in order to obtain medical, including obstetric, psychiatric and nursing, care of illness, disease, injury, infirmity, or deformity.
> The term "hospital", without regard to length of stay, shall also include:
> (a) any facility which is devoted primarily to providing psychiatric and related services and programs for the diagnosis and treatment or care of 2 or more unrelated persons suffering from emotional or nervous diseases.

In my field, psychiatric inpatient beds, along with residential treatment beds, are widely understood to serve as critical safety nets for youth experiencing a psychiatric crisis that require 24-hour treatment and high levels of clinical intervention. According to the National Alliance on Mental Illness (NAMI), a mental health crisis (psychiatric crisis) "is any situation in which a person's behavior puts them at risk of hurting themselves or others. When a child is experiencing a psychiatric crisis, they are unable to function effectively in a community and engage in significant day to day activities such as interacting with others, taking care of themselves, thinking, eating, communicating, concentrating, learning and performing manual tasks. Psychiatric crises also significantly impact the child's brain and neurological functioning. Based on my expertise and review of the materials I was provided, each of the children experienced, and have a record of experiencing, at least one psychiatric crisis that required immediate, stabilizing treatment. During their psychiatric crisis, the children's day-to-day brain functioning was significantly impaired as well as their ability to perform the activities described above. Due to those facts, each child is disabled under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

The Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR) defines a mental disorder as "a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning. Mental disorders are usually associated with significant distress or disability in social, occupational, or tother important activities."

A BMN designation is assigned by the psychiatric hospital when a youth in care has completed required treatment but has no placement to return to after acute services are rendered.

Stays in psychiatric hospitals are meant to stabilize the child, and help them through their psychiatric crisis, before returning to their guardian's care or placement. Children are not meant to stay in psychiatric hospitals BMN. In fact, doing so is extremely detrimental to the child's physical, mental, and emotional health.

In 2018 Dr. Michael Naylor, Director of the Behavioral Health and Welfare Program at the University of Illinois Chicago, testified before the Senate Human Services Committee regarding prolonged psychiatric hospitalizations for foster children. His testimony below accurately depicts the consensus in the field on what happens to children when left in an inappropriate, severely restricted psychiatric hospital for days and months on end:

1. Youth often become angry, frustrated, demoralized, and hopeless. They begin to think no one loves them or cares for them. It is not uncommon for them to decompensate behaviorally and emotionally, with increased self-harmful and suicidal behavior and increased argumentative/oppositional/and oppositional behavior.
2. Youth that have been beyond medical necessity for prolonged periods of time fall behind in school. School districts are responsible for providing only 45 minutes of education daily while children are in psychiatric hospitals.
3. Hospitals are generally not set up to provide prolonged inpatient stays. Groups and activities provided in the unit programming are repeated, often multiple times. Youth

3

    become bored and may reach maximum benefit from the programming early in the hospital stay.
4. Hospitalized youth have little to no access to the outdoors. Most hospitals do not have gyms, weight rooms or pools so youth have little opportunity for exercise. Consequently, these youth often gain a significant amount of weight, adversely affecting their physical well-being.
5. Youth retained in hospitals beyond medical necessity have very limited to no access to normative adolescent activities, such as holding a job, driving, dating, going to movies, bowling, going to dances or sports activities, thus hindering their normative social development.

As one illustrative example raised in the class representatives' case files (Skylar), in an email dated 3/3/15 from Steven Airhart, CEO of Hartgrove to DCFS Michael C. Jones, (doc#2195681) Hartgrove is 'desperately' seeking help to get Skylar (and other BMN children) a placement. He states that their programming is for an average of 14 days, which means it repeats itself roughly every 14 days. He states, "I would go crazy and some of these patients begin to deteriorate due that very reason and the system is failing them." In Skylar's instance, for example, from the time she became BMN on 11/19/14 till discharge on 4/8/15, she would have been subjected to approximately 10 additional 14-day programming cycles.

It is commonly accepted in my field that children have a different sense of time than adults. What seems like a short family disruption or a brief separation to adults may be a very painful and intolerably long period for children. (Proc 315.15(b) Best interest of the Child, The Child's Sense of Time). Despite this knowledge, the evidence that I have reviewed (along with my own experience) reveals that DCFS still allows hundreds of children a year to languish in hospitals beyond medical necessity for weeks and months on end.

