## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Charles Golbert, *et al.* | |
| Plaintiffs, | Case No. 18 C 8176 |
| v. | Hon. Jeffrey Cummings |
| | Hon. M. David Weisman |
| Beverly J. Walker, *et al.*, | Magistrate Judge |
| Defendants. | |

## DEFENDANTS' BRIEF IN OPPOSITION
## <u>TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

Dated: July 2, 2026

Defendants Beverly J. Walker, et al.,

Kwame Raoul, Illinois Attorney General

By: Special Assistant Attorneys General
   Brian C. Haussmann
   Timothy A. Hudson
   Amanda N. Catalano
   Jonathan P. Parts
   TABET DIVITO & ROTHSTEIN LLC
   209 S. LaSalle Street, 7th Floor
   Chicago, IL 60604
   (312) 762-9450

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ........................................................................................................... 1

SUMMARY OF THE ARGUMENT .............................................................................. 2

    1.     Why a child is in a hospital after being designated BMN, and for how long, are fact-specific, individualized questions. ........................... 2

    2.     Whether a delay violates the law cannot be resolved on a classwide basis. ...................................................................................................... 3

    3.     Plaintiffs' section 1983 claims hinge on questions about each Defendant's specific conduct and knowledge in relation to specific Plaintiffs. ................................................................................................. 4

    4.     Plaintiffs' ADA and Rehabilitation Act claims center on multiple individualized questions that cannot be resolved on a classwide basis. ...................................................................................................... 5

    5.     Plaintiffs' attempt to re-frame these issues for class treatment fails. .................. 7

SUMMARY OF THE EVIDENCE................................................................................. 8

    A.     The Parties .................................................................................................. 8

          1.     The Department of Children and Family Services .................................. 8

          2.     The Individual DCFS Defendants ............................................................ 9

          3.     The Named Plaintiffs ................................................................................ 12

    B.     The DCFS Process for Custody and Placement of Youth in Care...................... 13

          1.     The Juvenile Court Process for Abused, Neglected or Dependent Minors .................................................................................. 13

          2.     The DCFS Placement and Casework Process ......................................... 14

          3.     Clinical Placement Facilities and Options .............................................. 15

4. Psychiatric Hospitalization ................................................................. 16

5. The Central Matching Unit and the Clinical Matching Process ................................................................................. 17

6. Lockout Cases ..................................................................................... 18

C. "BMN" Designations ................................................................................. 19

D. Reasons Why a Youth in DCFS Care May Remain in a Hospital While Designated BMN ................................................................. 20

E. The experiences of the named Plaintiffs demonstrate that many events and considerations that may delay discharge are outside the Department's control. ................................................................. 25

F. The effect of a delayed placement varies depending on the youth. ................... 34

PLAINTIFFS' CLAIMS ......................................................................................... 35

A. Plaintiffs' Constitutional Claims ........................................................... 35

B. Plaintiffs' Rehabilitation Act and ADA Claims ................................... 39

LEGAL STANDARD ............................................................................................. 40

ARGUMENT .......................................................................................................... 41

I. Cases about delay in a complex process cannot be resolved as a class. ................ 41

II. Plaintiffs do not and cannot satisfy the commonality requirement .................. 43

A. Plaintiffs fail to present any "significant proof" of their "systemic shortage" theory and, in any event, that theory is not central to Plaintiffs' claims or amenable to classwide determination ................... 45

1. Plaintiffs do not and cannot supply the "significant proof" the law requires of them to show that the Department had an "illegal policy" of deliberately closing beds. ................................... 45

2.     Proof aside, a generalized bed shortage does not establish commonality. ....................................................................... 47

    a.     The common questions do not "drive the resolution" of Plaintiffs' substantive due process claims. ........................... 48

    b.     The common questions do not "drive the resolution" of Plaintiffs' statutory claims. ..................................................... 50

    c.     Plaintiffs fail to establish that a lack of beds proximately caused them to be held while designated BMN. ................................................................................ 51

B.     Plaintiffs' remaining "common" questions are fatally generic and plainly require case-specific adjudication. ........................................................... 54

III.     The proposed class fails the typicality and adequacy requirements. ............................. 56

IV.     Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance and superiority requirements. ................................................................................... 58

CONCLUSION .................................................................................. 60

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Arandell Corp. v. Xcel Energy Inc.*,
149 F.4th 883 (7th Cir. 2025) ...................................................................................................8

*B.H. v. Johnson*,
715 F. Supp. 1387 (N.D. Ill. 1989) ........................................................................................48

*B.H. v. McDonald*,
49 F.3d 294 (7th Cir. 1995) ....................................................................................................48

*Berrios-Romero v. Estado Libre Asociado De P.R.*,
641 F.3d 24 (1st Cir. 2011)....................................................................................................46

*Bostic v. Murray*,
160 F.4th 831 (7th Cir. 2025) ............................................................................... 5, 36, 38, 55

*Branham v. Snow*,
392 F.3d 896 (7th Cir. 2004) ............................................................................................6, 39

*Burks v. Raemisch*,
555 F.3d 592 (7th Cir. 2009) .............................................................................................5, 36, 37

*Califano v. Yamasaki*,
442 U.S. 682 (1979)................................................................................................................60

*CE Design Ltd. V. King Architectural Metals, Inc.*,
637 F.3d 721, 724 (7th Cir. 2011) ....................................................................................56, 57

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................................................41

*CTL v. Ashland Sch. Dist.*,
743 F.3d 524 (7th Cir. 2014) ...............................................................................6, 39, 51, 56

*Culp v. Caudill*,
140 F.4th 938 (7th Cir. 2025) ......................................................................................... *passim*

*D.G. ex rel. Stricklin v. Devaughn*,
594 F.3d 1188 (10th Cir. 2010) .............................................................................................59

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) .................................................................................................41

*Dixon v. County of Cook*,
819 F.3d 343 (7th Cir. 2016) .................................................................................................38

*Donegan v. Norwood*,
No. 16-CV-11178, 2017 WL 6569634 (N.D. Ill. Dec. 21, 2017)............................................57

*Driver v. Marion Cty. Sheriff*,
859 F.3d 489 (7th Cir. 2017) ...................................................................................................42

*Estate of Williams v. Cline*,
902 F.3d 643 (7th Cir. 2018) ...................................................................................................39

*Farmer v. DirectSat USA, LLC*,
No. 08 C 3962, 2010 WL 3927640 (N.D. Ill. Oct. 4, 2010).....................................................41

*Fleishman v. Cont'l Cas. Co.*,
698 F.3d 598 (7th Cir. 2012) ............................................................................................. 6, 39

*GE Capital Corp. v. Lease Resolution Corp.*,
128 F.3d 1074 (7th Cir. 1997) .................................................................................................46

*Gen'l Tel. Co. v. Falcon*,
457 U.S. 147 (1982).................................................................................................................58

*Gevas v. McLaughlin*,
798 F.3d 475 (7th Cir. 2015) ............................................................................................. 49, 55

*Golbert v. Smith*,
No. 23-CV-00300, 2025 WL 963914 (N.D. Ill. Mar. 31, 2025).................................................4

*Harper v. Sheriff of Cook County*,
581 F.3d 511 (7th Cir. 2009) ...............................................................................................4, 42

*Hill v. Shobe*,
93 F.3d 418 (7th Cir. 1996) .......................................................................................... *passim*

*Hoffman v. Knoebel*,
894 F.3d 836 (7th Cir. 2018) ......................................................................................... 5, 36, 58

*Howard v. Cook County*,
989 F.3d 587 (7th Cir. 2021) .......................................................................................41, 43, 46

*In re D.E.*,
2020 IL App (1st) 200361-U .....................................................................................................18

*In re Deepwater Horizon*,
785 F.3d 1003 (5th Cir. 2015) ..................................................................................................54

*In re Delta Dental Antitrust Litig.*,
88 F. Supp. 3d 898 (N.D. Ill. 2025)..........................................................................................59

*In re J.M.*,
2024 IL App (4th) 230577-U .............................................................................................18, 19

*In re J.S.*,
2022 IL App (1st) 220083 ................................................................................ 15, 17, 55, 56

*In re L.W.*,
2023 IL App (1st) 221048-U ......................................................................................19

*In re M.W.*,
386 Ill. App. 3d 186 (1st Dist. 2008) .................................................................. 13, 14

*J.H. v. Johnson*,
346 F.3d 788 (7th Cir. 2003) ...................................................................... *passim*

*Jamie S. v. Milwaukee Pub. Sch.*,
668 F.3d 481 (7th Cir. 2012) ...................................................................... *passim*

*Jonathan R. v. Justice*,
344 F.R.D. 294 (S.D.W. Va. 2023)..................................................................... 59

*Joseph v. Bd. of Regents of the Univ. of Wis. Sys.*,
432 F.3d 746 (7th Cir. 2005) .............................................................................4, 38

*Lacy v. Cook County*,
897 F.3d 847 (7th Cir. 2018) ......................................................................6, 40, 51

*Lawson v. CSX Transp., Inc.*,
245 F.3d 916 (7th Cir. 2001) ................................................................6, 39, 50, 58

*Lucero v. Credit Union Ret. Plan Ass'n*,
No. 22-CV-208-JDP, 2024 WL 95327 (W.D. Wis. Jan. 9, 2024) ..........................................35

*Mabes v. Thompson*,
136 F.4th 697 (7th Cir. 2025) ...........................................................................39

*Messner v. Northshore Univ. Health Sys.*,
669 F.3d 802, 811 (7th Cir. 2012) ..............................................................46, 47, 54

*Muro v. Target Corp.*,
580 F.3d 485 (7th Cir. 2009) ...........................................................................57

*K.H. ex rel. Murphy v. Morgan*,
914 F.2d 846 (7th Cir. 1990) ..................................................................36, 37, 48

*O.B. v. Norwood*,
No. 15 C 10463, 2016 WL 2866132 (N.D. Ill. May 17, 2016) .............................................54

vi

*Oshana v. Coca-Cola Co.*,
　472 F.3d 506 (7th Cir. 2006) ................................................................. 35, 56

*P.V. ex rel. Valentin v. Sch. Dist. of Phila.*,
　289 F.R.D. 227 (E.D. Pa. 2013) ................................................................. 59

*Peralta v. Dillard*,
　744 F.3d 1076 (9th Cir. 2014) ................................................................... 49

*Perez v. City of Chicago*,
　No. 13-cv-4531, 2019 WL 7290848, at *12 (N.D. Ill. Dec. 27, 2019) .............................. 50, 54

*Phillips v. Sheriff of Cook County*,
　828 F.3d 541 (7th Cir. 2016) ............................................................. *passim*

*Portis v. City of Chicago*,
　613 F.3d 702 (7th Cir. 2010) .................................................................. 4, 42

*Red Barn Motors, Inc. v. NextGear Cap., Inc.*,
　915 F.3d 1098 (7th Cir. 2019) ................................................................... 41

*Rockford League of Women Voters v. United States Nuclear Regulatory Com.*,
　679 F.2d 1218 (7th Cir. 1982) ................................................................... 49

*Roman v. Triton Logistics, Inc.*,
　No. 23 CV 15146, 2025 WL 1134191 (N.D. Ill. Apr. 16, 2025) ................................... 45

*Royan v. Chi. State Univ.*,
　145 F.4th 681 (7th Cir. 2025) .................................................................. 6, 40

*Santiago v. City of Chicago*,
　19 F.4th 1010 (7th Cir. 2021) ................................................................... 35

*Schneider v. Ecolab, Inc.*,
　No. 14 C 01044, 2016 WL 7840218 (N.D. Ill. Sept. 2, 2016) .................................... 59

*Stanek v. St. Charles Community Unit School District No. 303*,
　783 F.3d 634 (7th Cir. 2015) .................................................................. 5, 39

*Vance v. Rumsfeld*,
　701 F.3d 193 (7th Cir. 2012) .................................................................. 5, 36

*Vesey v. Owens*,
　No. 13 CV 7367, 2015 WL 3666730 (N.D. Ill. June 12, 2015) .................................... 55

*Wagner v. NutraSweet Co.*,
　95 F.3d 527 (7th Cir. 1996) ..................................................................... 58

vii

*Wagoner v. Lemman*,
778 F.3d 586 (7th Cir. 2015) ....................................................... 6, 39, 40

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .................................................................. *passim*

*Walker v. Rowe*,
791 F.2d 507 (7th Cir. 1986) ............................................................38

*Woodall v. Wayne Cnty.*,
No. 20-1705, 2021 WL 5298537 (6th Cir. Nov. 15, 2021) .......................................7

**Statutes**

20 ILCS 5/5-20 ...................................................................................10

20 ILCS 505/1 *et seq.*..........................................................................8

20 ILCS 505/7................................................................................14, 56

20 ILCS 505/7(a)-(b) ............................................................................14

20 ILCS 505/7(c) ................................................................................15

225 ILCS 10/7....................................................................................16

225 ILCS 10/8....................................................................................16

325 ILCS 5/1 *et seq.*............................................................................8

325 ILCS 5/7.3....................................................................................13

705 ILCS 405/1-3 .................................................................................15

705 ILCS 405/2-10 ................................................................................13

705 ILCS 405/2-13 ................................................................................13

705 ILCS 405/2-17(1)..............................................................................13

705 ILCS 405/2-27(3)..............................................................................14

705 ILCS 405/2-27.1(1)........................................................................14, 15

705 ILCS 405/2-28(2)........................................................................13, 14, 15

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ...................................5, 6, 38, 39, 43

Rehabilitation Act, 29 U.S.C. § 701, *et seq* ..................................................5, 38, 43

**Other Authorities**

89 Ill. Admin. Code § 301.60(b)............................................................................14, 15, 57

89 Ill. Admin. Code, Part 403 ...........................................................................................16

89 Ill. Admin. Code § 300 App. B ....................................................................................18

89 Ill. Admin. Code § 327.4 .............................................................................................12

United States Constitution, Fourth Amendment................................................................41

United States Constitution, Eleventh Amendment ..............................................4, 37, 47

United States Constitution, Fourteenth Amendment ........................................................43

Federal Rule of Civil Procedure 23 .......................................................................... *passim*

**INTRODUCTION**

Plaintiffs' motion for class certification must be denied. The reasons why a child's placement after being designated as "BMN" (beyond medical necessity) might occur quickly or slowly are kaleidoscopic and highly individualized. Likewise, whether a DCFS official owes damages under section 1983 to a child for taking (or failing to take) action that supposedly delayed the child's placement requires case-by-case assessment. There is no meaningful question here that can be resolved "in one stroke" with classwide answers.