DCFS has long known about the serious risk to children posed by keeping them hospitalized BMN. By the time a child is sitting beyond medical necessity, the damage is done. The State's service delivery system missed the opportunity to keep families united and supported by giving them options and access to less costly community-based services much earlier to keep them from sinking deeper into a system that only compounds the issues and rips them apart.

## Illustrative Case Discussions

In the next part of this report, I will highlight how the common issue of systemic bed unavailability caused children to be held in psychiatric hospitals beyond medical necessity based on my review of documents identified by DCFS in its interrogatory responses. Based on my review, all the cases reflected this common problem.

Examples of most restrictive to least restrictive setting for children in the care of DCFS -

1. Psychiatric Hospital – (DCFS proc) A psychiatric hospitalization is intended to assess, evaluate, diagnose, treat and stabilize a child experiencing a serious emotional and/or psychiatric crisis.

4

2. Psychiatric Residential Treatment Facility (PRTF) – A PRTF is any non-hospital facility (can be a hospital with an inpatient psych program) with a provider agreement with State Medicaid authority to provide the inpatient services benefit to Medicaid eligible youth under the age of 21 (psych under 21 benefits). Services are provided under the direction of physician
3. Residential Treatment Center (RTC) –DCFS residential treatment centers were a category of inpatient stay at a campus-like facility that provided intensive therapeutic supervision and services to ameliorate mental and/or behavioral health disorders. After the enactment of the federal Family First Prevention Services Act (FFPSA) Title IV-E restricted foster care maintenance payments to 14 days unless the child is placed in a Qualified Residential Treatment Program (QRTP). All contracted DCFS residential providers had to level up to this designation. QRTP's provide trauma-informed care to children with serious emotional and behavioral health disorders and meet other federal requirements. They are intended to be time-limited placements when family-based settings can't meet a child's needs.
4. Group Home (GRH) - Is a childcare facility that provides care for no more than 10 children placed by and under the supervision of a licensed child welfare agency with these homes being owned or rented, staffed, maintained and otherwise operated by the agency. (Section 2.17 of the Child Care Act of 1969)
5. Therapeutic Foster Care – (from LSSI website) Therapeutic Foster Care places children with histories of severe trauma and emotional/behavioral needs in family treatment homes where they receive more one-on-one care and attention. The program is evidence-based and provides short-term, intensive support for these children so that they can thrive in a family home. Therapeutic Foster Parents are paid a daily stipend. Therapeutic Foster Parents receive special training and 24/7 support. They also are part of a comprehensive team that supports the child.
6. Specialized Foster Care – Sometimes abused or neglected children need more intense services and the foster family must possess additional skills to meet the individual needs of that child. DCFS has contracts with agencies for "specialized" or "treatment" foster care programs. Foster parents who either already have necessary skills or are willing to be trained to meet the special needs of these foster children, may become part of a specialized program. These foster families also receive additional payments, resources and training than in what is considered "traditional" foster care programs.
7. Traditional Foster Care - A temporary, court-monitored service provided by the State to promote the safety, permanency, and well-being of children and youth.

The continuum of care for children moves from most restrictive to least restrictive if they successfully complete their treatment goals at each level. The closure of residential beds before the implementation of alternative resources such as therapeutic or specialized foster care beds, and community-based mental health services created exceedingly high rates of children left in clinically inappropriate restrictive settings for months on end.

**Matching kids to beds –**

While in DCFS care, children should have had access to a comprehensive array of services designed to enable them to successfully meet their treatment needs and return to their family.

Proc. 301.55, Placement & Visitation Services –

> At the time a Child Protection Specialist or DCFS/POS Permanency Worker is notified/investigating a case in which a child/youth is in a psychiatric hospital, the Child Protection Specialist/Permanency Worker shall immediately send a notification to DCFS Clinical by sending an email to the DCFS PHP mailbox and the ClinicalRef mailbox and begin to work for the child/youth to return to the prior placement or secure an appropriate placement in advance of discharge.

> The Child Protection Specialist/Permanency Worker shall also ensure that the necessary supports are available for the child/youth when hospitalization is no longer medically necessary. The Child Protection Specialist/Permanency Worker shall immediately begin arrangements for SASS and other appropriate outpatient treatment services for all children/youth to be available upon psychiatric hospital discharge.

> The Division of Clinical Practice and Development is available to assist with providing direction for obtaining the appropriate clinical services for the children/youth with psychiatric issues.