Consider eight hypothetical defendants who might have served as DCFS Director over the several years relevant to this lawsuit:

1. **The "placement-focused" Director** serves for two years. Her personal mission is to quickly find placements for BMN children. Though it is not her actual job, she spends most of her time personally locating placements. Several complex cases arise during her tenure, and some placements are expedited by her personal involvement. During her tenure, 10 children are placed within 7 days BMN and 10 are not.

2. **The "contract-focused" Director** serves for one year. His primary goal is to contract with more placement providers to expand available placements. But his tenure coincides with a state budget crisis, and many providers view it as too risky to contract with a state agency. During his tenure, 10 children are placed within 7 days BMN and 10 are not.

3. **The "future-looking" Director** serves for 18 months. After engaging with experts and spending significant time on the BMN issue, he devotes resources toward early interventions that prevent children from requiring psychiatric hospitalization in the first place. During his tenure, 10 children are placed within 7 days BMN and 10 are not.

4. **The "interim" Director** serves for one month. She knows little about DCFS but is a capable government employee, and is partly installed for practical reasons, like signing documents. Twenty children come into DCFS care on day one. She requests a briefing from her team and is satisfied they are taking reasonable steps. During her tenure, 10 children are placed within 7 days BMN and 10 children are not.

5. **The "budget-focused" Director** serves for three years. The Governor who appointed him ran on cutting state agency budgets substantially. The Director implemented budget reductions thoughtfully but made tough choices in balancing competing priorities. During his tenure, 10 children are placed within 7 days BMN and 10 are not.

1

6. **The "focused elsewhere" Director** serves for two years. She cares about children held BMN and has confidence in her team. But she spent her career serving children who are the victims of physical abuse and makes those children her highest priority. During her tenure, 10 children are placed within 7 days BMN and 10 children are not.

7. **The "absent" Director** serves for six months. She lacks the skills or work ethic to do her job well, devotes little time to substantive issues, gains no familiarity with the BMN issue, and is not involved in any significant decisions about it. During her tenure, 10 children are placed within 7 days BMN and 10 are not.

8. **The "animus-driven" Director** serves for six months. For years he has feigned interest in serving at-risk children but despises one group: those who are BMN. He directs his staff to do the bare minimum to locate appropriate placements for BMN children. But while his directive does delay some placements, many BMN children in this timeframe have straightforward placement options. During his tenure, 10 children are placed within 7 days BMN and 10 are not.

Now, *__which of these Directors owes damages to which of these children?__* Plaintiffs' misguided premise is that the answer is simple: *each* Director owes damages to *all* children not placed within seven days because the Directors were "on notice" about the "BMN problem" and did not solve it. No court has previously recognized such a claim, much less as a class action. Whether any official named in this suit is liable for any Plaintiff's delayed placement cannot be answered without an individualized analysis of each Plaintiff's unique situation and each Defendant's specific actions.

## SUMMARY OF THE ARGUMENT

1. **Why a child is in a hospital after being designated BMN, and for how long, are fact-specific, individualized questions.**

It is difficult to conjure a more individualized, context-specific, and fact-bound inquiry than how long it takes DCFS to locate an appropriate placement for a BMN youth. A youth may be a "lockout" who first comes into DCFS custody *after* being designated BMN, requiring DCFS to start from scratch on finding an appropriate placement. A youth may already be in the Department's custody and able to return quickly to a prior home or placement. Still others fall

2

somewhere in between. For all these children, the Department must consider many factors in arranging an appropriate placement, including keeping the child with siblings, geographic proximity to family, medical or mental health needs, and whether the child requires special placement as a victim or perpetrator of violence.

Based on their needs, which may change, a youth may be suited at a given time for a residential treatment facility, specialized foster home, group home, or secure facility. Both the youth and the private placement (none of which are "run by" DCFS) must agree to a match. Children may decline placements or present behavioral issues leading facilities to decline admission. Courts, guardians, families, doctors, and the youth themselves all play roles and may cause delays.

Moreover, the child's best option might remain the hospital setting. BMN is primarily a Medicaid/insurance designation that does not necessarily correspond with clinical judgment. A child's doctors may be awaiting an appeal from the insurer's BMN designation. The BMN designation alone does not establish when hospitalization goes from being necessary, to helpful, to neutral, to detrimental.

At bottom, the number of days a child is "BMN" does not answer whether the placement timeframe was reasonable or who is responsible for delay. No court has ever set a legally required placement timeframe, awarded damages beyond any timeframe, or ruled that these questions can be resolved on a classwide basis.

### 2. Whether a delay violates the law cannot be resolved on a classwide basis.

The Seventh Circuit has repeatedly held that questions about whether a complex process took too long—such that the delay violates legal rights—cannot be resolved classwide. *Phillips v. Sheriff of Cook County*, 828 F.3d 541, 556-56 (7th Cir. 2016) (questions around reasonable delay

3

for medical treatment are "contextual" and "the constitutionality of a wait . . . will depend on a variety of individual circumstances"); *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010) ("[b]ecause reasonableness is a standard rather than a rule, and because one [plaintiff's] circumstances differ from another's, common questions do not predominate"); *Harper v. Sheriff of Cook County*, 581 F.3d 511, 515 (7th Cir. 2009) ("[l]iability, to say nothing of damages, would need to be determined on an individual basis").

This binding precedent requires denial of Plaintiffs' motion. Plaintiffs' brief does not address these cases, and Plaintiffs do not identify any case in which class certification has been deemed appropriate under circumstances like those here. In fact, as explained below, Plaintiffs' claims—brought against a slew of civil servants in their *individual* capacities—are even less amenable to class treatment than those in *Phillips*, *Portis*, and *Harper*.

> **3.      Plaintiffs' section 1983 claims hinge on questions about each Defendant's specific conduct and knowledge in relation to specific Plaintiffs.**

*Phillips*, *Portis*, and *Harper* involved *official* capacity claims focused on institutional conduct. Here, Plaintiffs seek *individual*-capacity damages under section 1983 against 18 senior DCFS leaders who served at different times, under different administrations, with different priorities and with different budgets. Some served on an interim basis for weeks or months yet are lumped together with those who served for years.[1]

---

[1] The gravamen of Plaintiffs' claim is an official-capacity claim about DCFS's "policies and practices." *See, e.g.*, Mot. at 55 ("The putative class bases its claims on Defendants' policy of maintaining insufficient placements."); ¶¶ 32, 36, 38-40, 48 (attributing conduct to "DCFS" rather than Individual Defendants). But Plaintiffs cannot seek damages against a State agency or officer in his official capacity because the Eleventh Amendment bars such claims. *See Joseph v. Bd. of Regents of the Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). Because a "*Monell*" theory is unavailable, *id.* at 748-49, Plaintiffs attempt to repackage their claim as an individual-capacity claim. This fails. Indeed, in a companion case premised on the same theory, the claim was dismissed as barred by sovereign immunity. *Golbert v. Smith*, No. 23-CV-00300, 2025 WL 963914, at *2-7 (N.D. Ill. Mar. 31, 2025). Plaintiffs' appeal is pending. No. 25-2235.

Because Plaintiffs seek individual-capacity damages, "[l]iability depends on each defendant's knowledge and actions," *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009), and defendants must be "personally responsible for the constitutional deprivation." *J.H. v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003). Defendants' actions also must "be the cause-in-fact of the injury and its proximate cause." *Hoffman v. Knoebel*, 894 F.3d 836, 841 (7th Cir. 2018).

Constitutional liability under section 1983 also requires "deliberate indifference"—akin to criminal recklessness: "actual knowledge of impending harm which [the defendant] consciously refused to prevent," such that "one can infer he intended to inflict the resultant injury." *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996). "Incompetence, negligence, and official irresponsibility" are insufficient. *Bostic v. Murray*, 160 F.4th 831, 842 (7th Cir. 2025). Mere knowledge of an issue is also insufficient; courts have "rejected a contention that [prison officials] can be liable just because they know that violence occurs in prisons and don't do more to prevent it on an institution-wide basis." *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012); *accord Burks*, 555 F.3d at 595.

Thus, Plaintiffs must prove each Defendant's *specific actions* and *specific knowledge* made them *personally responsible* for a particular Plaintiff's harm with sufficient *causal nexus* to impose damages. In a case spanning many years, with 18 separate Defendants and nine named Plaintiffs each with unique circumstances, no relevant question can be answered on a classwide basis.

**4.     Plaintiffs' ADA and Rehabilitation Act claims center on multiple individualized questions that cannot be resolved on a classwide basis.**

So, too, for Plaintiffs' ADA and Rehabilitation Act claims. While those claims are at least properly brought against DCFS as an entity, *see Stanek v. St. Charles Community Unit School District No. 303*, 783 F.3d 634, 644 (7th Cir. 2015), and thus need not contend with differences among individual Defendants, the elements of these claims are not susceptible to class treatment except in simple and dissimilar cases (*e.g.*, wheelchair users seeking accommodations like ramps).

5

To prevail on these "functionally identical" claims, Plaintiffs must prove they (1) are qualified individuals with a disability and (2) were denied access to a program "because of" their disability. *Wagoner v. Lemman*, 778 F.3d 586, 592 (7th Cir. 2015). To obtain damages, Plaintiffs must prove "intentional discrimination," *CTL v. Ashland Sch. Dist.*, 743 F.3d 524, 528 n.4 (7th Cir. 2014), requiring "deliberate indifference." *Lacy v. Cook County*, 897 F.3d 847, 863 (7th Cir. 2018).

Whether an individual qualifies as disabled is "an individualized inquiry based on the particular circumstances of each case." *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 926 (7th Cir. 2001); *Branham v. Snow*, 392 F.3d 896, 903 (7th Cir. 2004). "[T]he existence of a medical condition alone is insufficient to satisfy the ADA." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012). The mere fact of hospitalization does not answer the question, especially because, under Plaintiffs' theory, Plaintiffs were *no longer in need of hospitalization* when DCFS allegedly discriminated against them.

Even if a Plaintiff qualifies as disabled, he must prove DCFS's awareness of the disability—another individualized inquiry. *See Royan v. Chi. State Univ.*, 145 F.4th 681, 693 (7th Cir. 2025). Plaintiffs also must prove causation—that "but for the disability, [plaintiff] would have been able to access the services or benefits desired." *Culp v. Caudill*, 140 F.4th 938, 943 (7th Cir. 2025). It is difficult to understand how Plaintiffs can argue that placement delays resulted from intentional discrimination against a particular group when their overarching theory is that an

6

across-the-board shortage affected everyone. Regardless, the elemental questions for this claim are inherently individualized and incompatible with class treatment.[2]

### 5. Plaintiffs' attempt to re-frame these issues for class treatment fails.

Faced with case law that forecloses class treatment and without any analogous supporting authority, Plaintiffs rest their motion on a few faulty arguments.

Plaintiffs claim DCFS had a "policy of maintaining insufficient placements." (Dkt. 372, ("Mot.") at 55.) But Plaintiffs have no proof of any such policy, let alone that any individual Defendant played a role in it. An "illegal policy might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class," but without "significant proof" of such a policy, a class cannot be certified. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498 (7th Cir. 2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351-56 (2011)). Plaintiffs cannot make that showing.