PLACEMENT AND VISITATION SERVICES November 19, 2012 – P.T. 2012.21 Appendix C

> Instructions / Content Guidelines for Completing Psychiatric Hospitalization Clinical Summary and Discharge Care Plan Forms

> CFS 399-2-C, Psychiatric Hospitalization Clinical Summary and Discharge Plan Addendum. Clinical Staff shall complete a CFS 399-2-C (including the CFS 399-2-B) within 10 business days after the 30-day Post-Discharge Staffing and each Quarterly Staffing. The Staffing Convener shall forward an electronic copy of the Addendum to the Clinical Manager, attach a copy of the CFS 399-2-A, and e-file it in the Central Matching Data Base.

> The Clinical Manager shall forward the Initial Summary and Initial Action Plan, 30-Day Post Discharge Summary and 30-day Post-Discharge Action Plan or Quarterly Staffing and Quarterly Staffing Action Plan, by email, to "ClinicalRef." If a change in level of care is recommended, the document shall also be e-filed in the Central Matching Data Base for submission to the Centralized Matching Team. The original signature sheet shall be placed in the file secured at a location designated by Clinical Managers for their respective areas. The CFS 399-2-A, B and C are a continuing narrative and the final, signed documents shall be provided to field staff upon termination of the Quarterly Staffing process.

In the child welfare system, treatment programs/beds are like fire stations. No one is concerned when the fire truck is in the firehouse and not being utilized. We pay for them to be available in

an emergency. They are there when we have an emergency need for them. Treatment beds should be considered in the same vein. We know there will be a need for that bed based on historical data. Children spent excessively long times (weeks and even months at a time) inside psychiatric hospitals beyond what was clinically necessary. That should constitute an emergency requiring the need for the 'firetruck' to be available.

From a data perspective, DCFS has years of data and experience with deep end services to children. DCFS Director BJ Walker provided testimony at the 8-14-18 Senate Human Services Committee acknowledging from a data perspective, the BMN problem had been fairly consistent over the past several years. Based on historical utilization data, DCFS should be able to project the approximate number of youth that will need that service and have the anticipated capacity readily available.

**Systemic Issues at DCFS**

The evidence I have reviewed to date, along with my experience, reflects a systemic and centralized problem that is not new to DCFS. DCFS has been responsible for hundreds of children being held BMN due to systemic deficiencies. Advocates for children in DCFS care have been aware of this problem for over three decades and have tried in vain to pressure DCFS to fix its current systems, so that children are ensured proper placement after their hospitalizations, and do not have to suffer the adverse effects of being held BMN.

Indeed, fifty years ago, DCFS placed children in state mental health hospitals when they had no other placements. (In re TT Tillman at 7). These children too, often languished in these facilities beyond their date of discharge (In re TT at 7). In more recent years, children in DCFS care have been held BMN in psychiatric hospitals since at least 1996 when the Public Guardian filed *M.K. v Corman*, 284 Ill. App 3d 449 (First Dist. 1996) on behalf of 116 children who had been held BMN. Courts dismissed the case believing that the consent decree entered in *B.H. v Johnson* covered any issues regarding placement, including hospitalization beyond medical necessity.[1]

However, in 2015, DCFS made the centralized decision to close hundreds of RTC beds – which would have held children with serious and on-going mental health needs. DCFS claimed that the agency would replace these beds with therapeutic foster homes but did not do so. (In re TT at 5). That same year, the number of children who were held BMN skyrocketed to 168. (In re TT at 6). And that number continued to rise. In 2018, the number of children who were held BMN hit 300. (Plaintiff 071629). The number grew to 314 in 2020 and 356 in 2021. The average number of days spent BMN has also grown from 40 days in 2015 to 55 days in 2021. As of 2024, DCFS again closed 460 residential beds, opening less than 30 therapeutic foster home bed alternatives. (In re TT at 5). DCFS expert and psychiatrist Dr. Mark Friedman would later testify that he did not understand why these beds were closed and that shuttering them caused a "crisis" in the agency. (In re TT at 6).

---

[1] "The consent decree [] states: "No child will be psychiatrically hospitalized longer than is clinically necessary. Absence of an appropriate placement shall not be deemed a basis for continuing a child's hospitalization." *Golbert v. Walker,* No. 18 C 8176, 2021 WL 1056989, at *3 (N.D. Ill. Mar. 18, 2021).