Instead, Plaintiffs pivot to a vague theory that "certain Individual Defendants" did something illegal in 2014, or 2014-2015, or "beginning in 2014 through the present." (Mot. at 15.) They say, "Defendants decided to remove 500 placements" (Mot. at 1), or that DCFS "eliminated 460 beds" (*Id.* ¶ 32), or "eliminated 500 beds . . . without replacing them, and then shrank the budget for placements." (*Id.* at 43.) [3]

---

[2] There also is a commonality problem from the expansive timeframe. What DCFS "did and did not know and what actions it did or did not take in response will almost certainly vary from year to year, month to month, and even day to day." *Woodall v. Wayne Cnty., Michigan*, No. 20-1705, 2021 WL 5298537, at *7 (6th Cir. Nov. 15, 2021). A class member in 2019 might have a stronger or weaker deliberate indifference claim than one in 2014 based on intervening events, creating potential conflicts. *See id.*

[3] Plaintiffs' theory is internally inconsistent. They argue the same "policy" applied since at least 2008 (Mot. ¶ 30) yet revised their class to exclude pre-2014 claims while suggesting those plaintiffs will still pursue individual claims on the same theory. (Mot. at 3 n.1.) Plaintiffs also contemplate a class running through January 1, 2026 (Mot. at 40) but have no representative who was BMN after 2018. It is unclear how Defendant Marc Smith (Director only from 2019 onward) remains in this lawsuit, or how Plaintiffs expect to prosecute for 2019-2026—further indication that the gravamen of the claims is *institutional*, not individual, conduct.

After years of discovery, Plaintiffs cannot provide basic details: Which Defendants took these actions? Was it 460 or 500 placements? DCFS does not operate placements, so what does it mean that DCFS "eliminated beds" in a private marketplace? Which Defendants shrank budgets, and when? (Agency budgets are published documents, and the Illinois legislature—not DCFS—sets annual budgets.) Plaintiffs provide no answers.

Plaintiffs urge that they need not prove the merits at this stage. (Mot. at 43-44.) True enough. But they still need "significant proof" of an illegal policy to certify such a class. *Jamie S.*, 668 F.3d at 498. "[T]he trial court can certify a class only if it is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 892 (7th Cir. 2025). "[C]lass certification imposes more than a pleading standard"; the party seeking certification bears the burden "by a preponderance of the evidence." *Id.*

Plaintiffs do not meet their burden. Stripped of generalized allegations that unnamed "Defendants" took some unnamed illegal action, Plaintiffs' brief is entirely devoid of *any* act or omission by *any* individual Defendant. The most Plaintiffs do is to accuse some (but not all) Defendants of corresponding with the Public Guardian about the BMN issue.

A class cannot be certified on this record. Plaintiffs' motion should be denied.

## SUMMARY OF THE EVIDENCE

### A. The Parties

#### 1. The Department of Children and Family Services

The Illinois Department of Children and Family Services ("DCFS" or the "Department") is responsible for responding to reports of suspected abuse or neglect of children and for providing social, rehabilitative, and residential services. 20 ILCS 505/1 *et seq.*; 325 ILCS 5/1 *et seq.* The Department's work is expansive. In 2025, the Department employed 3,922 people, responded to

8

238,169 hotline calls, conducted 78,096 child abuse and neglect investigations, and was responsible for 15,773 children. (Exhibit ("Ex.") 1, DCFS, *Building the Future of Families Together: 2025 Annual Report* (2026), at 10-11.)

## 2. The Individual DCFS Defendants

The Department has thousands of employees. *Id.* In this case, Plaintiffs seek money damages against 18 of these individuals who served "under color of law" as officers and employees of the Department (the "Individual Defendants"). (Dkt. 92, Amended Complaint ("Compl.") ¶ 36.) Plaintiffs' complaint places the Individual Defendants into four categories based upon their Department roles at various times. (*Id.* ¶¶ 36-69.)

**DCFS Directors.** Plaintiffs named as defendants the thirteen public servants who served as the Director, Acting Director, or Interim Director of the Department from 2008 until 2024. (Dkt. 170, Answer ("Ans.") ¶ 38.) However, in their motion for class certification, Plaintiffs have narrowed the proposed class definition to solely include Plaintiffs who were hospitalized BMN at any time on or after January 1, 2014. (Mot. ¶ 3.) As Plaintiffs admit, due to this change, five Plaintiffs do not meet the class definition and are not put forth as class representatives. (*Id.* ¶ 1 n.1.) Correspondingly, Defendants McEwen, Ortega-Piron, Peterson, and Calica, whose tenures in directorial positions at DCFS ended on or before January 1, 2014, are not included as class defendants. (*Id.* ¶ 7.)[4] The remaining Director defendants are:

- **Arthur Bishop** served as Interim DCFS Director **for about a month**, from January 24, 2014, to February 2014. (Ex. 2, Bishop Response ("Resp.") Interrogatory ("Int.") 32.)

---

[4] Additionally, though Defendant Gonzales's tenure as Interim Director ended on January 24, 2014, after the commencement date listed in the proposed class definition, Defendant Gonzales is not included in Plaintiffs' motion as a class defendant, nor mentioned anywhere therein, despite the fact that Plaintiffs continue to include Lise Spacapan as a defendant even though she was a Director for only 9 days. (Mot. ¶ 7). In any event, Defendants accept Plaintiffs' apparent position that Defendant Gonzales is not a class defendant.

- **Bobbie Gregg** served as DCFS Director for less than a year, from February 2014 to January 2015. (Mot. ¶ 7.)

- **Cynthia Tate** served as Interim DCFS Director for **about a month**, from January 2015 to February 2015. (*Id.*)

- **George H. Sheldon** served as DCFS Director for about two-and-a-half years, from February 2015 to June 15, 2017. (Ex. 3, Sheldon Resp. Int. 32.)

- **Lise T. Spacapan** served as Interim DCFS Director for **nine *days***, from June 16, 2017, to June 25, 2017. (Ex. 4, Spacapan Resp. Int. 1.)

- **Beverly J. Walker** served as DCFS Director for about nineteen months, from June 26, 2017, to February 2019. (Ex. 5, Walker Resp. Int. 32.)

- **Debra Dyer-Webster** served as interim DCFS Director for **about two months**, from February 2019 to April 2019. (Mot. ¶ 7.)

- **Marc D. Smith** served as DCFS Director from April 2019 until January 31, 2024. (Ex. 6, Smith Resp. Int. 32.)

The DCFS Director is tasked with "execut[ing] the powers and discharg[ing] the duties vested by law in . . . the Department." 20 ILCS 5/5-20. But the Director is *not* personally responsible for any specific youth's placement. (*See, e.g.*, Ex. 6, Resp. Int. 2.) The Director's placement responsibility is "general" and includes "identifying staff for high-level positions, proposing a budget to the legislature and Governor's office, [and overseeing] staffing and headcount." (*Id.*)

Plaintiffs' motion does not identify any relevant conduct of any Director. It alleges only that:

- **Debra Dyer-Webster** received, and **Bobbie Gregg** received and responded to, correspondence from the Public Guardian. (Mot. ¶¶ 30(a)-(e), 34.)

- **Beverly Walker** remarked "[a]t DCFS, we know who these kids [held BMN] are because we are the agency getting them out." (Mot. ¶ 26.)

**Associate Deputy Directors for Placement Resources.** Plaintiffs named as defendants two public servants who served as Associate Deputy Director for Placement Resources. Defendant

10

**Michael C. Jones** served in the position from September 2008 to May 2017. (Ex. 7, Jones Resp. Int. 1.) Defendant **Lauren Williams** served in the position from September 2017 to September 2021. (Mot. Ex. 9, Williams Resp. Int. 1.)

The Associate Deputy Director of Placement Resources is responsible for "develop[ing] and implement[ing] statewide policies and procedures applicable to placement services," including "oversight of the Central Matching Unit." (*Id.*, Resp. Int. 2.) The Central Matching Unit assists in the "individualized [placement] process" by providing information on available placements to caseworkers. (*Id.*) The Associate Deputy Director is "not directly responsible for the placement of youth in care. The placement of each individual youth [is] by the youth's caseworker and supervisor." (*Id.*)

Plaintiffs' motion alleges nothing about Defendant Williams and alleges only that Jones received and responded to correspondence regarding BMN challenges. (Mot. ¶¶ 31, 68.)

**Psychiatric Hospitalization Project Group Administrators.** Plaintiffs named as defendants two public servants who served as Administrator of the Psychiatric Hospitalization Project ("PHP") Group. Defendant **Felicia Guest** only served in the position prior to the proposed class period. (Compl. ¶ 55.) Defendant **Linda Stroud** served in the position from November 2013 to September 2019. (Ex. 9, Stroud Resp. Int. ¶ 9.)

The PHP Group Administrator "formulates and directs the implementation of statewide psychiatric services to children and youth." (Mot. Ex. 11 at 1.) However, "[s]teps to increase the number of placement options for children hospitalized BMN" are "outside the scope of [the Group Administrator's] duties." (*Id.*)

Plaintiffs' motion alleges nothing about any conduct of Defendants Guest or Stroud.

11

**Guardianship Administrators.** Plaintiffs named as defendants three public servants who served as DCFS Guardianship Administrators. Defendant **Jean Ortega-Piron** only served in the position prior to the proposed class period. (Compl. ¶ 62.)

Defendant **Debra Dyer-Webster** served as Guardianship Administrator from June 2013 to October 2017. (*Id.*) Plaintiffs claim that Defendant **Janet Ahern** serves as Guardianship Administrator "through the present," citing a LinkedIn profile that has evidently not been updated in several years (Mot. ¶ 13), but in fact Defendant Ahern served as Guardianship Administrator from November 2017 to December 2022. (Ex. 10, Ahern Resp. Written Discovery as Ordered May 17, 2023, ¶ 9.)

The Guardianship Administrator is appointed by the Director and serves as the legal guardian for all youth in DCFS care. The Administrator's responsibilities are codified at 89 Ill. Admin. Code § 327.4, and do not include the responsibility or authority for increasing placements for BMN children.

Plaintiffs' motion makes no allegations about Defendant Ortega-Piron and alleges only that Defendants Dyer-Webster and Ahern received correspondence from the Public Guardian. (Mot. ¶¶ 30(a)-(f), 34.)

### 3. The Named Plaintiffs

The operative complaint identifies fifteen Plaintiffs. (Compl. ¶ 172.) However, in their motion, Plaintiffs narrowed the proposed class definition to youth held BMN on or after January 1, 2014, and abandoned their claim that Archie C., Burl F., Issac D., Johnnise W., Sterling B., and Tyrese B. are suitable class representatives. (Mot. ¶¶ 1, 3.) The nine remaining putative class representatives are: Carrion C., Careale C., Charlie W., Skylar L., Alana M., Stephen W., Jamya B., Joshua F., and Erica C. (*Id.* ¶ 1.)

12

Plaintiffs attribute the change to the dropped Plaintiffs "not meet[ing] the class definition for the timing of their BMN period." (Mot. ¶ 1 n.1.) This rationale does not apply to Sterling B., whose majority of BMN days occurred in 2014, within the proposed class period. (Compl. ¶ 27.) Defendants therefore address Sterling B.'s case with the other putative class representatives.

**B.      The DCFS Process for Custody and Placement of Youth in Care**

In seeking placements for each of the more than 15,000 minors in the Department's care at any given time, the Department follows a detailed evaluation process that is tailored to each child's individual circumstances. This process is mandated by law and is designed to find an appropriate placement that best serves each child's unique interests and needs.

**1.      The Juvenile Court Process for Abused, Neglected or Dependent Minors**

The Department's involvement with a youth and family begins with an abuse and neglect investigation. *See* 325 ILCS 5/7.3. If the Department determines a youth needs to be removed from the legal and physical custody of the youth's parents or guardians, the State's Attorney files a petition for wardship, *see* 705 ILCS 405/2-13, and after a court hearing the youth is placed in the Department's temporary custody if there is probable cause to believe the allegations of abuse or neglect. *See* 705 ILCS 405/2-10; *In re M.W.*, 386 Ill. App. 3d 186, 190 (1st Dist. 2008). When a petition is filed alleging a youth is abused, neglected or dependent, the Juvenile Court also appoints a guardian *ad litem* for the youth, to represent the best interests of the youth and make recommendations to the court. 705 ILCS 405/2-17(1). The guardian *ad litem* is not associated with DCFS or the DCFS Guardianship Administrator.

Thereafter, the Juvenile Court "conducts an adjudicatory hearing to determine whether the allegations of the petition that a minor is abused, neglected or dependent are supported by a preponderance of the evidence." *In re M.W.*, 386 Ill. App. 3d at 196. If the State's attorney meets

13

its burden of proof, the court conducts a "disposition hearing" to determine whether it is "consistent with the health, safety and best interests of the minor" to place the youth in DCFS custody. *Id.* The court then conducts a "permanency hearing" at which the court will set a permanency goal. 705 ILCS 405/2-28(2).

"Cases involving abuse, neglect and wardship are *sui generis*; each case must be decided on its own distinct set of facts and circumstances." *In re M.W.*, 386 Ill. App. 3d at 197.

### 2. The DCFS Placement and Casework Process

Once the Department receives temporary custody of a youth, the Department is responsible for obtaining a placement for the youth and providing services to the youth and family. The Department assigns the case to a case worker, who reviews the youth's file and works with the youth and any interested parties to prepare for the permanency hearing. 705 ILCS 405/2-28(2). Primary responsibility for the placement rests with "the youth's caseworker and supervisor." (Mot. Ex. 9, Williams Resp. Int. 2.)