7

Despite the clear systemic correlation between reduced RTC beds and children held BMN, in 2016 DCFS requested a 30% reduction in funding for all services for youth in their care. This budget request included needed funding for residential and group home care – the latter of which DCFS claimed it wanted to increase when it made the decision to shutter almost 500 RTC beds. (CCPG Written Testimony at 6). The following year, "DCFS commended itself for making great strides to reduce the number of youth in shelter and high-end residential placements," and announced a centralized goal of "reducing the department's over-reliance on shelter and high-end residential placements."[2] In 2018, DCFS made an additional request to cut almost 30% of residential and group home funding. DCFS bed cuts and underfunding resulted in the closure of more than 500 beds for youth with "serious and ongoing mental health needs" by private agencies in Illinois. (CCPG Written Testimony at 7). During this same timeframe, DCFS failed as a systemic matter to develop the alternate therapeutic foster care placements that had been promised. By 2021, there was only one foster care agency in Illinois offering therapeutic foster care, and all homes in that program as of 2021 were full. Ultimately, the number of beds that DCFS manages to create each year continues to be vastly outnumbered by the beds DCFS cut. Closing these residential beds is a direct common cause of the BMN problem.

DCFS also lacks capacity as a systemic matter to step down children from residential placements, which means many children, too, are forced to remain in a more restrictive placement than necessary. In February 2024, 240 children were ready to be stepped down from residential care. (In re TT at 7). 78 of those children had been in residential treatment centers for over a year beyond necessity at that point. The court in *In re TT* recognized that if those 240 children had been placed appropriately, a majority of the 330 children held BMN in 2024 could have found residential placements quicker.

Due to the lack of residential beds, and well as less restrictive placements, children also languish as a systemic matter in residential treatment centers beyond necessity. This causes a systemic back up in the more restrictive settings. When psychiatric hospitals are full, including with children held BMN, any additional children experiencing psychiatric crises cannot be placed there. These children still require treatment, and so they are forced to wait for space in emergency rooms, where they are often subject to physical and chemical restraints until a bed opens up. (In re TT at 4).

In a similar vein, the lack of available placements inside DCFS was so widespread DCFS resorted to placing children in shelters because there was nowhere else to house them. (CCPG Written Testimony at 3). Stays in emergency shelters are meant to be temporary and short-term; the B.H. consent decree explicitly limited these stays to 30 days. These emergency shelters take many forms, including the offices of DCFS facilities. In 2019, DCFS started reporting to the Public Guardian how many children slept in offices, after parties to the B.H. consent decree agreed to allow children to stay for one (1) night in DCFS offices, which had previously been entirely prohibited by the consent decree. In other words, by 2019 the problem of a lack of enough appropriate placements for children was so bad that DCFS needed to turn to a previously prohibited practice in order to house children. From August 2019 to December of 2020, 162

---

[2] CCPG written testimony referencing DCFS statements from DCFS FY2017 Budget Briefing.

children in DCFS care spent at least one night in an office space. (CCPG Written Testimony at 5). DCFS violated this one-night rule in October 2019 (less than a month after the stipulation was entered), when the Public Guardian learned that a child lived at an office for 2 days. DCFS violated the standard 24 more times in 2020.

Hopping from one temporary placement to another other exacerbates the children's trauma and can put them on the path to psychiatric hospitalization. This reason is one of the reasons DCFS is prohibited from placing children into temporary or emergency shelter placements directly after psychiatric hospitalization. In 2019, in yet another failed and misguided attempt to solve the BMN problem, DCFS rebranded the emergency shelter as an Interim Care Center. (CCPG Written Testimony at 7). This workaround made it so children could be placed at the ICC after being hospitalized or being held BMN. As could be predicted, rebranding did not help solve the BMN problem, because it didn't actually create appropriate placements for the children to stay after being hospitalized. As discussed in the paragraphs above, the number of children who were held BMN continued to climb after this rebranding, reaching 314 in 2020 and 356 in 2021. Placing children held BMN in the ICCs also meant that emergency capacity was lost for any new kids coming into DCFS care. Children also tended to languish in the ICC. In 2021, 13 children that were previously hospitalized spent a combined 1,945 days at the ICC, with the average stay being about 149 days.