Placements are made consistent with the youth's best interests based on individualized needs. *See generally* 20 ILCS 505/7; Ex. 11, DCFS Procedures § 301.60. The Department must make "diligent efforts" to locate relatives, consider the child's religious beliefs and wishes, address education, medical, and mental health needs, and seek the least restrictive appropriate setting. 20 ILCS 505/7(a)-(b); 89 Ill. Admin. Code § 301.60(b).

State law also mandates procedures that must precede placement in certain facilities. *See* 705 ILCS 405/2-27.1(1) (secure child-care facility); 705 ILCS 405/2-27(3) (out-of-state residential treatment). These processes unavoidably take time.

Overall, the Department must "ensure that the child's health, safety, and best interests are met" considering "the individual needs of the child" based on a "comprehensive, individualized

14

assessment." 20 ILCS 505/7(c). To determine the child's "best interests," the Department must consider at least 10 factors "in the context of the child's age and developmental needs," including: "(a) the physical safety and welfare of the child . . .; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments . . .; (e) the child's wishes and long-term goals . . .; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence . . .; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child." 705 ILCS 405/1-3.

After an appropriate plan for a youth has been developed, it is presented to the court at a permanency hearing, at which "[t]he caseworker must appear and testify." 705 ILCS 405/2-28(2). After reviewing the evidence, the court determines a permanency goal for the child. *Id.* § 405/2-28(2.3). If the court determines that the plan is not sufficient to provide for the youth's needs, the court enters an "order for the Department to develop and implement a new service plan or to implement changes to the current service plan consistent with the court's findings." *Id.* § 405/2-28(2.4).

### 3. Clinical Placement Facilities and Options

The Department matches youth in care with several different types of facilities for "clinical" placements (*i.e.*, placements not with a relative or in traditional foster care). *See, e.g.*, 705 ILCS 405/2-27.1(1); 89 Ill. Admin. Code § 301.60(b). These include residential treatment centers, specialized foster care facilities, and group homes. (Ex. 9, Resp. Int. 2.) A residential treatment facility "is a facility which offers counseling, medication management, and other services unique to an individual's needs." *In re J.S.*, 2022 IL App (1st) 220083 ¶ 1, n.1. A

15

specialized foster home is "a foster home placement where the foster parent or parents are trained to deal with minors that have either low IQs, behavioral disorders, medical issues, or mental health disorders." *Id.* ¶ 1, n. 2.

A DCFS-licensed "group home" is a child-care facility, often providing residential care for up to 10 children in a structured environment and offering 24-hour nonmedical care, supervision, and services like counseling or specialized education. *See* 89 Ill. Admin. Code, Part 403.

These clinical placement facilities are privately owned, and DCFS contracts with them to provide placements. DCFS is legally responsible for ensuring these facilities meet extensive licensing and compliance requirements. 225 ILCS 10/7. To ensure children held in any facility are properly served, DCFS may suspend placements with a non-compliant facility or terminate its contract with that facility. 225 ILCS 10/8.

### 4. Psychiatric Hospitalization

DCFS procedures identify a psychiatric hospitalization for a youth in care as a crisis situation. (Ex. 12, DCFS Procedures § 301.110(b)(2).) A psychiatric hospitalization is intended to assess, evaluate, diagnose, treat and stabilize a child experiencing a serious emotional or psychiatric crisis. If a child is then in DCFS custody, discharge and placement planning should begin when the child enters a psychiatric hospital, and the caseworker's first task is to "determine whether the pre-admission living arrangement is viable and willing to accept the ward back upon discharge." (*Id.* at § 301.110(h)(1)(F).) The youth's caseworker is responsible for the planning, movement, and placement of youth hospitalized in psychiatric facilities. (*Id.* at § 301.110(b)(7).)

Prior to psychiatric hospitalization, all youth in care receive a mandatory screening assessment. (*Id.* at § 301.110(c)(1).) DCFS tracks youth in care who are admitted to a psychiatric

16

hospital from their admission, during the time they remained psychiatrically hospitalized and when they were identified as BMN. (*Id.* at § 301.110(c)(5); Mot. Ex. 8, Jones Resp. Int. 3.)

### 5. The Central Matching Unit and the Clinical Matching Process

The Central Matching Unit is part of the DCFS Clinical Division that works with other DCFS staff, including the youth's assigned caseworker and supervisor and DCFS regional clinical staff, to identify clinical placements for youth. (Mot. Ex. 9, Williams Resp. Int. 2.) Within the Central Matching Unit, "[a]ny youth in care who is psychiatrically hospitalized and does not have an identified discharge placement resource is prioritized, with youth in care who are beyond medical necessity given a higher priority." (*Id.*; *see e.g.*, Ex. 13, ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ .)

When a youth in care is hospitalized, DCFS undertakes a "clinical staffing . . . to ensure appropriate post-hospital placement, treatment, and other after-care services." (Ex. 12 at § 301.110(f).) "A clinical staffing is a meeting between [a minor's] clinical staff, the minor's caseworker, and the minor's [guardian *ad litem*] to determine the most appropriate and least restrictive foster placement or setting to address the minor's needs." *In re J.S.*, 2022 IL App (1st) 220083, ¶ 10 n.4. The clinical staffing team then provides a report to the Central Matching Unit detailing the youth's history, circumstances of hospitalization, and individual needs. (Mot. Ex. 9, Resp. Int. 2.) The Central Matching Unit prepares a list of potential placement options, notifies the placement provider, and informs the caseworker about the potential match. (*Id.*) The caseworker must then "provide[] additional in-depth information on the youth to the placement provider and

work[] with the placement provider to arrange interviews with the placement provider and the youth." (*Id.*)

To secure placement, the matched provider must accept the youth, and the youth must consent to the placement. (Mot. Ex. 8, Resp. Int. 2.) If both conditions are met, the casework staff and provider develop a plan and date for placement of the youth. (*Id.*) If a matched provider declines a youth or the youth does not consent to the placement, the casework staff submits a re-match request to the Central Matching Unit. (*Id.*) When caseworkers encounter difficulties in matching a youth, the Central Matching Unit may facilitate a placement by arranging for additional staff or services to be provided to the facility, if feasible. (*Id.*)

### 6. Lockout Cases

A "lockout" occurs when a child who is not in DCFS's care is psychiatrically hospitalized, and "the parent or caregiver has denied the child access to the home and has refused or failed to make provisions for another living arrangement." 89 Ill. Admin. Code § 300 App. B.; *see also In re D.E.*, 2020 IL App (1st) 200361-U, ¶¶ 8-12 (discussing DCFS evaluation prompted by lockout); *In re J.M.*, 2024 IL App (4th) 230577-U, ¶ 5 (same).

In these circumstances, DCFS does not have legal authority over the child until the court awards it temporary custody. *See, e.g., In re J.M.*, 2024 IL App (4th) 230577-U, ¶ 16. Nor does DCFS immediately know if it needs to request that the State's Attorney file a petition for custody. (*See* Ex. 39, DCFS Procedures § 301.130(e)(5).) The first step in a lockout is an initial abuse and neglect investigation, which occurs within 24 hours of the receipt of the lockout report to the DCFS child abuse hotline. (*Id.*) If a lockout cannot be resolved within 48 hours, the youth may be taken into protective custody by DCFS, and the Department commences the process for finding a

18

placement and can place a youth after being granted temporary custody. *See, e.g.*, *In re J.M.*, 2024 IL App (4th) 230577-U, ¶¶ 5-9.

Lockouts pose heightened challenges for DCFS. When DCFS is notified, the youth is already designated as BMN. Further, lockouts often occur when the parent or caregiver refuses to pick up the youth due to dangerous behavior or the youth or parent will not engage with alternative placement efforts. *See, e.g.*, *id.* ¶ 5. Most significantly, DCFS is starting from scratch and must gather information to evaluate the child's individual placement needs. (Ex. 14, Expert Report of Dr. Bethany O'Neill at 14 ("Lockout[s] represent a distinct subset of BMN cases that require individualized attention.").)

### C.    "BMN" Designations

Plaintiffs' motion defines the term "BMN" as follows:

> "BMN" is an acronym for "Beyond Medical Necessity" used by Medicaid and DCFS, and refers to the circumstances when a child in DCFS care remains in a psychiatric hospital after the child has been medically cleared for discharge because they have been stabilized and can safely be released into a less restrictive placement with appropriate treatment and support. Children are given the BMN designation by psychiatric hospitals when the child has completed the required treatment but has no placement to return to."

(Mot. ¶ 22.) This is partly accurate. BMN is a term "used by Medicaid" and other insurers, and thus does not necessarily correspond with a clinical judgment. It does not necessarily mean that a determination has been made by a patient's *doctors* that the patient is ready for discharge but, instead, a determination has been made by a patient's *insurer* that it will no longer pay for treatment. *See In re L.W.*, 2023 IL App (1st) 221048-U, ¶ 15 (recounting testimony that a BMN determination "was due to [the youth's] Medicaid benefits running out not that her level of psychiatric need had decreased").

19

Thus, Plaintiffs' assertion that a child declared "BMN" has been "medically cleared for discharge" or that they are "stabilized and can be safely released" (Mot. ¶ 22) oversimplifies and mischaracterizes the import of a "BMN" designation.

**D.     Reasons Why a Youth in DCFS Care May Remain in a Hospital While Designated BMN**

There are countless reasons why a youth in DCFS care may remain in a psychiatric facility BMN, many of which are outside the Department's control or have nothing to do with whether an available "bed" or "placement" exists. These include the following:

**Timing Issues.** Plaintiffs' proposed class includes any child held "BMN" for more than seven days. (Mot. ¶ 3.) Seven days is an arbitrary cut-off, but this class definition acknowledges that the Department needs *some* amount of time to find appropriate placements. For many youths, this arbitrary seven-day clock is not an appropriate time to begin measuring or assessing DCFS's involvement or actions. For example:

- Children sometimes do not come into DCFS's care until they are already at or near the seven-day BMN-mark. This frequently happens in "lockout" cases—where a parent or caregiver places a child in the care of a hospital but then refuses to take the child back upon discharge. DCFS must then initiate the placement process without the benefit of prior casework. (*See, e.g.*, Ex. 15, ███████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████.)

- A youth's doctors may be awaiting the outcome of an appeal from the insurer's determination that a child is BMN. Multiple appeals are possible and not infrequent. (Ex. 14 at 10.)

- A youth's doctors may determine that a youth requires a shorter hospital stay than the doctors initially predicted. (*Id.* at 6.)

**Lack of Cooperation / Waiting on Others.** DCFS cannot unilaterally "place" children in "beds." Placements require the cooperation of and coordination with the children themselves, their families, foster parents, potential facilities, private doctors and mental health professionals,

20

hospital social workers, the courts, and others (none of which DCFS controls). This legally mandated coordination may itself cause delay. For example:

- Children and youth may decline to interview with potential placements. (*See, e.g.*, Ex. 16, ███████████████████████████████████████ ████████████████████████████████████████████.)

- Interviews may be delayed due to unforeseen changes in the youth's medical condition. (*See* Ex. 17, ████████████████████████ ████████████████████████████████████████████ ████████████████████████.)

- Children and youth may reject a matched placement, or may insist on particular type of placement, requiring additional time and resources to locate an appropriate placement. (*See* Mot. Ex. 64 at 1-3 (████████████████████ ████████████████████████████████████████████ ████████████████████████████████████).)

- A possible placement may signal a willingness to accept the youth, only for the placement to backtrack and withdraw later in the process. (*See* Ex. 18, ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████.)

- Delays outside of DCFS's control may occur in transferring children to locked facilities, which exist only out-of-state. (Ex. 14 at 13, 19 (████████████ ████████████████████████████████████████████ ████████████████████████).)

- A child may be able to return to the pre-admission placement, but may be unable to connect to needed support or court-ordered services required to maintain stability. (*See* Mot. Ex. 133 at 3 (████████████████████ ████████████████████████████).)

- Delays may occur in holding a court-ordered psychological evaluation. (Ex. 14 at 12 (████████████████████████████████ ████████████████████████████).)

- DCFS may be required to await a court order on the appropriateness of a placement. (Ex. 14 at 16-17.)

- DCFS must consult with the child and family, who may refuse to cooperate or delay in responding. (Ex. 14 at 18 (████████████████████████████ ████████████████████████████████████████).)

21

**Child-Specific Needs.** While Plaintiffs acknowledge that a placement must meet the unique needs of each child in care, they ignore that those needs may require employing child-specific resources, which may cause delays despite diligent efforts. For example:

- A youth in care may present complex issues such as a history of running away, multiple past placements, criminal histories, severe behavioral issues, or other circumstances that make them difficult to place. (*See, e.g.*, Mot. Ex. 64 at 2-3 (█████████ ); Mot. Ex. 112 at 2 (█████████ ██████████ ).)

- A youth's recent acuity or specific needs may result in a third-party provider denying the youth a placement that previously was deemed a match. (*See, e.g.*, Mot. Ex. 119 at 7 █████████ █████████ .)