Since these 2015 residential bed closures, DCFS has faced a slew of litigation aimed at getting kids placed appropriately. And the court in *In re TT* noted that whatever strategies DCFS was using to create bed capacity were "failing" despite promises to courts in the 1990's and 1970's that the problem of holding children BMN would cease. (In re TT at 14). In these cases, courts have recognized the factors that have resulted in children being held BMN, including:

- A lack of appropriate placements for older DCFS children (In re MDC at 2)
- Lack of group homes (In re MDC at 2)
- Lack of foster homes (In re MDC at 2)
- Temporarily housing children in inappropriate placements due to a lack of capacity, without necessary supports and follow up care, which leads the child to require hospitalization again
- The closure of the Illinois Department of Mental Health and Developmental Disabilities which had units for youth with mental illnesses, including such youth who also had indigent parents (In re MDC at 3)

In re JS et al, the court called DCFS's methods of placing children "repetitive" and "ineffective." Despite courts' repeated admonishments to figure out the BMN problem, DCFS continues to utilize the same "failing" methods, such as sending placement packets to facilities that are full or inappropriate, instead of fixing the true problem – that there simply are not enough placements for children in their care. Advocates such as the Public Guardian have been sounding the alarm for several years that there is an urgent and unmet need for in-state therapeutic placements for children who have experienced extreme trauma and those who are regarded as having severe emotional and behavioral challenges. As discussed above, when there are not enough placements for children (at every level), the system backs up and leaves children

in inappropriate placement which exacerbates their trauma. DCFS has admitted that it does not have enough beds. (The Challenge of Youth In Psychiatric Hospitals). DCFS has also admitted that creating more beds is not a money issue, but nonetheless the agency has still taken no meaningful steps to replace the nearly 500 beds it closed almost 10 years ago. (*Id.*)

**Illustrative Case Discussions**

I have been provided with DCFS's responses to Plaintiffs' Second Supplemental Interrogatory for each of the 15 named Plaintiffs, as well as all of the documents referenced in those responses. I have reviewed these files to determine whether there was a common issue in each of the children's hospitalization beyond medical necessity. Based on my review of the materials and my expertise, I conclude that each of the named Plaintiffs' BMN stays were affected by the lack of placements available to DCFS. I note that each child has individual needs and circumstances. Nevertheless, the lack of available placements undeniably prolonged each of these children's BMN stays.

In the next part of this report, I will highlight how the common issue of systemic bed unavailability caused three children to be held in psychiatric hospitals beyond medical necessity based on my review of documents identified by DCFS in its interrogatory responses. Based on my review, all cases reflected this common problem.


**Skylar**

In 2014, Skylar was a 15-year-old child. On 11/9/14 she was hospitalized at Hartgrove Behavioral Health System as she was experiencing a psychiatric crisis. On 11/19/24 Skylar had successfully completed her inpatient treatment and was ready to step down to a less restrictive setting to continue treatment. She was held BMN at Hartgrove Behavioral Health System for 140 days. When Skylar's mental health disability became a serious risk to herself and to other family members, Skylar's parents turned to DCFS as the only option left to get her necessary mental health treatment. DCFS's capacity issues left the system woefully inadequate to meet Skylar's needs.


**Skylar Timeline**

A systematic issue of bed unavailability prevented Skylar from receiving the appropriate placement she was entitled to.

11/19/24- Skylar is BMN at Hartgrove Behavioral Health System (01971619).

A Clinical Discharge Summary recommends a group home (GRH) placement (01916568). This Summary was completed on 12/10/14, approved by the Supervisor on 11/7/14 but not sent to Central Matching until 1/7/15 (03552278).

**Skylar is 55 days BMN**

**Referrals through Cook Central Clinical for GRH**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 1/13/15 (01954026) | Thresholds Young Adult Program James House | 1/29/15 | No bed available. Placed on waitlist (02639894-5) |
| 1/13/15 (01954026) | Webster Cantrell GRH | 2/9/15 | No bed available (02639892) |
| | | 3/16/15 | Webster Cantrell accepts Skylar but no bed available until the end of June (02831795) |
| | | 2/20/15 | No bed available until after 6/15 (03555325) |
| 2/6/15 (02639893) | Allendale Daisy | 2/19/15 | Allendale states if Skylar is accepted there is a 6 month waitlist (02639888) |
| | | 3/4/15 | Allendale accepts Skylar but there is a 4-6 month waitlist (02639884) |
| 2/6/15 (02639893) | Aunt Martha's Group Home Wolpers | 3/6/15 | Aunt Martha's accepts Skylar and places on waitlist (02639882) |
| 2/6/15 (02639893) | ChildServ Highland | 3/13/15 | No bed available (02831796) |
| 3/23/15 (02890010) | Eric Family Services | 4/3/15 | Eric accepts Skylar for placement (03550391) and she is placed on 4/8/15 (03550390) |

In a 2/4/15 email (02639894) requesting an additional match for Skylar, CMT acknowledges that most of the agencies have long waitlists.