- A third-party facility with available beds may not meet the youth's needs, or may be unsafe or otherwise inappropriate for the youth given the age, sex, behavior, or other characteristics of the other then-resident youth in that facility. (*See, e.g.*, Mot. Ex. 68 at 16 (█████████ ████████ ). )

- The facility may meet the needs of the youth needing placement, but the facility may determine the youth would place its then-residents at risk due to the incoming youth's age, sex, sexually or physically aggressive behaviors, needs, or other characteristics. (*See, e.g.*, Mot. Ex. 79 at 2 █████████ █████████ .)

- A youth may need additional psychiatric treatment before placement. (*See* Ex. 17, █████████ █████████ .)

- A guardian, including the Public Guardian or guardian *ad litem*, may reject a matched placement. (*See* Ex. 14 at 10 █████████ █████████ .)

**Changes in Circumstances.** Contrary to Plaintiffs' oversimplified characterization, children in DCFS care do not have a static and straightforward need for placement following a

hospital stay. In reality, a child's circumstances frequently change in ways that delay their stable

placement. For example:

- A youth's preferred type of placement may change due to a court order or a change in the guardian *ad litem*'s or clinical staff's recommendations. (*See* Mot. Ex. 79 at 1 .)

- Foster parents may agree to the placement of a youth only to change their minds and reject the placement later in the process. (*See* Mot. Ex. 133 at 5 .)

- Children admitted to a hospital from an existing placement may not be able to return to that placement because of a change in their needs. (*See* Ex. 19, .)

- Children admitted to a hospital by a parent are sometimes suddenly "locked out" of the home by the parent upon discharge. (*See* Ex. 14 at 18.)

**System-Wide and Market Pressures.** Larger-scale forces outside of DCFS control, such

as market pressures, labor shortages, and geographic and demographic changes affect DCFS's

ability to place children and the timing of those placements. For example:

- There may be an unanticipated influx of youth requiring highly specialized services, as was the case during and immediately following the COVID-19 pandemic. (Ex. 20, McCarrel Deposition Transcript ("Tr.") 179:10-19. (testifying that BMN stays are a "nationwide problem," and that "[i]n the more recent years after COVID . . . it has become more prevalent").)

- Labor shortages in third-party facilities and specialized patient care and support industries may leave facilities with open beds, but unable to accept a placement due to a lack of available staffing support for that child. (Ex. 21, DCFS, *Annual Youth in Care Waiting for Placement Report* (2025) at 5 (noting that "staff shortages" are a reason for BMN stays).)

- Market forces generally may change the availability of group homes or residential treatment facilities. While DCFS can contract with facilities, it does not control those facilities' market-based decisions. (*See, e.g.*, Ex. 22, Christina Buttons, *The Radical Movement to Divest from Youth Residential Treatment*, Manhattan Institute

(Apr. 10, 2025), https://manhattan.institute/article/the-radical-movement-to-divest-from-youth-residential-treatment ("The number of residential treatment programs declined by 61% between 2010 and 2022[] . . . because of growing policy resistance and ideological opposition.").)

For these and other reasons, Dr. Bethany O'Neill, a licensed psychologist with 20 years of experience working with children and adults in inpatient mental health hospitals across several states, explained that "[i]ndividual, rather than common, questions and assessments predominate when determining why a given youth-in-care experienced a post-BMN placement after an inpatient psychiatric intervention." (Ex. 14 at 7.) Dr. O'Neill notes that different patient populations must be treated differently, which may lead to delay in finding an appropriate placement. (*Id.* at 3-6.) Children with cognitive functioning and other developmental delays; individualized behavioral problems; suicidal ideation or self-harming behavior; "group conduct behaviors" such as property destruction, fire setting, substance abuse, elopement and sexualized behaviors; and serious mental illness will require particularized care and attention, both for their benefit and for the safety and benefit of others living with them. (*Id.*) "Each child needs an individual treatment plan during hospitalization, as well as a tailored placement strategy that reflects their unique clinical profile, safety considerations, and long-term needs." (*Id.*) In addition:

> When a youth is hospitalized and experiences a BMN delay in placement, determining the reasons why such a delay occurred cannot be addressed as a single causal agent causing the delay. This is because the cases are incredibly complex and the reasons that a youth is held BMN while awaiting placement are varied. . . . Determining the cause of a delayed placement for any specific youth (and determining whether the delay is caused, in any part, by placement/bed unavailability or DCFS placement efforts) requires an analysis of many factors.

(*Id.* at 8.) Dr. O'Neill identifies many of the same factors addressed above. (*Id.* at 9.)

Plaintiffs do not (and cannot) dispute any of this. Although Plaintiffs' expert, Dr. McCarrel, opines that "each of the named Plaintiffs' BMN stays were *affected* by the lack of placements available to DCFS," (Ex. 23, Expert Report of Dr. McCarrel at 10 (emphasis added)), she also

24

admits that when a child held BMN is locked out of a home, a delay in placement is "completely unrelated to whether there's available beds." (Ex. 20, McCarrel Tr. at 90-91.) She further admits that to determine whether any circumstance delayed placement for any youth, "you would have to look at the case file" because "that's the only way" to find out. (*Id.* at 91.)

Dr. McCarrel also admits that court orders and delays in transporting children to out-of-state locked facilities, among other circumstances, are not attributable to a "systemic" lack of beds, and that to ascertain whether these factors caused delays, a case-by-case file review is necessary. (*Id.* at 100, 134-35.) Dr. McCarrel testified that to determine whether placement unavailability was the "causal factor" in a post-BMN placement, "you are always going to have to do record review. How else would you know anything about the child?" (*Id.* at 154-55.) And even if "you are looking at the entire population and you are doing a meta-analysis of all the children that are beyond medical necessity . . . you would always have to review records to determine why a child being held in a psychiatric hospital BMN had a delayed placement." (*Id.* at 158-159.) As Plaintiffs' own expert succinctly opines: "every child has different needs and different outcomes and . . . every child needs an appropriate placement." (Ex. 23 at 17.)

**E.     The experiences of the named Plaintiffs demonstrate that many events and considerations that may delay discharge are outside the Department's control.**

The named Plaintiffs' own individual circumstances demonstrate the complexity of finding an "appropriate" placement and the many events and considerations that may lead to delays.

**Alana M.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25

26

**Skylar L.**

**Erica C.** ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

**Sterling B.** ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

28

29

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

**Joshua F.** █████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

**Carleale C. and Carrion C.** ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████

**Charlie W.**

30

**Jamya B.**

**Steven W.**

33



**F.     The effect of a delayed placement varies depending on the youth.**

As Dr. O'Neill explains, "[t]he idea that all BMN delays are harmful or harmful at an equal level is baseless." (Ex. 14 at 6.) The "impact of prolonged hospitalization, particularly in cases where youth remain inpatient BMN, varies significantly based on age, diagnosis, and psychosocial context." (*Id.* at 5.) In fact, "a delay in placement can be beneficial in some cases." (*Id.* at 6.) For youth with certain conduct-type behaviors, such as fire setting or sexual acting out, the Department "must prioritize safety." (*Id.* at 5.) These youth not only pose risks to more vulnerable peers, but in many cases, "these youths can benefit from longer-term hospitalization where a high degree of structure, supervision, and therapeutic consistency can be provided." (*Id.*) The same can be true of youth with cognitive functioning and developmental delays, aggression, suicidal tendencies or a history of self-harm, and serious mental illness. (*Id.* at 5-6.) Whether these youth will be better off in a step-down placement or in hospital depends on many factors, including the demographics of the proposed facilities, any comorbidities present in the youth, and the youth's unique treatment plan and needs. (*Id.*)

34

Further, while Defendants acknowledge that in some cases long periods of hospitalization may be detrimental to a youth in care, "[l]ong delays, beneficial in some circumstances, are likely a far better outcome than poor treatment and placement decisions that lead to failed placements." (*Id.* at 6.) In other words, to account for the best interests of the children, the Department must weigh these alternatives in each unique case and at any given time.

## PLAINTIFFS' CLAIMS

Understanding the elements of Plaintiffs' claims is a critical first step in the evaluation of their motion for class certification. "Only by properly circumscribing the claims and breaking them down into their constituent elements can a district court decide which issues are common, individual, and predominant." *Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021). "[I]t is the plaintiff's burden" to define their claims and "prove the class should be certified." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see also Lucero v. Credit Union Ret. Plan Ass'n*, No. 22-CV-208-JDP, 2024 WL 95327, at *3 (W.D. Wis. Jan. 9, 2024) ("[C]laims cannot be certified [if the] plaintiffs haven't clearly defined them.").

Plaintiffs here have not defined their claims or adequately identified their constituent elements. The motion devotes less than two pages to a threadbare discussion of Plaintiffs' legal theories, and it articulates only rote and vague descriptions of the claims. (Mot. at 37-38.)

## A.     Plaintiffs' Constitutional Claims

Plaintiffs cite no case in which a plaintiff has recovered money damages under section 1983 for the failure of senior officials at a state child welfare agency to find a placement for a youth by a particular date. Nor have Defendants been able to locate one. Although Plaintiffs assert that this action is "straightforward" (Mot. at 1), they make no attempt to set forth the elements of their constitutional claims.

35

Because Plaintiffs purport to seek damages against these DCFS officials in their *individual* capacities, "[l]iability depends on each defendant's knowledge and actions," *Burks*, 555 F.3d at 594, and defendants must be "personally responsible for the constitutional deprivation" for liability to attach. *J.H.*, 346 F.3d at 793. Defendants' actions must also "both be the cause-in-fact of the injury and its proximate cause." *Hoffman*, 894 F.3d at 841.

Constitutional liability under section 1983 requires "deliberate indifference"—akin to criminal recklessness: "actual knowledge of impending harm which [the defendant] consciously refused to prevent." *Hill*, 93 F.3d at 421. "Incompetence, negligence, and official irresponsibility" are not enough. *Bostic*, 160 F.4th at 842. The defendant's actual knowledge must be sufficiently specific to "allow an inference" that her action or inaction was "designed to produce or allow harm"; "[a] warden's knowledge that violence occurs frequently in prison does not make the warden personally liable for all injuries." *Vance*, 701 F.3d at 204.

As a threshold inquiry, Plaintiffs must establish that a specific Individual Defendant violated their constitutional rights—which means identifying an existing right that was violated. Plaintiffs point to *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990), and its observation that "the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically." (Mot. at 37.) While generally true, this sentence from *K.H.* does not provide any detail about the contours of any constitutional right at issue here, and how it may (or may not) be applied in suits seeking damages.

*K.H.* acknowledged one established but narrow right that could form the basis of a damages claim: the "right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser*." *Id.* at 852 (emphasis added). The Seventh Circuit contrasted that right with one that does not exist:

36

"the right to a stable foster-home environment," *id.* at 853, and one not amenable to damages suits—the right "not to be shifted among foster homes 'too frequently.'" *Id.* at 854.

Defendants have not (and are not alleged to have) placed any child in a custodial setting knowing it houses an abuser. The abstract rights that Plaintiffs seek to vindicate—a right to placement within seven days of being declared BMN, a right to an "adequate" number of placements, or more spending on placements—is not one that any court has recognized. [5]

In *K.H.*, the Seventh Circuit expressed profound doubt about whether federal courts play any role in this arena. As Judge Posner observed:

> [T]he underlying problem is not lack of professional competence but lack of resources, a problem of political will unlikely to be soluble by judicial means. Good foster parents are difficult to find, unless they are paid generously; good institutional care is expensive too. The needs of neglected, abused, and abandoned children compete with other demands, both public and private, for scarce resources. The allocation of the nation's—even of a single state's—resources is not a realistic assignment for the federal courts.

*Id.* at 853. Yet Plaintiffs seek, on a classwide basis, damages against specific DCFS leaders based on the mere existence of an ongoing societal problem. They do not base the theory on any specific conduct of any specific leader, but rather merely the role these leaders held within the State agency. There is no analogue in the case law of this Circuit or the nation.

Indeed, the Seventh Circuit repeatedly has rejected claims against high-level officials under the personal liability standard. *E.g.*, *Burks*, 555 F.3d at 593 ("The assumption underlying this choice of defendants – that anyone who knew or should have known of [a specific problem], and

---

[5] The metamorphosis of this theory prompted Magistrate Judge Weisman to observe that "plaintiffs had not actually thought through their actual theory of liability," as it originated from Plaintiffs' counsel's since-abandoned logic that Defendants had "'unlimited funds' and therefore could have spent any amount of money necessary to properly house the BMN children, and chose not to." (Dkt. 262 at 1 n.1.) Like most public entities, DCFS receives appropriations (in its case from the Illinois General Assembly), and must then balance competing priorities within its appropriated budget. Plaintiffs have not identified any illegal act that any Defendant took with respect to that budgeting or spending process.

everyone higher up the bureaucratic chain, must be liable – is a bad one."); *Walker v. Rowe*, 791 F.2d 507, 508 (7th Cir. 1986) (claim alleging the occupant of an office "should have done something (by virtue of office) but neglected to do it" fails because "the constitution does not make supervisory officeholders vicariously liable").