**Skylar is 140 days BMN upon her placement at Eric Family Services.**

Skylar was admitted to Chicago Lakeshore Hospital on 7/3/2015. She was only in her placement at Eric Family Services for 86 days. During that time her behavioral health deteriorated rapidly resulting in psychiatric hospitalization.

**Referrals through Residential Transitional Protocol for RTC**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 1/7/15 (02327638) | Allendale Daisy North Chicago | 1/16/15 | Allendale accepts Skylar for placement (03188635) |
| 1/7/15 (02327638) | Lutheran Child & Family Services (Lutherbrook) Harmony | | |

**Skylar is placed at Allendale on July 22, 2015 (00160332)**

**Skylar's experiences while BMN exemplify what children in DCFS care undergo.** GRH's can provide a wide range of diagnostic programming serving a wide range of children with specific diagnoses or behaviors. There is no mention in the documents of the specific diagnostic programming that the 6 GRH's had that made them the appropriate match for Skylar's needs.

Like other children held BMN, Skylar's prolonged period of BMN appears to be based on the lack of placements available. For example, the Central Matching Team ("CMT") acknowledged in an email (#02639894) that most agencies have long waitlists. CMT knew there were no placements at two group homes but sent the referrals there regardless 55 days after Skylar's BMN designation. Presumably, if there were open beds available, CMT would have tried to get Skylar placed somewhere with an available bed, particularly after she had been hospitalized BMN for 55 days. The 2nd round of referrals went out at the request of the DCFS caseworker 79 days after Skylar's BMN designation to three other facilities that also had no available capacity.

It does not appear from the documentation presented that Skylar's acuity needs were the reason she was forced to remain BMN for so long, rather the demographics of the program such as "teenage girls" or "teenage girls over 16". One such email in the same timeframe as Skylar's BMN, (#00311412) the subject line is "Girls we are in need of RTC placement urgently." In other words, when DCFS was looking to place Skylar, they sought programs for her age and gender, suggesting that her specific needs were not a barrier to her receiving a placement, but rather a lack of beds in general was.

Skylar was placed at ERIC GRH on 4-8-15. This was already noted by staff to be an inappropriate placement for her due to concerns raised by her bio dad about the location. The DCFS Supervisor as well as ChildServ raised questions early on about the appropriateness of a GRH and suggested a residential facility is a better option based on the review of Skylar's files. Those concerns were ignored. ERIC had not been a placement consideration until the Judge entered an order for placement within 5 business days.

Illinois statute declares that 'DCFS must ensure a sufficient number of placement and other resources of sufficient quality and variety to meet the needs of children and families…'(CFSA 20 ILCS 505/2.1). As a result of systemic bed unavailability, Skylar spent five months locked inside a psychiatric hospital beyond medical necessity waiting and waiting for DCFS to provide her with mental health services she was entitled to by state and federal law.

**Jamya Timeline**

Like all the other children whose cases I reviewed, a systematic issue of bed unavailability prevented Jamya from receiving the appropriate placement she was entitled to.

**CIPP Foster Care Referrals (CIPP = Clinical Intervention for Placement Preservation)**

| Date of Referral | Provider | Date | Outcome |
| --- | --- | --- | --- |

| 11/27/17 (01265361) | Lutheran Social Services of IL Augustana-Chicago | 1/12/18 | LSSI withdraws (01265357) |
|---|---|---|---|
| 11/27/17 (01265361) | Children's Home & Aid Rice Child & Family Ctr | 1/30/18 | Rice won't consider unless a Sexual Behavior Problems (SBP) screen is completed (01265351) |
| 11/27/17 (01265361) | Caritas Family Solutions St. John Bosco Child. Ctr. | 1/28/18 | No openings (01265361) |
| 11/27/17 (01265361) | Children's Home Assn. of IL (CHAIL) | 2/13/18 | CHAIL accepts Jamya to wait list |

12/7/17 – CMT places Treatment Foster Care of Oregon (TFCO) referrals on hold. Proceeds with RTC referrals. (01265360)