Plaintiffs also refer to the legal standard for supervisory liability under section 1983. (Mot. at 37.) But they do not argue that *subordinates* did anything illegal that these Defendants, as supervisors, approved or condoned. Their argument seems to be that *these defendants* did something illegal. So the test for *supervisory* liability—whether defendants "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see," *Bostic*, 160 F.4th 831 at 842 n.8—does not match Plaintiffs' theory.[6] Or, at minimum, they do not identify what subordinate actions the supervisors supposedly knew about, facilitated, approved, condoned, or turned a blind eye toward. Plaintiffs' reference to the standard for supervisory liability instead seems to be a backdoor "attempt[] to fasten liability on the office, which the eleventh amendment forbids." *Walker*, 791 F.2d at 509. Plaintiffs hope to import the standard for *Monell* official-capacity liability—"that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016), to instead establish personal liability. But that theory of liability is barred by the Eleventh Amendment and therefore is unavailable to Plaintiffs. *See Joseph v. Bd. of Regents of the Univ. of Wis. Sys.*, 432 F.3d 746, 748-49 (7th Cir. 2005).

Given the novelty of Plaintiffs' claims, each Defendant's entitlement to qualified immunity also poses a significant hurdle and another inherently individualized analysis. "Our cases

---

[6] Even for supervisory liability, general knowledge of a problem is insufficient. For example, even when defendants have "troubling" information about a subordinate's conduct– "a risk that [the subordinate] would act inappropriately toward women"–that knowledge is insufficiently specific to lead the supervisor to believe that the subordinate "would eventually grope and rape" a woman. *Bostic*, 160 F.4th at 844.

demonstrate a painstaking commitment to an individualized qualified-immunity analysis, especially when the facts relative to the alleged constitutional violation differ from defendant to defendant." *Estate of Williams v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018); *accord Mabes v. Thompson*, 136 F.4th 697, 701, 706 (7th Cir. 2025). Plaintiffs have not identified any case law establishing any right to a placement within seven days of being BMN or establishing that failing to contract with new placements is conduct so egregious that it "shocks the conscience."

## B. Plaintiffs' Rehabilitation Act and ADA Claims

Plaintiffs also assert statutory claims under the Rehabilitation Act and the Americans with Disabilities Act ("ADA"). (Dkt. 92, Am. Compl. ¶¶ 195-208.) These claims are properly brought against DCFS rather than against Individual Defendants. *See Stanek*, 783 F.3d at 641.

To prevail on these "functionally identical" statutory claims, plaintiffs must prove they (1) are a qualified individual with a disability and (2) were denied access to a program or activity "because of" their disability. *Wagoner*, 778 F.3d at 592. To obtain damages, Plaintiffs must demonstrate "intentional discrimination," *CTL*, 743 F.3d at 528 n.4, requiring "deliberate indifference"—"knowledge that a harm to a federally protected right is substantially likely" and "a failure to act upon that likelihood." *Culp*, 140 F.4th at 942.

The Seventh Circuit has repeatedly emphasized that whether an individual qualifies as a person with a disability is "an individualized inquiry based on the particular circumstances of each case." *Lawson*, 245 F.3d at 926; *Branham*, 392 F.3d at 903. And because "determining whether a plaintiff has a disability is made on an individualized basis . . . the existence of a medical condition alone is insufficient to satisfy the ADA." *Fleishman*, 698 F.3d at 607. The mere fact of Plaintiffs' hospitalization or an underlying medical condition does not answer the question. That is especially so in this case because Plaintiffs' theory is that they were *no longer in need of hospitalization* (and

39

thus less likely to qualify as a person with a disability) at the time DCFS allegedly discriminated against them.

Even if a specific Plaintiff qualifies as a person with a disability, he or she must then prove DCFS's awareness of the disability—another individualized inquiry. *Cf. Royan*, 145 F.4th at 693 (explaining that "lack of knowledge" of the disability "forecloses any reasonable likelihood that [the challenged action] was motivated by animus toward her or her disabilities"). Plaintiffs also are required to prove causation—that "but for the disability, [plaintiff] would have been able to access the services or benefits desired." *Culp*, 140 F.4th at 943.

Plaintiffs do not specify what variety of ADA claim they bring, and cite to only two cases in describing them, both of which involve an alleged failure to modify facilities to accommodate wheelchairs. (Mot. at 37–38 (citing *Wagoner v. Lemmon*, 778 F.3d 586 (7th Cir. 2015), and *Lacy*, 897 F.3d at 863). Such claims are based on an array of federal regulations implementing "ADA's structural accessibility standards," *Lacy*, 897 F.3d at 854, and shed no light on the claims asserted in this case.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores*, 564 U.S. at 348 (citation and quotation omitted). A party seeking to certify a class bears the burden of proving by a preponderance of the evidence that the proposed class satisfies the prerequisites of Rule 23(a): (1) "the class is so numerous that joinder of all members is impracticable" (numerosity); (2) "there are questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and (4) "the representative parties will fairly and adequately protect the interests of the class" (adequacy

40

of representation). Fed. R. Civ. P. 23(a); *see, e.g.*, *Howard v. Cook County*, 989 F.3d 587, 597 (7th Cir. 2021). Numerosity is not in dispute.

In addition to satisfying Rule 23(a), "a party seeking class certification must also establish that the proposed class satisfies one of the requirements set forth in Rule 23(b)." *Farmer v. DirectSat USA, LLC*, No. 08 C 3962, 2010 WL 3927640, at *9 (N.D. Ill. Oct. 4, 2010). Plaintiffs seek certification under Rule 23(b)(3), so they must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

"A decision to deny or grant certification can have a considerable impact on the playing field of litigation and requires a rigorous analysis." *Red Barn Motors, Inc. v. NextGear Cap., Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019). Often, that "rigorous analysis" will require examining matters bearing on the "merits of the plaintiff's underlying claim." *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019) (quoting *Wal-Mart*, 564 U.S. at 350-51).

## ARGUMENT

### I.     Cases about delay in a complex process cannot be resolved as a class.

The Seventh Circuit has repeatedly held that the question of whether some complex process took too long—such that the delay violates a plaintiff's legal rights—is a question that cannot be resolved on a classwide basis. Those cases control here, and they alone defeat Plaintiffs' motion.

In *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016), plaintiffs were detainees complaining about delays in medical treatment. The court explained that "when assessing deliberate indifference claims, a delay in medical treatment is not a factor that is either always, or

never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* at 555. Questions around reasonable delay are necessarily "contextual"—"the constitutionality of a wait . . . will depend on a variety of individual circumstances"—and such questions are "incapable of being solved on a classwide basis." *Id.*[7]

In *Harper v. Sheriff of Cook County*, 581 F.3d 511 (7th Cir. 2009), the Seventh Circuit considered whether a class bringing Fourth Amendment claims presented common questions about the length of detention. *Id.* at 515. Plaintiff argued that the Sheriff was "unconstitutionally holding detainees after bond has been posted." *Id.* The court held:

> The constitutionality of this detention depends on whether the length of the delay between the time the Sheriff was notified that bond had been posted and the time that the detainee was released was reasonable in any given case. That is an individual issue that will depend on how long each detainee was held after bond was posted and what justifications there might be for the delay on that particular day or for that particular detainee—the time of day, whether the jail was processing an unusually large number of detainees at that time, whether other events occurring at the jail legitimately slowed processing times, whether the detainee's lack of cooperation delayed processing, etc. Liability, to say nothing of damages, would need to be determined on an individual basis. Thus, common issues do not predominate over individual issues, making this case inappropriate for class disposition.

*Id.* (internal citations omitted).

In *Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010), plaintiffs were arrestees who committed offenses punishable by fines but not imprisonment. They argued that taking more than two hours to release arrestees violates the Fourth Amendment. *Id.* at 703. The court rejected this rule, criticizing the district court's failure to recognize why delays beyond two hours might occur:

> If all officers are tied up with more urgent matters (a riot starts, for example, or a group of youngsters is arrested, and juveniles' higher processing priority delays the handling of adult cases), that's irrelevant. If so many people are arrested at once

---

[7] The Seventh Circuit has determined class certification to be appropriate where delay is at issue, but rather than "myriad steps," the delay is in performing "ministerial actions to accomplish … release which are within the control of the jail officials." *Driver v. Marion Cty. Sheriff*, 859 F.3d 489, 491 (7th Cir. 2017). That case is not analogous to the complex circumstances around BMN placements.

42

> that officers on duty in the stationhouse are overwhelmed and a queue develops, that's irrelevant. If a person is too drunk or high on drugs to make a voluntary decision to accept the conditions of the bond . . . or is ill and receiving emergency medical treatment, that's irrelevant too.

*Id.* at 704. The court reasoned that "plaintiff bears the burdens of proof and persuasion on the contention that any particular detention was excessive, and the court must examine not only the length of a given detention but also the reasons why release was deferred." *Id.* at 705. "[B]ecause reasonableness is a standard rather than a rule, and because one [plaintiff's] circumstances differ from another's, common questions do not predominate and class certification is inappropriate." *Id.*

These cases require denying Plaintiffs' motion. It is impossible to say categorically whether a delay after a child is designated BMN is reasonable without inquiring into the specific circumstances. And this trio of Seventh Circuit cases—while closing the door to certification—are *more* susceptible to classwide treatment because they are *official* capacity cases about institutional conduct that do not require the added and inherently individualized inquiries about each Individual Defendant's personal involvement, state of mind, and causal nexus.

## II.     Plaintiffs do not and cannot satisfy the commonality requirement.

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[B]ut not just any question will do." *Howard*, 989 F.3d at 598. "Superficial questions like whether each class member 'suffered a violation of the same provision of law do not suffice.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). Rather, class claims "must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350); *Jamie S.*, 668 F.3d at 497 ("plaintiffs must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims") (emphasis in original).

Plaintiffs posit four supposedly "common" questions of fact: (1) whether there was a "systemic shortage in placements" during the class period; (2) whether each Defendant was "on notice" of the purported systemic shortage; (3) whether each Defendant "facilitated, approved, condoned, or turned a blind eye to the systemic shortage of placements, or whether it occurred at their direction, such as through their policies and practices, and with their knowledge and consent"; and (4) whether each Defendant was "deliberately indifferent" to the class members' alleged injuries. (Mot. at 42.) Plaintiffs posit three supposedly "common" questions of law: (1) whether DCFS "deprived class members of less restrictive housing on the basis of their disabilities and thus violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act"; (2) whether each Individual Defendant "deprived class members of their rights under the due process clause of the Fourteenth Amendment"; and (3) whether each Individual Defendant was "personally involved in and/or liable as supervisors" for the alleged violations. *Id*.

Plaintiffs' proposed questions fail to show commonality. Three of the proposed fact questions hinge on a supposed "systemic shortage of placements." Plaintiffs do not and cannot offer "significant proof" that the alleged shortage was the result of DCFS policy, and even if they could, the mere existence of a shortage does not "resolve a central issue in all class members' claims." *See Jamie S.*, 668 F.3d at 497, 498. Second, Plaintiffs' fourth fact question (deliberate indifference) and all three proposed legal questions suffer the same defect: they are "generic question[s]" that "must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation." *Id.* at 498.

The evidence before the Court shows that Plaintiffs' claims "are highly individualized and vastly diverse, making this case unsuitable for class-action treatment." *Id.* at 486.

44

A. **Plaintiffs fail to present any "significant proof" of their "systemic shortage" theory and, in any event, that theory is not central to Plaintiffs' claims or amenable to classwide determination.**

Three of Plaintiffs' factual questions ask whether "there was a systemic shortage in placements" that "Defendant[s] were on notice of" and "turned a blind eye to." (Mot. at 42.) These questions fail to establish commonality for at least two reasons.

First, Plaintiffs' argument is based on the objectively false premise that "Defendants decided to remove 500 placements" in 2014. (Mot. at 1.) Plaintiffs cannot supply the "significant proof" the law requires of them to certify a class on this basis. *See Jamie S.*, 668 F.3d at 498 (7th Cir. 2012) (quoting *Wal-Mart Stores, Inc.* 564 U.S. at 353) (describing a plaintiff's burden to certify based on a "systemic failure" by a state agency). Indeed, no such proof exists, because Plaintiffs' claim that DCFS deliberately removed beds is categorically and demonstrably false.

Second, even if Plaintiffs were able to substantiate their baseless allegation that the Department deliberately reduced bed placements, their highly individualized claims do not "rise or fall on the resolution of that question." *Roman v. Triton Logistics, Inc.*, No. 23 CV 15146, 2025 WL 1134191, at *5 (N.D. Ill. Apr. 16, 2025).

1. **Plaintiffs do not and cannot supply the "significant proof" the law requires of them to show that the Department had an "illegal policy" of deliberately closing beds.**

When plaintiffs seek to adjudicate "otherwise highly individualized claims" as a class, they must point to something more than a generic inquiry into whether the state fulfilled its legal obligations. *Jamie S.*, 668 F.3d at 498. They must instead prove the existence of "an illegal policy" that "provid[es] the 'glue'" that "hold[s] the alleged *reasons* for all those decisions together." *Id.* (quoting *Wal-Mart*, 564 U.S. at 352).