1/13/18 – Jamya returned to Illinois – placed in interim FC

**Referrals for Residential Treatment Center (RTC)**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 1/25/18 (01265355) | Children's Home & Aid Rice Child & Family Ctr | 1/30/18 | Rice won't consider unless a SBP screen is completed. (01265351) |
| 1/25/18 (01265355) | Allendale – Young Child | 1/25/18 | Allendale closes referral. Jamya is too young for their program. Only contracted for female 12 yr olds. (01265355) |
| 1/25/18 (01265355) | Hephzibah | 1/26/18 | No individual bedroom available. (01265353) |
| 1/30/18 (01265351) | Lydia Home 2 North | 1/31/18 | No openings for girls unit for 90+ days |
|  |  | 5/3/18 | No openings for 30-60 days. Placed on waitlist (01594374) |

3/2/18 – (00622338) – email from Piney Ridge Treatment Center Ridgeview Group Home (Arkansas) accepting Jamya into their program.

4/6/18 – psych hospitalization at Chicago Lakeshore (06509228)

4/11/18 – (00623607) – ICPC informs Jamya is approved by AR ICPC for placement at Piney Ridge.

**5/17/18 – Jamya is BMN at Chicago Lakeshore (06509228)**

6/6/18 – (04611739) – ChildServ Supervisor states Lydia Home contacted her and they had availability for Jamya 6/8/18. Asking if placement was possible?

6/7/18 – (05789208) – Gantner, DCFS Clinical, informs DCFS legal that they feel that Lydia Home would not be able to provide high end treatment in a safe, secure manner.

13

**Jamya is 21 days BMN**

6/11/18 – (01411897) Sexual Abuse Services Assessment completed (6/8/18) recommending RTC in state or Piney Ridge in AR. (5/17/18 (01266861) – DCFS Rico states she told worker in Feb. to get a SBP assessment.

6/14/18 – (00280635) CMT states Jamya's juvenile court case continued to 7/10/18 – unable to proceed with placement until court issues are resolved.

**Jamya is 28 days BMN**

**Referral for RTC**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 8/22/18 (00917104) | Indian Oaks | 8/22/18 | Accepts Jamya for placement (00917103) |

8/28/18 – Jamya placed at Indian Oaks

**Jamya was 102 days BMN upon placement at Indian Oaks. She was 11 years old.**

Jamya's BMN was exacerbated not only from lack of available bed opportunities but from the prolonged timeframe for securing the SBP assessment. The SBP assessment was recommended (01411816) in February 2018 and was not completed until 6/8/18. DCFS appeared to struggle with obtaining this assessment due to a lack of contracted resources to perform the assessment, coordination among the staff involved, and the confusion around who was responsible for facilitating and funding the assessment.

There are no documents that were submitted to support CMT making referrals to providers from 6/14/18 to 8/22/18 at which time a referral to Indian Oaks was made and immediately accepted Jamya for placement. There were providers that accepted Jamya but lacked available contracted capacity and there is no evidence in the documentation submitted that attempts were made to remediate the lack of capacity.

**Alana Timeline**

Alana was admitted to Chicago Behavioral Hospital on 11/20/14 (00164492) and recommended for Specialized Foster Care (FHS) on 12/8/14 (02093447). A systematic issue of bed unavailability prevented Alana from receiving the appropriate placement she was entitled to.

**Referrals for Clinical Foster Home Specialized (FHS)**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 12/9/14 (03883510) | Kaleidoscope | 1/8/15 | No bed available (03883509) |
| 12/9/14 (03883510 | Camelot Care Centers - Matteson | 1/8/15 | No bed available (03883509) |

| 12/9/14 (03883510) | Aunt Martha's - Harvey | 1/14/15 | No bed available (03883508) |
|---|---|---|---|
| 12/9/14 (03883510) | Children's Home & Aid Society of IL | 1/9/15 | No bed available (03883509) |
| 1/15/15 (03883507) | Lutheran Child & Family Services – Chicago/Regenerations | 1/27/15 | Temporary bed identified but then became unavailable. (03883503) |
| 1/15/15 (03883507) | National Youth Advocate | 2/25/15 | No bed available to meet Alana's needs given her deterioration (03554952) |
| 1/15/15 (03883507) | Our Children's Homestead - Naperville | 2/4/15 | No bed available (03883502) |

**1/17/2015 – Alana is BMN at Chicago Behavioral Hospital (02093447)**

1/28/15– Interstate Compact on the Placement of Children (ICPC) request to Indiana for relative home study. (00071823)