45

Plaintiffs claim DCFS had a "policy of maintaining insufficient placements." (Mot. at 55.) Plaintiffs cite no actual Department policy to support this contention because there is none. In fact, the Department's policies state the opposite: they require DCFS officers to employ best efforts to locate placements for all wards. (Ex. 11 at § 301.60(a)(1).) Nor do Plaintiffs identify any incentive for the Department to have a deliberate bed shortage policy.

Because Plaintiffs cannot base their claim on any actual Department policy, they base their argument on the erroneous contention that DCFS "eliminated 460 beds" from 2014-2015. (Mot. at 15, 17-18, 20, 45.) This argument fails. The Department does not operate residential facilities—it contracts with private third-party providers who retain independent operational control. To the extent facilities decreased capacity, those were decisions by private parties, not DCFS.

Plaintiffs' only "evidence" of deliberate bed elimination is a single state trial court opinion, *In re TT*, in which the judge interpreted testimony from another case. (Mot. at 15 ¶ 32.) This is not evidence. *Berrios-Romero v. Estado Libre Asociado De P.R.*, 641 F.3d 24, 27 (1st Cir. 2011); *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997). Moreover, the underlying transcript belies Plaintiffs' characterization: the witness testified that reductions were attributable to "a combination of reasons," including programs closing because "*they decide[d] to close*" and DCFS terminating contracts "due to poor performance." (Mot. Ex. 50 at 38-39.)

Plaintiffs' insistence that "DCFS continued to eliminate beds" in subsequent years relies on similarly unfounded allegations of the Public Guardian himself (Mot. Ex. 54) and a Department publication that Plaintiffs badly misrepresent. *See Messner v. Northshore Univ. Health Sys.*, 669

46

F.3d 802, 811 (7th Cir. 2012). The publication Plaintiffs cite makes clear that "*private agencies closed more than 500 beds.*" (Mot. Ex. 24 at 2.)[8]

Plaintiffs also assert that the Department "requested a decrease in funding," but supply no proof, which is their burden. *See Messner*, 669 F.3d at 811. And bed closures that occurred in 2014 do not reflect anything about any specific Defendant's conduct, let alone the conduct of the Directors and other senior officials who came into office months or years after these closures would have occurred. Plaintiffs' "bed closure" policy is thus no policy at all. Plaintiffs cannot point to any "policy" to supply the "glue" to tie their disparate claims together. *Wal-Mart*, 564 U.S. at 352. For this reason alone, their motion fails.[9]

### 2. Proof aside, a generalized bed shortage does not establish commonality.

The answer to a proposed common question must do more than provide context—it must prove a "central" contention, the resolution of which will "drive the resolution of the litigation." *Howard*, 989 F.3d at 603; *accord Wal-Mart*, 564 U.S. at 350. A generalized placement shortage does not meet that standard. Plaintiff's claims do not rise or fall on the *general* performance of the Department's placement efforts. They are Plaintiff-specific claims requiring Plaintiff-specific proof.

---

[8] The publication also explains, among other things, that: (1) "BMN" is "not a medical determination that the patient is cured or no longer in need of intensive services" but, rather, "a payer determination about the authorized length of hospitalization" (*i.e.*, whether a stay is "beyond the approval of medical insurance"); (2) children held BMN comprise a small percentage of the 17,000 children in DCFS custody and the 1,200 youth who require psychiatric hospitalization; (3) many of the Department's facilities have open beds, but those beds may not match the "very specific" needs of the particular youths who are BMN at any given time; and (4) the growth in BMN cases is largely attributable to the growing number of "lockout" cases, where DCFS does not obtain custody until the youth is *already* BMN. (Mot. Ex. 24 at 2, 4.)

[9] Plaintiffs cite various communications discussing the purported effect of the bed shortage, but none of those communications are relevant to whether DCFS deliberately closed beds.

### a. The common questions do not "drive the resolution" of Plaintiffs' substantive due process claims.

Plaintiffs argue that they can prove their claims by simply showing that "DCFS maintained systemic bed shortages" and had "no strategy on how to deal with this crisis." (Mot. at 44.) Plaintiffs first cite to the *B.H.* consent decree case and argue that it put the Department on "notice" of a "systemic" issue. (Mot. at 11 (citing *B.H. v. Johnson*, 715 F. Supp. 1387 (N.D. Ill. 1989)).) But *B.H.* involved a consent decree pre-dating the relevant timeframe in this case by decades, and it involved many different topics and allegations. *B.H.* does not render DCFS, let alone individual DCFS employees, liable for damages just because some aspect of DCFS's performance is referenced in the decree.[10]

Plaintiffs point to the Department's statutory obligations to maintain sufficient placements (Mot. at 7), create placements (Mot. at 21 ¶ 55), and track children being held BMN (Mot. at 39). They criticize the Department for allocating resources to other problems (*see, e.g.*, Mot. at 44) or "fail[ing] to take advantage" of state programs offering funding (Mot. at 21 ¶ 58). Their motion is premised on the incorrect theory that, so long as an Individual Defendant had *some* awareness of or connection to a system-wide issue, that Individual Defendant is liable for classwide damages.

That is not the law. Merely being on notice of a shortage of resources or a general problem does not establish individual liability. Such knowledge merely reflects the unremarkable, if unfortunate, reality that "[t]he needs of neglected, abused, and abandoned children compete with other demands, both public and private, for scarce resources." *K.H.*, 914 F.2d at 853; *see also*

---

[10] *B.H.* is of no help here for additional reasons—the case was a settlement after a motion-to-dismiss ruling, and the court "has not found any concrete wrong." *B.H. v. McDonald*, 49 F.3d 294, 302 (7th Cir. 1995) (Easterbrook, J., concurring). And *B.H.* was an injunction case, which our courts instruct is the appropriate vehicle to "remedy deep-seated problems of public responsibility." *K.H.*, 914 F.2d at 853. This damages case is different.

*Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n.*, 679 F.2d 1218, 1222 (7th Cir. 1982) ("Government agencies have limited resources to perform their appointed tasks."); *Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) ("A chronic shortage of resources may well amount to a policy or practice for which monetary relief may be available under *Monell*, but *Monell* claims can't be brought against states, which are protected by the Eleventh Amendment.").

No court has held a state official responsible for liability premised on the failure to place a child in an appropriate setting (suited to the best interests of the child) by any deadline, or failing to solve a challenging societal problem during their tenure, or for operating within their allocated budget but not managing to increase it. Nor do Plaintiffs cite any remotely analogous case.

To hold state actors personally liable, courts require proof that the defendant had "*actual* knowledge of *impending harm*" to the plaintiff and consciously disregarded it. *See, e.g.*, *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996) (emphasis added); *Gevas v. McLaughlin*, 798 F.3d 475, 480-481 (7th Cir. 2015) ("Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that [an] official had actual knowledge [of] danger").

*J.H.* is instructive. In *J.H.*, the Seventh Circuit considered claims against DCFS officials who allegedly exposed children to sexual abuse by placing them in foster homes with known abusers. 346 F.3d at 789-91. *J.H.* raises a narrow right not at issue here: "children in state custody have a constitutional right not to be placed in a foster home where the state knows or suspects that the children may be subject to sexual or other abuse." *Id.* at 791 (citing *K.H.*, 914 F.2d at 852). Even in such cases, however, the court held that "to prevail on a § 1983 claim based on this right, the plaintiffs must . . . prove that the state actors knew of or suspected the specific risk facing plaintiffs and consciously ignored it." *Id.* at 792. This is a subjective standard, and it is "stringent." *Id.* It

49

"require[s] plaintiffs to demonstrate that the individual defendants had 'specific knowledge or suspicion' of the risk of sexual abuse facing the children." *Id.* (citing and quoting *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002)). To hold an individual defendant liable, a plaintiff must show that the defendant "had some personal involvement in the constitutional deprivation." *Id.* at 793.

Similar to Plaintiffs' argument here with regard to placements, the *J.H.* plaintiffs argued that "the defendants 'knew' of the risk of sexual abuse to J.D. and J.H. because it was the defendants' responsibility to know." *Id.* The court rejected that argument and affirmed summary judgment in favor of defendants, holding that even if a DCFS official violated state law, *e.g.* by failing to properly investigate, it did not establish any constitutional violation: "Even if state regulations do fix personal responsibility for children in the custody and guardianship of DCFS with DCFS employees, the regulations themselves provide no evidence that any individual defendant had any actual knowledge or suspicion of the problems occurring in these particular households." *Id.*

In this case, even if a placement delay for an individual child could be treated the same as exposure to known sexual abuse (it cannot), knowledge of a generalized bed shortage does not show an Individual Defendant's knowledge of the specific circumstances or risks facing any individual Plaintiff. The specific needs of each child, the reasons they are held BMN, and the placements available at any given time, are unique to each child. Showing a general delay or "BMN issue" therefore does not "drive the resolution" of any Plaintiff's constitutional claim. *Phillips*, 828 F.3d at 553; *Perez v. City of Chicago*, No. 13-cv-4531, 2019 WL 7290848, at *12 (N.D. Ill. Dec. 27, 2019).

> **b.** **The common questions do not "drive the resolution" of Plaintiffs' statutory claims.**

Plaintiffs' proposed common questions also do not "drive the resolution" of their statutory claims. *See Wal-Mart*, 564 U.S. at 350. To succeed, each Plaintiff must show (i) they were

disabled, *Lawson*, 245 F.3d at 926, and (ii) the Department intentionally denied them access to a program or right because of their disability, *CTL*, 743 F.3d at 528 n.4, requiring (iii) "deliberate indifference." *Culp*, 140 F.4th at 942.

Such a claim is a poor fit for Plaintiffs' motion, and there are no common questions regarding these claims that "drive" resolution of the case. No Plaintiff claims they were denied placement; they claim unreasonable delay. But the reasons for delay cannot be litigated classwide. *See Phillips*, 828 F.3d at 556. Each placement is necessarily unique to each individual Plaintiff. So even if delay were treated as a "denial" of rights, its cause would be different for every Plaintiff.

These factual differences distinguish this case from cases cited by Plaintiffs. *Lacy* is a good example. (*See* Mot. at 38.) There, the court considered a proposed class of wheelchair-bound inmates seeking accommodations accessing ramps and bathrooms. 897 F.3d at 851. The court found commonality for an injunctive class because plaintiffs had the same disability, faced the same physical barriers, and sought the same modifications. *Id.* at 865. The court distinguished that circumstance from one where plaintiffs "had a variety of disabilities or had sought a variety of accommodations," citing *Phillips*. *Id.* This case is far closer to *Phillips* than to *Lacy* because there is no one disability at issue, no one policy or practice at issue, and no one-size-fits-all solution. Those problems are compounded in this case, because Plaintiffs must show deliberate indifference to prove their damages claims. *See Culp*, 140 F.4th at 942.

c. **Plaintiffs fail to establish that a lack of beds proximately caused them to be held while designated BMN.**

Plaintiffs' motion relies heavily on what they call "classwide evidence"—an arbitrary designation for various reports showing the number of children held BMN at a given time. (Mot. at 15-20.) Those reports do not use a clinical definition of what it means to be "beyond medical necessity." *See supra* at 18-19. Nor does the data map onto the class—they do not show which

51

patients were held BMN for more than seven days, as Plaintiffs' class definition requires. Even setting these structural problems aside, the reports do nothing to explain the *cause* of BMN hospitalizations. Plaintiffs merely assume that because a lack of placement beds can cause a child to remain BMN, the fact that children were BMN means there is a lack of placement beds.

As Dr. Fred Wulczyn, Ph.D., explains, this is a logical fallacy known as "affirming the consequent." (Ex. 38, Wulczyn report at 3.) Plaintiffs' argument follows this flawed logic: "if beds are in short supply (*P*), John will remain in the current setting beyond medical necessity (*Q*). John is in his current setting beyond medical necessity (*Q*). Therefore, beds are in short supply." (*Id.*) This conflates cause and effect. (*Id.*) Plaintiffs are required to come forward with actual evidence that the alleged bed shortage caused every class member's BMN hold, not mere speculation that a shortage may have played a factor. *See Wal-Mart*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard.").

In *Wal-Mart*, the Supreme Court rejected a similar attempt to rely on an alleged general practice to bridge the gap between macro-level data and individual liability. The plaintiffs sought class certification based on Wal-Mart's alleged "general policy of discrimination," relying on "statistical evidence" showing gender disparities that their expert opined could "be explained only by gender discrimination." *Id.* at 353, 356. The court held this evidence fell "worlds away" from the "significant proof" the law demands for certification. *Id.* at 355. The plaintiffs' general data did not show what role the alleged discriminatory policies played in Wal-Mart's employment decisions, and "merely showing that Wal-Mart's [alleged] policy" produced "an overall sex-based disparity," with no evidence to support a causal connection, did not establish commonality. *Id.* at 357; *see also J.H.*, 346 F.3d at 795 ("general allegations of systemic risk [within the DCFS system] are insufficient").