**Referrals through Cook South Clinical for FHS**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 2/9/15 (03883501) | Camelot Care Centers - Itasca | | No written response from provider in documentation provided |
| 2/9/15 (03883501) | Camelot Care Centers – Matteson ADFC | | No written response from provider in documentation provided |
| 2/9/15 (03883501) | Easter Seals | | No written response this provider in documentation provided |

2/23/15 – Alana deteriorated due to her prolonged stay in the psychiatric hospital. A CATU referral was rejected. **No openings at CATU**. Hospital changes level of care recommendation to group home or residential setting. (03555137)

Clinical summary for Alana was amended to recommend residential treatment level of care (03883499). CMT Frank responds that 'beds are very limited in residential treatment'. Indeed, a systematic unavailability prevented Alana from receiving the appropriate placement she was entitled to.

**Alana is 48 days BMN**

**Referrals through Cook South Clinical for FHS**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 3/6/15 (03546071) | Allendale Daisy | 3/23/15 | No bed available – has 90 day waitlist (03892227) |
| | | 4/30/15 | Allendale accepts Alana but bed not |

| | | | available until 5/5/15 (03546044) |
|---|---|---|---|
| 3/6/15 (03546071) | Uhlich Hope | 3/10/15 | No bed available (03546069) |

**Alana is 68 days BMN**

**Referrals through Cook South Clinical for RTC**

| Date of Referral | Provider | Date | Outcome |
|---|---|---|---|
| 3/25/15 (03546062) | Cunningham Children's Home New Hope | 4/2/15 | Alana initially declined to talk with Cunningham (03546057). |
| | | 4/7/15 | Cunningham has no bed available for at least 30-45 days (03546055). |
| | | 4/20/15 | After Alana talks with Cunningham they accept her but have no bed availability till early June, 2015 (03546052) |
| 3/25/15 (03546062) | Norman C. Sleezer Youth Home | | No written response from provider in documentation provided |
| 3/26/15 (03546060) | Lydia Home | 4/6/15 | No bed available for 61-90 days (03340991) |

4/6/15 – The Guardian Ad Litem suggested a placement at Campagna Academy in Indiana for Alana to be close to sister. DCFS responds that there are no beds there until at least July 1, 2015 (03546056)

5/19/15 – Alana placed at Allendale

**Alana was 121 days BMN upon placement at Allendale. She was 14 years old.**

Alana's prolonged stay in a psychiatric hospital can be attributed to the systemic issue of lack of bed availability. There were numerous referrals sent out in small batches to specialized foster care providers that had no capacity to accept her and no documentation of any remediation that occurred to increase bed capacity. Alana's extended stay in the hospital directly attributed to her behavioral health deteriorating to the point of needing a more intensive level of care than specialized foster care. This resulted in referrals to residential treatment centers that had no bed availability either. There was no documentation of any remediation that occurred to increase residential capacity.

I have reviewed documents referenced for each of the named class members, and each child's period held BMN was marked by no available placements. Every child had packets sent by CMT to agencies that had no available beds. It is remarkable that CMT had no idea which facilities had openings when sending packets, and I saw no reference in any of the files to taking steps to create additional placements to ensure that children did not have to remain BMN. Rather, children stuck BMN because of a lack of placements were forced to remain BMN until a facility

was able to have an opening. Time and again, CMT sent packets to several facilities that were all full; I presume that if CMT had available placements for the children held BMN, they would have sent packets to those facilities. Sending packets to facilities with months-long waitlists when children are already BMN is an exercise in futility and smacks of rearranging the deck chairs on the Titanic. What the BMN children need are placements, and sending packets to facilities that have no placements does nothing for the children but allows DCFS the appearance of trying to help them. In fact, DCFS is well aware that when there are not enough placements allotted for children who need them, dozens or hundreds of children will go BMN each year. It is the children who suffer the harm, yet in my review of each of these children's cases and my experience working in the child welfare system, CMT responded to the chronic shortage of placements by continuing to send packets to facilities with no available placements. DCFS's response to the problem is either banging one's head against the wall or the definition of insanity by repeating the same unhelpful action hoping for a different result. Every child has different needs and different outcomes, but every child needs an appropriate placement, and the simple truth is that there are not enough placements to go around. Thus, some children will be forced to wait weeks or months as a result until their lot in the placement roulette comes up.

If asked, I will testify to the contents of this report under oath.


s/ Deborah McCarrel