Plaintiffs' generalized bed shortage theory also ignores that, as their own expert admits, there are many reasons why patients may be held BMN that have nothing to do with placement availability, such as lockouts, court delays, legal requirements, BMN appeals, or a patient's (or family's) refusal to interview or accept a placement. (Ex. 20, McCarrel Dep. Tr. at 90-91, 100, 134-35, 163.) With respect to one Plaintiff, Plaintiffs' expert's "honest opinion" was that the delay was due to "Christmas" and because "people went on vacation, workers were sick, e-mails weren't answered." (*Id.* at 234:9-16.) She reached this conclusion by "reading through" the Plaintiff's file because "you would always have to review records when you are making determinations about [the] best interest of the child." (*Id.* at 158:16-18, 234:10.) When such an individualized inquiry is paramount to determining the cause of delay, a general bed shortage cannot "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

With no evidence of proximate cause, Plaintiffs argue they need not show it. (Mot. at 41-42.) Plaintiffs rely on *Suchanek* (Mot. at 48), a consumer fraud case alleging deceptive labeling of instant coffee. 764 F.3d 750, 752-53 (7th Cir. 2014). The court there certified a class because "whether the [defendant's] packaging was likely to deceive a reasonable consumer is common." *Id.* at 757. Here, in contrast, Plaintiffs' claims do not "rise or fall" on a singular objective liability inquiry. *Id*. A generalized bed shortage is not dispositive of Plaintiffs' constitutional claims in the way a deceptive practice is dispositive of a consumer fraud claim. Plaintiffs seek individual-capacity damages, so they must prove that each Individual Defendant was "personally responsible" for the Plaintiff's alleged deprivation and had "actual [subjective] knowledge of impending harm" to that Plaintiff. *J.H.*, 346 F.3d at 793; *Hill*, 93 F.3d at 421. Whether the Department had a bed shortage policy has no bearing on those questions.

Plaintiffs' other authorities are similarly off base. *In re Deepwater Horizon*, 785 F.3d 1003 (5th Cir. 2015), speaks to damages, not causation; liability was not even in issue. *See id.* at 1007. Plaintiffs also purport to quote *O.B. v. Norwood*, No. 15 C 10463, 2016 WL 2866132 (N.D. Ill. May 17, 2016), see Mot. at 42, but *O.B.* is inapposite—the plaintiffs there alleged official capacity claims seeking injunctive relief, not damages. *Id.* at *1, 4-5.

### B.    Plaintiffs' remaining "common" questions are fatally generic and plainly require case-specific adjudication.

Plaintiffs' remaining "common" questions ask whether the Defendants "deprived class members of their rights" and thus "violated" the law, whether the Individual Defendants were "personally involved in and/or liable as supervisors" for the "violation of class members' rights," and whether each Individual Defendant was "deliberately indifferent." (*See* Mot. at 42.) These questions fail to establish commonality for multiple reasons.

First, these questions do not identify common issues. They simply ask whether the Defendants are liable. As a matter of law, that is insufficient to establish commonality. *See Jamie S.*, 668 F.3d at 497 ("superficial common questions—like whether each class member [ ] 'suffered a violation of the same provision of law'—are not enough"); *Perez*, 2019 WL 7290848, at 11 n.14 (plaintiffs' proposed common question was insufficient because it "boil[ed] down to whether Plaintiffs suffered the same constitutional injury"). Accepting Plaintiffs' argument would amount to sanctioning an impermissible "fail-safe class" where class membership "depends on whether the person has a valid claim." *Messner*, 669 F.3d at 825.

Second, to the extent these questions ask whether each Individual Defendant acted with sufficient personal involvement to be liable, that question is both claim-specific and Individual Defendant-specific. Plaintiffs' motion identifies no evidence to suggest that *any* Individual Defendant had personal responsibility for the placement of *any* Plaintiff. As Plaintiffs' expert

54

testified, determining "the people that were touching each child's case" requires a "deep dive" into each case file. (Ex. 20, McCarrel Tr. at 248:15-20.) Indeed, up to 20 DCFS "staff" could be "involved" in just one case. (Ex. 40, Case File Exhibit to Expert Report of Dr. McCarrel.) Determining what level of responsibility (if any) an Individual Defendant had for a particular Plaintiff's placement would therefore require countless mini-trials.

Moreover, even if Plaintiffs could succeed by showing the Individual Defendants' involvement in a general bed shortage, they have not met their burden. Plaintiffs do not come forward with a single piece of evidence to show any Individual Defendant's involvement in the alleged policy beyond regurgitating the supervisory and/or statutory obligations of each position. (Mot. at 4-7, ¶¶ 6-14.) But "[s]imply being atop an organizational food chain does not make a supervisor liable." *Bostic*, 160 F.4th at 841.

Finally, Plaintiffs' proposed "deliberate indifference" question cannot be answered on a classwide basis. "Deliberate indifference" requires that "a defendant realizes that a substantial risk of serious harm to the [*plaintiff*] exists, but intentionally or recklessly disregards that risk." *Phillips*, 828 F.3d at 554. The knowledge defendants must have is "*actual* knowledge of *impending harm*," not being "on notice" of some generalized problem or resource shortage. *Hill*, 93 F.3d at 421 (emphasis added); *cf. Gevas v. McLaughlin*, 798 F.3d 475, 480-481 (7th Cir. 2015) ("Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger."); *Vesey v. Owens*, No. 13 CV 7367, 2015 WL 3666730, at *8 (N.D. Ill. June 12, 2015) ("[A] general risk of violence is not enough to establish knowledge of a substantial risk of harm . . . . Were that enough, prison officials would, in effect, become strictly liable for all violence in the institution. And that, of course, is not the law."). A defendant cannot be "deliberately indifferent" to a generalized problem;

55

he or she can only be deliberately indifferent to "actual knowledge of impending harm which he consciously refused to prevent." *Hill*, 93 F.3d at 421.

Here, the question of whether an Individual Defendant was deliberately indifferent must turn on whether that Defendant had knowledge and acted intentionally or recklessly. Even the state court cases upon which Plaintiffs rely agree that "[e]ach [BMN] case is sui generis with respect to what 'some efforts [to find a placement]' mean with respect to that individual case." (Mot. Ex. 29, *In re TT* at 10.) Similarly, in *In re J.S.*, 2022 IL App (1st) 220083, the Illinois Appellate Court reversed a finding that DCFS Director Marc Smith should be held in contempt for failing to place children within court-ordered deadlines, holding that "each of the minors in question [] presented with very complicated histories, personal circumstances, and specific treatment plans" that delayed placements. *Id.* ¶¶ 51, 79.

For these reasons, the court would have to hold mini-trials on "deliberate indifference" for each Plaintiff-Individual Defendant pair. Rule 23 does not permit that.

## III.    The proposed class fails the typicality and adequacy requirements.

Plaintiffs fail to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3), or that "the representative parties will fairly and adequately protect the interests of the class," *id.* 23(a)(4). Adequacy often merges with typicality because "if a plaintiff's claim is atypical, he is not likely to be an adequate representative." *CE Design Ltd. V. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011).

Typicality ensures that the named representative's claims "have the same essential characteristics as the claims of the class at large." *Oshana*, 472 F.3d at 514. "The essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go

56

the claims of the class." *Donegan v. Norwood*, No. 16-CV-11178, 2017 WL 6569634, at *12 (N.D. Ill. Dec. 21, 2017). Here, the named Plaintiffs' claims are not typical of the class.

First, because of the highly individualized nature of placement, Plaintiffs' delay claims do not arise from the "same event or practice or course of conduct." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). The reasons why any particular child was held BMN, and for how long, depend upon a constellation of circumstances and actors, many outside the Department's control. *Supra* at §§ D, E. Whether the delay causes harm or is neutral or beneficial also depends upon each individual Plaintiff's unique attributes. *Id.* at § F.

Moreover, because State law mandates that the Department act in each child's unique best interest, *e.g.*, 20 ILCS 505/7; 89 Ill. Admin. Code § 301.60(b), the actions taken with respect to each class representative are necessarily different. As discussed above, each Plaintiff presented unique circumstances and challenges that delayed placement. *See supra* § E. These differences present unique defenses to each Plaintiff's claims, precluding class treatment. "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *CE Design Ltd.*, 637 F.3d at 726.

Given these differences, none of these Plaintiffs' claims rises or falls on any Defendant's action toward any other Plaintiff. Determining why a Plaintiff was held BMN does nothing to answer those questions for the remaining Plaintiffs or the proposed class. *See Donegan*, 2017 WL 6569634, at *12.

Second, to prove liability, each Plaintiff must prove actionable conduct by at least one Defendant. For their section 1983 claims, each Plaintiff must show that an Individual Defendant was "personally responsible for the constitutional deprivation," *J.H.*, 346 F.3d at 793, and caused

their damages, *Hoffman*, 894 F.3d at 841, and that the Individual Defendant had "actual knowledge of impending harm which [the Individual Defendant] consciously refused to prevent." *Hill*, 93 F.3d at 421. For the statutory claims, each Plaintiff must show they were disabled, *Lawson*, 245 F.3d at 926, and that the Department engaged in "intentional discrimination" because of their disability, *CTL*, 743 F.3d at 528 n.4, requiring "deliberate indifference." *Culp*, 140 F.4th at 942.

Here, too, Plaintiffs fail to establish typicality. Typicality "should be determined with reference to the [defendants'] conduct." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996). Each Individual Defendant's conduct must be separately evaluated, and even a finding that one Individual Defendant violated one Plaintiff's rights would not translate to any other claim or claimant. *See Hill*, 93 F.3d at 421; *Culp*, 140 F.4th at 942.

Nor can Plaintiffs avoid this inquiry by reference to a vague "policy" of delay or discrimination. *See Wal-Mart*, 564 U.S. at 352-53. Typicality requires that class members suffer "the same injury as" the named plaintiff. *Gen'l Tel. Co. v. Falcon*, 457 U.S. 147, 157 (1982). Even where a single plaintiff proves discrimination, he cannot support a class action based upon an "otherwise unsupported allegation that the [defendant] has a policy of discrimination." *Id.*; *Wal-Mart*, 564 U.S. at 353-54. Here, as in *Wal-Mart*, even Plaintiffs' own expert identifies no "policy" of delay and admits that the reason for delay must be assessed for each individual child. (Ex. 20 at 136:2-8 (stating that she would "go back and look at each file" to determine whether a particular circumstance outside DCFS control caused delay); *see also id.* 107:3-108:9 (delays in the interview process must be assessed by review of "e-mails between the workers and Central Match and the providers").) This defeats Plaintiffs' policy argument.

## IV.     Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance and superiority requirements.

Because Plaintiffs seek classwide damages, they must satisfy Rule 23(b)(3)'s requirement "that the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement is "far more demanding" than commonality. *Schneider v. Ecolab, Inc.*, No. 14 C 01044, 2016 WL 7840218, at *8 (N.D. Ill. Sept. 2, 2016). Where individual transactions or interactions must be analyzed to determine liability, predominance will not be met. *Id.*

As with commonality and typicality, *supra* §§ II-III, Plaintiffs' claims fall far short of establishing predominance. Their claims require evidence that each Defendant was personally responsible, took some action or failed to take some action in a way that violated a Plaintiff's rights, and did so with deliberate indifference. *Supra* at 56-57 (citing cases). Plaintiffs do not show that these elements can be determined other than case-by-case.

Plaintiffs argue that courts "routinely certify classes involving . . . system-wide failures impacting children under state care." (Mot. at 56.) But they cite only Rule 23(b)(2) injunctive cases—and "Rule 23(b)(2), unlike Rule 23(b)(3), does not require predominance of common issues." *In re Delta Dental Antitrust Litig.*, 88 F. Supp. 3d 898, 931 n.31 (N.D. Ill. 2025). Indeed, *every* case Plaintiffs cite is an inapposite Rule 23(b)(2) case involving claims against state entities or officers in their *official capacity*. (*See* Mot. at 56 (citing *M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013); *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010); *Jonathan R. v. Justice*, 344 F.R.D. 294 (S.D.W. Va. 2023); *P.V. ex rel. Valentin v. Sch. Dist. of Phila.*, 289 F.R.D. 227 (E.D. Pa. 2013)).)

Plaintiffs identify *no* case in *any* jurisdiction with meaningful similarities to this lawsuit—nor have Defendants found one. The purported common question regarding placement deficiency is false and dwarfed by the myriad circumstances bearing on each Plaintiff's claims. Plaintiffs cannot establish that this action could be adjudicated classwide absent countless mini-trials, or that

59

"a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs must proceed "by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification.

Dated: July 2, 2026

Respectfully submitted,

By:    /s/ *Brian C. Haussmann*
*Attorney for Defendants*

Brian C. Haussmann (ARDC #6283054)
Timothy A. Hudson (ARDC #6271244)
Amanda N. Catalano (ARDC #6311024)
Jonathan P. Parts (ARDC # 6349744)
*Special Assistant Attorneys General*
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle Street, 7th Floor
Chicago, IL 60604
(312) 762-9450
bhaussmann@tdrlaw.com
thudson@tdrlaw.com
acatalano@tdrlaw.com
jparts@tdrlaw.com